# EXHIBIT 1

Court of Common Pleas of Philadelphia County
Trial Division

**Civil Cover Sheet**

For Prothonotary Use Only (Docket Number)

**SEPTEMBER 2023**     **01940**

E-Filing Number: 2309038305

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| CITIZENS BANK, N.A. | USRE 257 LLC |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 101 JFK PARKWAY<br>SHORT HILLS NJ 07078 | 45 CITY AVENUE UNIT 3838<br>BALA CYNWYD PA 19003 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 1 | 1 | ☐ Complaint  ☐ Petition Action  ☐ Notice of Appeal<br>☐ Writ of Summons  ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less<br>☐ More than $50,000.00 | ☐ Arbitration<br>☐ Jury<br>☐ Non-Jury<br>☒ Other:  JUDGMENTS | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☐ Commerce<br>☐ Minor Court Appeal<br>☐ Statutory Appeals | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

CASE TYPE AND CODE

7C - CONFESSION OF JUDGMENT

STATUTORY BASIS FOR CAUSE OF ACTION

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | **FILED<br>PRO PROTHY**<br>SEP **19** 2023<br>**G. IMPERATO** | IS CASE SUBJECT TO<br>COORDINATION ORDER?<br>YES          NO |
|---|---|---|

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: CITIZENS BANK, N.A.

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| DANIEL M. PEREIRA | STRADLEY RONON<br>2005 MARKET STREET<br>SUITE 2600<br>PHILADELPHIA PA 19103 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (215)564-8747 | (215)564-8120 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 318674 | dpereira@stradley.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| DANIEL PEREIRA | Tuesday, September 19, 2023, 04:51 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

**Stradley Ronon Stevens & Young, LLP**
BY:   Gretchen M. Santamour, Esquire
      Julie M. Murphy, Esquire
      Daniel M. Pereira, Esquire
ID. Nos. 41720, 206265, 318674
2005 Market Street, Suite 2600
Philadelphia, PA 19103
(215) 564-8000



Filed and Attested by the
Office of Judicial Records
19 SEP 2023 04:51 pm
G. IMPERATO

Attorneys for Plaintiff

| | | |
|---|---|---|
| CITIZENS BANK, N.A., successor by merger to Investors Bank, | : | COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY |
| Plaintiff, | : | |
| v. | : | No. |
| USRE 257 LLC, 45 City Avenue Unit 3838 Bala Cynwyd, PA 19004, | : | |
| Defendant. | : | |

## JUDGMENT BY CONFESSION

Pursuant to the authority contained in the warrant of attorney set forth in the Mortgage Loan Note, dated as of November 30, 2020 (as amended, modified, supplemented and/or restated from time to time, the "Note"), a copy of which is attached to the Complaint for Confession of Judgment with Averment of Mortgage filed in this action, I appear for Defendant and confess judgment in favor of the Plaintiff, Citizens Bank, N.A., as successor by merger to Investors Bank, and against the Defendant in the amount of $12,455,556.90, comprised as follows:

| | |
|---|---|
| Principal | $9,583,461.76 |
| Accrued and unpaid interest (as of 9/18/23) | $1,198,332.02 |
| Accrued and unpaid late charges | $49,125.23 |

| | |
|---|---:|
| Attorneys' fees (15% of all sums due per the warrant of attorney) | $1,624,637.85[1] |
| **Total:** | **$12,455,556.90*** |

\*and together with all interest from and after September 18, 2023, at the default rate of $3,593.80 per diem from and after September 18, 2023, and all additional costs of suit and collection of costs accrued and accruing from and after September 18, 2023, as set forth in the Note and other Loan Documents.

STRADLEY RONON STEVENS & YOUNG, LLP

 _/s/ Daniel M. Pereira_
Gretchen M. Santamour, Esquire
Julie M. Murphy, Esquire
Daniel M. Pereira, Esquire
ID. Nos. 41720, 206265, 318674
2005 Market Street, Suite 2600
Philadelphia, PA 19103
(215) 564-8000

*Attorneys for Plaintiff, Citizens Bank, N.A., successor by merger to Investors Bank*

Dated:  September 19, 2023

---

[1] As provided in the Note, the attorneys' fees to be added to the judgment are to be the greater of $5,000 or 15% of all sums due under the Note. This amount is being included in the judgment to establish a sum certain and for lien priority purposes but Citizens will not collect more than the actual fees and costs that it incurs to the extent such fees and costs are less than the amount included in the judgment.

**Stradley Ronon Stevens & Young, LLP**
BY:   Gretchen M. Santamour, Esquire
        Julie M. Murphy, Esquire                     Attorneys for Plaintiff
        Daniel M. Pereira, Esquire
ID. Nos. 41720, 206265, 318674
2005 Market Street, Suite 2600
Philadelphia, PA 19103
(215) 564-8000

|  |  |
|---|---|
| CITIZENS BANK, N.A., successor by merger to Investors Bank, | :  COURT OF COMMON PLEAS<br>:  OF PHILADELPHIA COUNTY |
| Plaintiff, | : |
| | :  No. |
| v. | : |
| | : |
| USRE 257 LLC, | : |
| 45 City Avenue | : |
| Unit 3838 | : |
| Bala Cynwyd, PA 19004, | : |
| | : |
| Defendant. | : |
| | : |

## COMPLAINT IN CONFESSION OF
## <u>JUDGMENT WITH AVERMENT OF MORTGAGE</u>

Plaintiff, Citizens Bank, N.A., successor by merger to Investors Bank, hereby files this

Complaint against Defendant, USRE 257 LLC, and states as follows:

### <u>THE PARTIES</u>

1.      Plaintiff, Citizens Bank, N.A., successor by merger to Investors Bank ("Citizens"

or the "Bank"), is a national banking association with a business address at 101 JFK Parkway,

Short Hills, New Jersey 07078. .

2.      On information and belief, Defendant, USRE 257 LLC ("Defendant" or

"Borrower"), is a Delaware limited liability company with an address of 45 City Avenue, Unit

3838, Bala Cynwyd, PA 19003.

## FACTUAL BACKGROUND

### *The Loan Documents*

3.     On November 30, 2020, Citizens extended to Borrower a construction and permanent mortgage loan in the maximum principal amount of Fourteen Million and 00/100 Dollars ($14,000,000) (the "Loan").

4.     The obligations of Borrower to Citizens for the Loan are evidenced by, among other things, (a) that certain Loan Agreement between Borrower and Bank dated November 30, 2020 (as the same may be amended, modified, supplemented and/or restated from time to time, the "Loan Agreement"), and (b) that certain Mortgage Loan Note by Borrower to Citizens, dated November 30, 2020, in the maximum principal amount of $14,000,000.00 (as the same may be amended, modified, supplemented and/or restated from time to time, the "Note").

5.     True and correct copies of the Loan Agreement and the Note are attached hereto as Exhibits A and B, respectively, and incorporated herein by reference as if set forth in full.

6.     The obligations of Borrower to Citizens under the Note and Loan Agreement are secured by, *inter alia*,

   a.   that certain Open End Mortgage, Assignment of Leases and Rents and Security Agreement and Fixture Filing by Borrower to Citizens, dated November 30, 2020 (as the same may be amended, modified, supplemented and/or restated from time to time, the, "Mortgage"), granting to Citizens a first priority lien and security interest in (i) that certain real property and improvements thereon known as 257 South 16 Street, Philadelphia, PA, OPA No. 881031500 (as more fully described in the Mortgage, the "Mortgaged Property"), and (ii) the fixtures, chattels, accounts, equipment, inventory, contract rights, general intangibles and other personal

57742260v1

Case ID: 230901940

property included within the Project (as further defined in the Mortgage, the "**Personal Property Collateral**");

b.   that certain Absolute Assignment of Leases and Rents by Borrower in favor of Citizens, dated November 30, 2020 (as the same may be amended, modified, supplemented and/or restated from time to time, the "Assignment of Rents); and

c.   that certain Assignment of Contracts, Licenses and Permits, by Borrower to Bank, dated November 30, 2020 (as the same may be amended, modified, supplemented and/or restated from time to time, the "Assignment of Contracts");

7.      The Mortgage was recorded with the office of the Recorder of Deeds of Philadelphia County, PA on December 8, 2020, at Document No. 53760075.   A true and correct copy of the Mortgage is attached hereto as Exhibit C and incorporated herein by reference as if set forth in full.

8.      The Assignment of Rents was recorded with the office of the Recorder of Deeds of Philadelphia County, PA on December 8, 2020, at Document No. 53760076.  A true and correct copy of the Assignment of Rents is attached hereto as Exhibit D and incorporated herein by reference as if set forth in full.

9.      To perfect the Bank's interest in the Personal Property Collateral, UCC-1 financing statements were filed listing the Bank as secured party and the Borrower as debtor, as follows: (a) with the Office of the Recorder of Deeds of Philadelphia County, Pennsylvania, on December 8, 2020, at Document No. 53760077, and (b) with the Delaware Secretary of State on December 8, 2020, at Document No. 2020 8624084.

10.      Additionally, the obligations of Borrower to Citizens under the Loan are secured by (a) that certain Guaranty and Suretyship Agreement by David Daniel and David Schreiber in

5

Case ID: 230901940

favor of Bank, dated November 30, 2020 (as the same may be amended, modified, supplemented, confirmed, ratified and/or restated from time to time, the "Guaranty"), and (b) that certain Guaranty of Completion by David Daniel and David Schreiber in favor of Bank, dated November 30, 2020 (as the same may be amended, modified, supplemented, confirmed, ratified and/or restated from time to time, the "Completion Guaranty", and together with the Guaranty, the "Guaranties").

11.     The Loan Agreement, Notes, Mortgage Assignment of Rents, the Assignment of Plans, the Assignment of Contracts, the Guaranties and all other documents executed in connection with or otherwise evidencing the Loan shall be referred to herein as the "Loan Documents."

### *Warrant of Attorney for Confession of Judgment*

12.     The Note contains the following warrant of attorney:

**IN ADDITION TO ANY OTHER RIGHT OR REMEDY, THE FOLLOWING PARAGRAPHS SET FORTH A WARRANT OF AUTHORITY FOR AN ATTORNEY TO CONFESS JUDGMENT AGAINST BORROWER. IN GRANTING THIS WARRANT OF ATTORNEY TO CONFESS JUDGMENT AGAINST BORROWER, BORROWER HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, AND AFTER CONSULTING WITH SEPARATE COUNSEL OF BORROWER (OR INDEPENDENTLY ELECTING NOT TO DO SO), UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS BORROWER HAS OR MAY HAVE TO PRIOR NOTICE AND AN OPPORTUNITY FOR HEARING UNDER THE RESPECTIVE CONSTITUTIONS AND LAWS OF ANY STATE AND THE COMMONWEALTH OF PENNSYLVANIA.**

**AFTER THE OCCURRENCE OF ANY EVENT OF DEFAULT HEREUNDER, BORROWER IRREVOCABLY AUTHORIZES AND EMPOWERS THE PROTHONOTARY, CLERK OF COURT, ANY ATTORNEY OF ANY COURT OF RECORD IN THE COMMONWEALTH OF PENNSYLVANIA TO APPEAR FOR BORROWER IN ANY AND ALL ACTIONS AND TO ENTER JUDGMENT AGAINST BORROWER FOR THE ENTIRE PRINCIPAL SUM REMAINING DUE HEREUNDER, AND FOR ANY OTHER OF THE LIABILITIES, AND FOR INTEREST AND COSTS TOGETHER WITH AN ATTORNEY' COMMISSION OF FIFTEEN PERCENT (15%) OF THE AMOUNT THEN DUE, BUT IN TO**

5774226v1
Case ID: 230901940

**EVENT LESS THAN FIVE THOURSAND DOLLARS ($5,000.00), WITH OR WITHOUT DECLARATION OR STAY OF EXECUTION, AND WITH RELEASE OF ERRORS. NOTWITHSTANDING THE ATTORNEY'S COMMISSION SET FORTH ABOVE WHICH IS INCLUDED IN THE WARRANT OF AUTHORITY FOR THE PURPOSE OF ESTABLISHING A SUM CERTAIN, THE AMOUT OF ATTORNEYS' FEES THAT LENDER MAY RECOVER SHALL NOT EXCEED THE ACTUAL ATTORNEYS' FEES INCURRED BY LENDER. IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL HEREOF, SUCH VERIFIED COPY SHALL BE SUFFICIENT WARRANT FOR ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR AND CONFESS JUDGMENT AGAINST BORROWER AS PROVIDED HEREIN. JUDGMENT MAY BE CONFESSED FROM TIME TO TIME UNDER THE AFORESAID POWERS, WHICH SHALL NOT BE EXHAUSTED BY ONE EXERCISE THEREOF EVEN IF PREVIOUSLY STRICKEN PURSUANT TO THE PENNSYLVANIA RULES OF CIVIL PROCEDURE.**

**BORROWER, BEING FULLY AWARE OF THE RIGHT TO NOTICE AND A HEARING CONCERNING THE VALIDITY OF ANY AND ALL CLAIMS THAT MAY BE ASSERTED AGAINST BORROWER BY LENDER BEFORE A JUDGMENT CAN BE ENTERED HEREUNDER OR BEFORE EXECUTION MAY BE LEVIED ON SUCH JUDGMENT AGAINST ANY AND ALL PROPERTY OF BORROWER, HEREBY WAIVES THESE RIGHTS AND AGREES AND CONSENTS TO JUDGMENT BEING ENTERED BY CONFESSION IN ACCORDANCE WITH THE TERMS HEREOF AND EXECUTION BEING LEVIED ON SUCH JUDGMENT AGAINST ANY AND ALL PROPERTY OF BORROWER, IN EACH CASE WITHOUT FIRST GIVING NOTICE AND THE OPPORTUNITY TO BE HEARD ON THE VALIDITY OF THE CLAIM OR CLAIMS UPON WHICH SUCH JUDGMENT IS ENTERED.**

*See* Ex. B (emphasis in original).

### *The Defaults*

13.     The Bank extended the Loan to Borrower for the purpose of financing certain improvements to the Mortgaged Property (as further described in the Loan Agreement, the "Improvements").

14.     Pursuant to the Loan Agreement, Borrower was required to, and failed to, complete construction of the Improvements within eighteen months (18) of the closing date of November, 30, 2022.

5774226v1

Case ID: 230901940

15.     Construction activity at the Mortgaged Property has ceased and it appears Borrower has abandoned it, leaving it unsecured and resulting in a danger to the public.

16.     The Mortgaged Property has open windows and other access points that allow third parties to gain entry and utilize the property for unintended purposes.

17.     Third parties accessing the property are damaging the interior and exterior of the property, and Citizens has been notified that the Mortgaged Property is being used for such parties to access and to damage other adjacent properties.

18.     Damage and safety issues have been brought to the attention of neighbors who are lodging complaints.

19.     The abandoned and unsecured Mortgaged Property poses health and safety issues to the public, but also are contributing to the diminution in value of the Mortgaged Property (Citizens' collateral), which directly damages Citizens.

20.     Upon information and belief, Borrower has ceased paying contractors and property managers in connection with the Property.

21.     Defaults and Events of Default have occurred under the Loan Documents as a result of, among other things, the following:

   a.   Failure to pay the outstanding indebtedness under the Loan in full on or prior to the maturity date;

   b.   The existence of a mechanic's lien on the Mortgaged Property, which has not been vacated or bonded over and stayed within thirty days, which constitutes an Event of Default under Section 6.6. of the Loan Agreement;

   c.   The Mortgaged Property is not being operated and maintained in accordance with Legal Requirements, in violation of Section 5.14 of the Loan Agreement;

Case ID: 230901940

     d.   The work on the Mortgaged Property has been suspended; and

     e.   Borrower's failure to secure the property materially and adversely affects the operations and value of the Mortgaged Property, which constitutes an Event of Default under Section 6.17 of the Loan Agreement.

22.     As a result of the occurrence of Events of Default, the Bank sent Borrower a notice of default on May 8, 2023, advising Borrower and David Daniel and David Schreiber that they were in default under the Loan Documents as a result of, *inter alia*, (i) Borrower's failure to pay the Loan in full on the maturity date; (ii) Borrower's failure to pay the Philadelphia Center District assessments resulting a lien being levied against the Property in violation of Sections 5.1 and 5.3 of the Loan Agreement; and (iii) Borrower's failure timely to pay all contractors providing labor and materials to the Property resulting in the commencement of several mechanics' lien litigations against Borrower in violation of Section 5.3 of the Loan Agreement.

23.     On June 27, 2023, counsel for the Bank sent an additional notice of default and demanded payment in full of the outstanding bank indebtedness.  A true and correct copy of the June 27, 2023 correspondence is attached hereto as Exhibit E and incorporated by reference herein as if set forth in full.

24.     To-date, Defendant has failed to pay the outstanding Bank Indebtedness in full.

### *Bank Indebtedness*

25.     As of September 18, 2023, there is due and owing to Citizens the following amounts :

| Principal | $9,583,461.76 |
|---|---|
| Accrued and unpaid interest (as of 9/18/23) | $1,198,332.02 |
| Accrued and unpaid late charges | $49,125.23 |

9

Case ID: 230901940

| Attorneys' fees (15% of all sums due per the warrant of attorney) | $1,624,637.85[1] |
|---|---|
| **Total:** | **$12,455,556.90\*** |

26.     The foregoing sums will continue to accrue interest at the default rate of $3,593.80 per diem from and after September 18, 2023, and Citizens will continue to accrue costs and fees, including attorneys' fees, all of which shall be due and owing by Defendant in accordance with the terms of the Loan Documents (such sums together, the "Bank Indebtedness").

27.     Citizens incorporates all of the allegations in the foregoing paragraphs as if set forth fully herein.

### *Confession of Judgment*

28.     Judgment in favor of the Plaintiff and against the Defendants is demanded as authorized by the Note and the warrant of attorney contained therein.

29.     Judgment has not been entered against the Defendant in any jurisdiction on the warrant of attorney contained in the Note.

30.     The Note, which contains the warrant of attorney, is less than twenty (20) years old and a copy is attached hereto.

31.     No application for a court order granting leave to enter judgment after notice is required.

32.     Judgment is not being entered in connection with a consumer credit transaction as that term is defined in Pennsylvania Rule of Civil Procedure 2950 (as amended), and does not arise

---

[1] As provided in the Note, the attorneys' fees to be added to the judgment are to be the greater of $5,000 or 15% of all sums due under the Note. This amount is being included in the judgment to establish a sum certain and for lien priority purposes but Citizens will not collect more than the actual fees and costs that it incurs to the extent such fees and costs are less than the amount included in the judgment.

57742266v1

Case ID: 230901940

out of a "retail installment sale, contract or account" as defined under the Goods and Services Installment Sales Act, 69 P.S. Section 1101, *et seq.*

33.     An Affidavit of Non-Retail Sales Contract and Non-Consumer Credit Transaction is attached hereto and incorporated as if set forth fully herein.

34.     An Affidavit of Default and Assessment of Damages is attached hereto and incorporated as if set forth fully herein.

35.     An Affidavit of Address and Non-Military Service is attached hereto and incorporated as if set forth fully herein.

WHEREFORE**,** Plaintiff, Citizens Bank, N.A., as successor by merger to Investors Bank, respectfully requests the entry of judgment in its favor and against Defendant, in the amount of $12,455,556.90, together with all interest from and after September 18, 2023, at the default rate of $3,593.80 per diem as set forth herein, and all additional costs of suit and collection costs, including without limitation, reasonable attorneys' fees accrued and accruing from and after September 18, 2023, as set forth in the Note and other Loan Documents.

Respectfully submitted,

  /s/ Daniel M. Pereira

**Stradley Ronon Stevens & Young, LLP**
BY:    Gretchen M. Santamour, Esquire
         Julie M. Murphy, Esquire
         Daniel M. Pereira, Esquire
ID. Nos. 41720, 206265, 318674
2005 Market Street, Suite 2600
Philadelphia, PA 19103
(215) 564-8000

*Attorneys for Plaintiff, Citizens Bank, N.A.,*
*successor by merger to Investors Bank*

Dated:  September 19, 2023

11

5774226v1
Case ID: 230901940

## <u>VERIFICATION</u>

I, Joseph Gargiulo, state that I am a Vice President of Citizens Bank, N.A., the plaintiff herein, and as such I am duly authorized to make this Verification on behalf of Plaintiff. The facts set forth in the within Complaint in Confession of Judgment and Averment of Mortgage are true and correct to the best of my knowledge, information and belief. I understand that the statements made herein are subject to the penalties of 18 Pa.C.S. §4904, relating to unsworn falsification to authorities.

Dated: 9/18/23

By: Joseph Gargiulo
Title: Vice President

**Stradley Ronon Stevens & Young, LLP**
BY:   Gretchen M. Santamour, Esquire
          Julie M. Murphy, Esquire                                    Attorneys for Plaintiff
          Daniel M. Pereira, Esquire
ID. Nos. 41720, 206265, 318674
2005 Market Street, Suite 2600
Philadelphia, PA 19103
(215) 564-8000

| | |
|---|---|
| CITIZENS BANK, N.A., successor by merger to Investors Bank, | : COURT OF COMMON PLEAS<br>: OF PHILADELPHIA COUNTY<br>: |
| Plaintiff, | : |
| | : No. |
| v. | :<br>: |
| USRE 257 LLC,<br>45 City Avenue<br>Unit 3838<br>Bala Cynwyd, PA 19004, | :<br>:<br>:<br>:<br>: |
| Defendant. | :<br>: |

### AFFIDAVIT OF NON-RETAIL SALES
### CONTRACT AND NON-CONSUMER CREDIT TRANSACTION

I, Joseph Gargiulo, being first duly sworn according to law, depose and say:

1.        I am a Vice President of Citizens Bank, N.A. ("Citizens").

2.        I am authorized to make this Affidavit on behalf of Citizens.

3.        The transactions represented by the instruments attached to the Complaint in Confession of Judgment and Averment of Mortgage filed in this matter were business transactions and were not entered into for personal, family or household purposes.

4.        Neither the Loan Agreement nor the Note pursuant to which Citizens seeks to confess judgment against Defendant, are for a retail sales contract or a retail installment contract.

[SIGNATURE PAGE TO FOLLOW]

5774226v1

Case ID: 230901940

[SIGNATURE PAGE TO AFFIDAVIT OF NON-RETAIL SALES CONTRACT AND NON-CONSUMER CREDIT TRANSACTION]

Date:                                            CITIZENS BANK, N.A.

_____

By: Joseph Gargiulo
Title: Vice President

SWORN AND SUBSCRIBED
BEFORE ME THIS _Sept_
DAT OF __19_____, 2023.

_____
Notary Public

ZINA GREGORY
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Nov. 19, 2026

14

**Stradley Ronon Stevens & Young, LLP**
BY:   Gretchen M. Santamour, Esquire
        Julie M. Murphy, Esquire                           Attorneys for Plaintiff
        Daniel M. Pereira, Esquire
ID. Nos. 41720, 206265, 318674
2005 Market Street, Suite 2600
Philadelphia, PA 19103
(215) 564-8000

| | |
|---|---|
| CITIZENS BANK, N.A., successor by merge to Investors Bank, | : COURT OF COMMON PLEAS |
| | : OF PHILADELPHIA COUNTY |
| Plaintiff, | : |
| | : No. |
| v. | : |
| | : |
| USRE 257 LLC, | : |
| 45 City Avenue | : |
| Unit 3838 | : |
| Bala Cynwyd, PA 19004, | : |
| | : |
| Defendant. | : |
| | : |

## <u>AFFIDAVIT OF ADDRESS AND NON-MILITARY SERVICE</u>

I, Joseph Gargiulo, being first duly sworn according to law, depose and say:

1.        I am a Vice President of plaintiff, Citizens Bank, N.A., as successor by merger to

Investors Bank and am authorized to make this Affidavit of Address and Non-Military Service on

behalf of Plaintiff.

2.        The registered address of defendant, USRE 257 LLC, is 45 City Avenue, Unit 3838,

Bala Cynwyd, PA 19004.

3.        Defendant is not a natural person and is not subject to the Solders' and Sailors' Civil

Relief Act of 1940 and the amendments thereto.

4.        The address of Plaintiff is 101 JFK Parkway, Short Hills, New Jersey 07078.

[SIGNATURE PAGE TO FOLLOW]

[SIGNATURE PAGE TO AFFIDAVIT OF ADDRESS AND NON-MILITARY SERVICE]

Date:                                          CITIZENS BANK, N.A.

_____

By: Joseph Gargiulo
Title: Vice President

SWORN AND SUBSCRIBED
BEFORE ME THIS _Sept_
DAT OF _____19_____, 2023.

_____
Notary Public

ZINA GREGORY
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Nov. 19, 2026

16

Case ID: 230901940

**Stradley Ronon Stevens & Young, LLP**
BY:    Gretchen M. Santamour, Esquire
       Julie M. Murphy, Esquire                    Attorneys for Plaintiff
       Daniel M. Pereira, Esquire
ID. Nos. 41720, 206265, 318674
2005 Market Street, Suite 2600
Philadelphia, PA 19103
(215) 564-8000

| | |
|---|---|
| CITIZENS BANK, N.A., successor by merger to Investors Bank, | : COURT OF COMMON PLEAS : OF PHILADELPHIA COUNTY |
| Plaintiff, | : |
| | : No. |
| v. | : |
| | : |
| USRE 257 LLC, | : |
| 45 City Avenue | : |
| Unit 3838 | : |
| Bala Cynwyd, PA 19004, | : |
| | : |
| Defendant. | : |
| | : |

<u>**AFFIDAVIT OF DEFAULT AND ASSESSMENT OF DAMAGES**</u>

I, Joseph Gargiulo, being first duly sworn according to law, depose and say:

1.     I am a Vice President of plaintiff, Citizens Bank, N.A., as successor by merger to Investors Bank and am authorized to make this Affidavit on behalf of Plaintiff.

2.     The instruments attached Exhibit "A", Exhibit "B", Exhibit "C", and Exhibit "D" (the "Instruments") to the Complaint in Confession of Judgment and Averment of Mortgage (the "Complaint") filed in this matter are true and correct copies of the original Instruments.

3.     Defendant is in default of his obligation under the Note and other Loan Documents ( as such terms are defined in the Complaint), as more fully set forth in the Complaint.

4.     By reason of the Defendant's defaults under the Instruments and other Loan Documents, as of September 18, 2023, there was due and owing to Plaintiff the amount of

Case ID: 230901940

$12,455,556.90, comprised as follows:

| Principal | $9,583,461.76 |
|---|---|
| Accrued and unpaid interest (as of 9/18/23) | $1,198,332.02 |
| Accrued and unpaid late charges | $49,125.23 |
| Attorneys' fees (15% of all sums due per the warrant of attorney) | $1,624,637.85[3] |
| **Total:** | **$12,455,556.90\*** |

\*and together with all interest from and after September 18, 2023, at the default rate of $3,593.80 per diem as set forth above, and all additional costs of suit and collection of costs accrued and accruing from and after September 18, 2023, as set forth in the Note and other Loan Documents.

5.     The allegations of the Complaint are true and correct to the best of my knowledge, information and belief.

[SIGNATURE PAGE TO FOLLOW]

---

[3] As provided in the Note, the attorneys' fees to be added to the judgment are to be the greater of $5,000 or 15% of all sums due under the Note. This amount is being included in the judgment to establish a sum certain and for lien priority purposes but Citizens will not collect more than the actual fees and costs that it incurs to the extent such fees and costs are less than the amount included in the judgment.

18

[SIGNATURE PAGE TO AFFIDAVIT OF DEFUALT AND ASSESSMENT OF DAMAGES]

Date:                                           CITIZENS BANK, N.A.

                                                _____
                                                By: Joseph Gargiulo
                                                Title: Vice President

SWORN AND SUBSCRIBED
BEFORE ME THIS _Sept_
DAT OF ____19____, 2023.

_____
Notary Public

ZINA GREGORY
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Nov 19, 2026

19

Case ID: 230901940

**Exhibit A**



*Filed and Attested by the*
*Office of Judicial Records*
*19 SEP 2023 04:51 pm*
*G. IMPERATO*

Case ID: 230901940

# LOAN AGREEMENT

## USRE 257 LLC

(Borrower)

- and -

## INVESTORS BANK
(Lender)

DATED:     November _30_, 2020

Parcel No:     OPA  Parcel No. 881031500

Street Address:     257 South 16th Street, City of Philadelphia, Pennsylvania

Case ID: 230901940

**LOAN AGREEMENT**

THIS LOAN AGREEMENT ("Agreement") dated as of November __30__, 2020, by and between **USRE 257 LLC**, a Delaware limited liability company ("**Borrower**") having a mailing address of  45 City Avenue, Unit 383, Bala Cynwyd, Pennsylvania 19004 and **INVESTORS BANK**, a New Jersey chartered bank, having an office at 101 JFK Parkway, Short Hills, New Jersey 07078 (the "**Lender**").

BACKGROUND

Borrower is the owner in fee simple of certain real property located at 257 South 16th Street, City of Philadelphia, Commonwealth of Pennsylvania, designated as Parcel No, OPA # 881031500 on the tax maps of the City of Philadelphia, Pennsylvania, as more fully described on *Exhibit "A"* attached hereto and made a part hereof (the "**Mortgaged Property**").   The Borrower proposes to finance the renovation and development of a +/- 55,204 gross square foot 17-story elevator served 60 unit multi-family rental apartment project (the "**Project**") on the Mortgaged Property and has applied to the Lender for financing of the Project. The Construction Loan (as hereinafter defined) shall be for a term of eighteen (18) months (plus the term of the Extension Period if the Extension Option is exercised in accordance with the terms of this Agreement) and shall be used to finance the hard costs of construction, the hard cost contingency, an interest reserve and the reimbursement of the cost of the land in connection with the development of the Mortgaged Property (the "**Project**")  The Lender has agreed to make the Loan to the Borrower on the terms and conditions set forth herein.  The Loan will be evidenced by this Agreement and a Mortgage Loan Note, dated as of the date hereof, and secured by a mortgage on the Mortgaged Property. Subject to compliance with the terms of this Agreement, the Construction Loan will convert to the Permanent Loan (as hereinafter defined).

ARTICLE I
**DEFINITIONS**

Use of or reference to the following terms herein shall be construed as indicated:

1.1     **Advances**: Shall have the meaning ascribed to such term in Section 4.1.

1.2     **Affiliate**: Shall mean, as to any Person, any other Person that: (i) directly or indirectly, owns more than twenty-five percent (25%) of such Person, (ii) is in control of, is controlled by or is under common ownership or control with such Person or (iii) is a director or officer of such Person or of an Affiliate of such Person.  As used in this definition the term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

1

Case ID: 230901940

1.3     **Architect's Agreement**: Shall mean that certain Architect Agreement between the Project Architect and the Borrower that was provided to and approved by the Lender in connection with the closing of the Loan.

1.4     **Assignment of Contracts**: Shall mean that certain Assignment of Contracts, Licenses and Permits, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning all of Borrower's right, title and interest in, to and under all permits, licenses, general intangibles, agreements and contracts (including, without limitation, contractor agreements, subcontractor agreements, service contracts and other documents, now or hereafter obtained, produced or entered into, as the case may be, pertaining to the construction, use, occupancy, possession, management, maintenance, ownership, or otherwise in respect of the Improvements and/or the Mortgaged Property.

1.5     **Assignment of Leases and Rents**:  That certain agreement made by Borrower assigning to Lender all of its right, title and interest to all present and future Leases, rents, and income affecting the Mortgaged Property.

1.6     **Authorized Representatives**: Those Persons authorized by the Borrower to execute and deliver the Borrower's Request for Loan Advance on behalf of Borrower.

1.7     **Blocked Account**:  A Lender controlled blocked depository account maintained with Lender in the name of Borrower.  There may be more than one (1) Blocked Account at any time.

1.8     **Borrower's Equity**: Borrower's cash at risk equity investment in the Project in the total amount of $5,425,000.00,   representing 29.4% of the $18,425,000.00 of the estimated total Project costs.  Borrower's Equity will remain in place through the term of the Construction Loan and will not be reimbursed.

1.9     **Budget**: The final certified budget for total estimated costs of Completion of the Improvements, certified as true and correct as of the Closing Date, prepared by Borrower and approved by the Lender and the Construction Consultant and all amendments and modifications thereto approved by Lender in accordance with this Agreement.

1.10    **Building Costs**: All costs and expenses of constructing and developing the Improvements (including Hard Costs, the Hard Cost Contingency and Soft Costs), as shown on the Budget.

1.11    **Business Day**:  A day, other than Saturday and Sunday or a legal holiday on which banks in New Jersey or New York are authorized or required by law to be closed for business.

1.12    **Code**:  Shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

1.13    **Completion of the Improvements**:  Completion of the construction of the Improvements on or before eighteen (18) months from the date hereof, or any extension thereof

USRE 257 – Loan Agreement
4839-4449-2748, v. 6

Case ID: 230901940

as defined in this Agreement (the "**Completion Date**") substantially in accordance with all Plans, all Legal Requirements, all Permitted Encumbrances, and this Agreement, such compliance to be evidenced to the reasonable satisfaction of Lender and the Construction Consultant; together with the delivery to Lender of a permanent or temporary certificate of occupancy (if subject to any conditions, such conditions being acceptable to Lender) for the Improvements and evidence that all other Governmental Approvals have been issued and all other Legal Requirements have been satisfied so as to allow the use and occupancy of the Improvements in accordance with the definition of "**Improvements**" set forth in this Agreement.

1.14    **Construction Consultant**:  Beacon Planning and Consulting Services, LLC or such other Person as Lender may designate and engage as a replacement to inspect the Improvements and the Mortgaged Property as construction progresses and to provide advice to and to render reports to Lender, which Person may be, at Lender's option upon notice to Borrower, either consulting architects, engineers or inspectors appointed by Lender.

1.15    **Construction Loan**:  Shall mean the loan in the maximum amount of $13,000,000.00 to be made by Lender to Borrower to finance the construction of the Improvements.

1.16    **Conversion**: The Borrower's option to convert the Construction Loan to the Permanent Loan subject to the conditions set forth in Article VIII herein including, but not limited, to the payment of an Exit Fee if the Borrower, for any reason, does not convert to the Permanent Loan.

1.17    **Conversion Date**: The date of the Conversion from the Construction Loan to the Permanent Loan.

1.18    **Conversion Fee**: A fee payable by the Borrower to the Lender on the Conversion Date in the amount of $35,000.00, representing one-quarter of one percent (1/4%) of the principal amount of the Permanent Loan.

1.19    **Debt**:  All amounts payable to the Lender by the Borrower under the Loan Documents, whether existing or subsequently accruing, including without limitation the outstanding principal amount of the Loan, interest of any kind and description, fees, costs and other charges.

1.20    **Debt Service**: Shall mean, with respect to any particular period of time, scheduled principal (if applicable) and interest payments under the Note for such period.

1.21    **Default:**    The occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

1.22    **Environmental Indemnity**: That certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantors (collectively the "**Environmental Indemnitors**"), in which the Environmental Indemnitors, jointly and severally, shall indemnify, defend and hold the Lender harmless from and against all costs, claims,

3

Case ID: 230901940

liabilities and expenses arising in connection with Environmental Laws, Regulated Substances or Contamination as defined in the Environmental Indemnity.

1.23 **Environmental Laws**: Any and all federal, state, commonwealth and local laws, regulations, statutes, codes, rules, resolutions, directives, orders, executive orders, consent orders, guidance from regulatory agencies, policy statements, judicial decrees, standards, permits, licenses and ordinances, or any judicial or administrative interpretation of any of the foregoing, pertaining to the protection of land, water (including surface and ground water), air, threatened or endangered species, health, safety or the environment, whether presently in effect or enacted, promulgated, issued or amended in the future, including, without limitation, those laws of the state or commonwealth where the Mortgage is or is to be recorded. Environmental Laws shall specifically include but in no way be limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, et seq. ("CERCLA"), the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, et seq. ("RCRA"), the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq., the **"Clean Air Act"**, 42 U.S.C. §§ 7401, et seq., the Toxic Substance Control Act, 15 U.S.C. §§ 2601, et seq. ("TSCA"), the Emergency Planning Community Right To Know Act, 42 U.S.C. §§ 11001, et seq. ("EPCRA"), the Endangered Species Act (16 U.S.C. §1531 et seq.), the Occupational Safety and Health Act (29 U.S.C. §651 et seq.) and the Hazardous Materials Transportation Act (49 U.S.C. §1801 et seq.), the Pennsylvania Solid Waste Management Act, 35 P.S. §6018.103, as amended, and 25 Pa. Code §§75.260 and 75.261, as amended, and the Hazardous Sites Cleanup Act, 35 P.S. §6020.101 et seq., as amended, and those relating to lead based paint and any analogous state or commonwealth and local laws, and the regulations promulgated pursuant to those laws.

1.24 **Event of Default**: Shall have the meaning set forth in Article VI.

1.25 **Extension Fee:** Shall mean $5,000.00 payable in connection with Borrower's option, subject to and in accordance with the terms of this Agreement, to extend the term of the Construction Loan for the Extension Period.

1.26 **Extended Maturity Date**: Shall have the meaning as set forth in Section 2.5.

1.27 **Extension Option**: Shall mean the Borrower's right to extend the term of the Construction Loan for the Extension Period as set forth in Section 2.5.

1.28 **Extension Period**: Shall mean a period of six (6) consecutive months following the Initial Maturity Date.

1.29 **General Contractor**: MMB Contractors Inc. or other general contractor acceptable to Lender.

1.30 **General Contractor Agreement**: That certain Agreement between Borrower and General Contractor, that was provided to and approved by the Lender in connection with the closing of the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time subject to the terms of this Agreement, which General Contractor Agreement shall be for a fixed or guaranteed maximum price satisfactory to the Lender and provide for the construction of the Improvements on the Mortgaged Property in accordance with the Plans.

USRE 257 – Loan Agreement
4839-4449-2748, v. 6

Case ID: 230901940

1.31   **Governmental Approvals**:   All approvals, consents, waivers, orders, acknowledgments, authorizations, permits and licenses required under applicable Legal Requirements to be obtained from any Governmental Authority for the construction of the Improvements and/or the use, occupancy and operation of the Mortgaged Property following completion of construction, as the context requires, including, without limitation, all land use, building, subdivision, condominium, zoning and similar ordinances and regulations promulgated by any Governmental Authority.

1.32   **Governmental Authority**:   Any court, board, agency, commission, office, authority, department, bureau or instrumentality of any nature whatsoever or any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

1.33   **Guaranties**:  Shall mean, collectively, the Guaranty of Completion, the Guaranty of Payment, the Environmental Indemnity and any and all other guaranty and/or indemnity agreements executed and delivered by Borrower and/or the Guarantors in connection with the Loan.

1.34   **Guarantor(s)**:  Shall mean, jointly and severally, David Daniel and David Schreiber.

1.35   **Guaranty of Completion**:  That certain guaranty of lien free completion of the Project from Guarantors, jointly and severally, in favor of Lender dated as of the date hereof.

1.36   **Guaranty of Payment**:  That certain guaranty of payment and suretyship of Borrower's loan obligations from Guarantors, jointly and severally, in favor of Lender dated as of the date hereof.

1.37   **Hard Costs**:  Building Costs which are for labor, materials, equipment, and fixtures.

1.38   **Improvements**:  The completely renovated and developed +/- 55,204 gross square foot 17-story elevator served sixty (60) unit multi-family rental apartment building, to be constructed in accordance with the approved Plans at 257 South 16th Street, Philadelphia, Pennsylvania.

1.39   **Indemnitee**:  Lender, its participants, all subsequent holders of the Mortgage securing the Loan, their respective successors and assigns and their respective officers, directors, employees, agents, representatives, contractors and subcontractors and any subsequent owner of the Mortgaged Property who acquires title thereto from or through Lender.

1.40   **Indemnity Agreement**:  That certain indemnity agreement requiring Borrower and Guarantors to: (i) indemnify, defend and hold harmless Lender from and against all costs, claims, liability or expense arising in connection with the  Loss Liability Events as such term is defined in the Indemnity Agreement, and (ii) guaranty the timely performance of all obligations of Borrower under the Loan Documents (as defined herein) upon the occurrence of one or more Full Recourse Events as such term is defined in the Indemnity Agreement.

Case ID: 230901940

1.41    **Initial Maturity Date:**  Shall mean that date that is eighteen (18) months from the date hereof.

1.42    **Interest Reserve:** Shall have the meaning set forth in <u>Section 4.6</u>.

1.43    **Leases**:  Any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Mortgaged Property, and every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.  Borrower represents that there are no leases as of the date herewith.

1.44    **Legal Requirements**:    All federal, state, county, municipal and other governmental statutes, laws, treaties, rules, orders, regulations, ordinances, judgments, decrees, injunctions, permits or requirements of Governmental Authorities affecting Borrower or the Mortgaged Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Mortgaged Property or any part thereof, including, without limitation, any which may: (i) require repairs, modifications or alterations in or to the Mortgaged Property or any part thereof, or (ii) in any way limit the use and enjoyment thereof.

1.45    **Lien**:  Any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Mortgaged Property, or any portion thereof, or Borrower, or any interest in Borrower, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances against the Mortgaged Property or any portion thereof or Borrower or any interest in Borrower.

1.46    **Loan**: Individually or collectively as the context may require, the Construction Loan and the Permanent Loan.

1.47    **Loan Amount**:  $13,000,000.00, or as much thereof as shall be advanced hereunder and is outstanding, which shall aggregate the amount to be advanced by the Lender for Hard Costs, the Hard Cost Contingency, the Interest Reserve and reimbursement of land, as set forth in the Budget.  Upon Conversion, the Loan Amount for the Permanent Loan will be $14,000,000.00.

1.48    **Loan Documents**:  Shall mean collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases and Rents, the Assignment of Contracts, Guaranty of Completion, Guaranty of Payment, Environmental Indemnity, Indemnity Agreement, the Post

6

Case ID: 230901940

Closing Agreement and any other instrument or agreement given to secure Borrower's obligations hereunder executed by the Guarantors or Borrower.

1.49    **Loan Term**: Shall mean the period between the date of this Agreement and the applicable Maturity Date.

1.50    **Management Agreement:** Shall have the meaning as set forth in Section 5.33.

1.51    **Material Adverse Effect**: Shall mean a material adverse effect on: (a) the ability of Borrower to perform its payment obligations under the Loan Documents to which it is a party, or to perform its obligations thereunder in respect of the Improvements, maintenance of the Mortgaged Property or the maintenance of insurance or the payment of taxes and other charges in respect of the Mortgaged Property, (b) the validity or enforceability of any of the Loan Documents, the lien of the Mortgage or the rights and remedies of Lender under any of the Loan Documents (except to the extent caused solely by an act or omission of the Lender), (c) the ability of Guarantors to perform Guarantors' obligations under the Guaranties or (d) the Mortgaged Property or any other collateral for the Loan.

1.52    **Maturity Date**:   Shall mean: (a) the Initial Maturity Date or the Extended Maturity Date, as applicable, with respect to the Construction Loan; (b) the Permanent Loan Maturity Date, if Conversion has occurred; or (c) such earlier date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

1.53    **Mortgage**: The Open End Mortgage, Security Agreement and Fixture Filing of even date creating a first priority lien upon the Mortgaged Property and the Improvements given to secure the repayment of the Loan and the performance of the obligations set forth in this Agreement, the Note and the Mortgage.

1.54    **Mortgaged Property**:   Shall mean the real property, as more particularly described on *Exhibit A*, and the Improvements now or hereafter erected thereon and all personal property owned by Borrower and encumbered by the Mortgage, together with all rights pertaining to such property and Improvements, as more particularly described in the Granting Clauses of the Mortgage.

1.55    **Note**:  Shall mean the Mortgage Loan Note of even date herewith made by Borrower containing its promise to repay the Loan with interest and other sums as provided therein, and all extensions, modifications, replacements and renewals thereof.

1.56    **Obligor**: Shall mean, jointly and severally, Borrower and/or any Guarantor.

1.57    **Permanent Loan**: Shall have the meaning given such term in Section 8.1(a).

1.58    **Permanent Loan Guaranty**:  Shall have the meaning given such term in Section 8.1(c).

1.59    **Permanent Loan Interest Rate**:   Shall have the meaning given such term in Section 8.1(c).

7

Case ID: 230901940

1.60    **Permanent Loan Maturity Date**:  Shall have the meaning given such term in Section 8.1(c).

1.61    **Permitted Encumbrances**:  Collectively: (i) the Liens and security interests created by the Loan Documents or otherwise permitted by the Loan Documents, (ii) all Liens, encumbrances and other matters disclosed in the Title Policy, (iii) Liens, if any, for taxes and other similar charges imposed by any Governmental Authority not yet due or delinquent, and (iv) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

1.62    **Person**:  Any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

1.63    **Personal Property**:  Shall mean materials, furnishings, fixtures, machinery, equipment and all items of tangible and intangible personal property now or hereafter owned by Borrower, wherever located, and either: (i) to be incorporated into the Improvements, (ii) used in connection with the construction of the Improvements or (iii) to be used in connection with the operation of the Mortgaged Property.

1.64    **Plans**:  The plans and specifications (and all amendments thereto) for the Improvements prepared by and delivered by the Project Architect as the same may be approved by Lender in its reasonable discretion, as the same may be further amended and supplemented, with Lender's prior approval, from time to time in accordance with the terms of this Agreement.

1.65    **Post-Closing Agreement**:  shall mean that certain agreement of even date by and between Borrower and Lender with respect to certain post-closing obligations of Borrower.

1.66    **Project**:  The Mortgaged Property together with the Improvements.

1.67    **Project Architect**:  SgRA Architecture.

1.68    **Regulated Substances**:  Shall have the meaning as set forth in the Environmental Indemnity Agreement.

1.69    **Rent**:  Shall have the meaning as set forth in Assignment of Leases.

1.70    **Retainage**:  Shall mean, for each construction contract and subcontract, the greater of: (a) ten percent (10%) of all costs funded to the contractor or subcontractor under the applicable contract or subcontract until such time as the labor or materials provided under such contract or subcontract is eighty-five (85%) percent complete as certified by the Construction Consultant and Project Architect, at which time: (i) Lender will release a portion of the accumulated Retainage to Borrower in an amount determined by Lender; and (ii) the Retainage shall thereafter be reduced to five percent (5%) of all costs funded to the contractor or subcontractor under the contract or subcontract; and (b) the actual retainage required under such contract or subcontract. Retainage will be released on an individual line item basis upon receipt of final subcontractor lien waiver, sign off by Lender's Engineer and the Project Architect. Final

8

Case ID: 230901940

Retainage amounts, if any, shall be released upon sign offs ("**Sign Offs**") by the Lender's construction consultant and Project Architect, and upon Completion of the Project.

1.71    **Soft Costs**:  Building Costs which are not Hard Costs, including but not limited to, architect's, engineer's or contractor's fees, recording taxes and title charges in respect of the Mortgage, taxes and other charges, insurance premiums and such other non-construction costs as required in connection with the Project. All Soft Costs shall be the sole responsibility of the Borrower.

1.72    **Tax Abatement**:  Shall mean a long term real estate tax abatement, to be issued by the City of Philadelphia relating to the Mortgaged Property and the Improvements.

1.73    **Tenant**:  Shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Mortgaged Property.

1.74    **Title Company**:  Land Services USA, Inc., as agent for First American Title Insurance Company.

1.75    **Title Policy**:  An ALTA mortgagee title insurance policy in a form acceptable to Lender issued by the Title Company with respect to the Mortgaged Property and insuring the Lien of the Mortgage.

1.76    **Unit**:  Shall mean an individual rental apartment unit located at the Mortgaged Property.

## ARTICLE II
## THE CONSTRUCTION LOAN

2.1    <u>Interest Rate and Repayment</u>.  The interest rate, repayment schedule and other terms of the Loan are set forth in the Note in the principal amount of up to $13,000,000.00 (the "**Construction Loan**") made by the Borrower to the Lender for the purposes set forth above.

2.2    <u>Increased Costs</u>.  If, after the date of this Agreement, any existing or future law, regulation, or guideline or the interpretation thereof by any court or administrative or Governmental Authority charged with the administration thereof, imposes, modifies, deems applicable or results in the application of any capital maintenance, capital ratio or similar requirement against loan commitments made by Lender (or participations therein) or Lender in anticipation of the effectiveness of any capital maintenance, capital ratio or similar requirement takes reasonable action to enable itself to comply therewith, and the result thereof is to impose upon Lender or increase any capital requirement applicable as a result of the making or maintenance of the commitment or participations therein (which imposition of or increase in capital requirements may be determined by Lender's reasonable allocation of the aggregate of such capital impositions or increases and deemed conclusive absent manifest error) then, within thirty (30) days of written demand by Lender, Borrower shall pay to Lender from time to time as specified by Lender additional commitment fees that shall be sufficient to compensate Lender for such impositions of or increase in capital requirements, together with interest on each such amount from the date demanded until payment in full thereof at the otherwise applicable rate

9

Case ID: 230901940

hereunder or prepay the Loan in its entirety without any prepayment payment or premiums. Lender shall be entitled to such amounts only when such amounts are charged to its other lending customers generally.

2.3     Loan Documentation and Collateral.  The Loan will be evidenced by the Note and shall be secured by the Mortgage and the Borrower hereby grants the Lender a lien and security interest on all construction materials, equipment, furniture, furnishings, fixtures and other personal property now or hereafter acquired by the Borrower and located on the Mortgaged Property or elsewhere.   In addition, the Loan is secured and evidenced by, among other documents:

(a)  the Assignment of Leases and Rents

(b)  an assignment of the Borrower's rights in and to all Plans (the "**Assignment of Plans**");

(c)  the Guaranty of Payment executed by the Guarantors;

(d)  the Guaranty of Completion executed by the Guarantors;

(e)  the Environmental Indemnity Agreement;

(f)  the Assignment of Contracts;

(g)  the Indemnity Agreement;

(h)  a certificate from the General Contractor providing its written consent to continue performance under the General Contractor Agreement in the event that Borrower defaults under this Agreement. The form of General Contractor Certificate is annexed hereto as ***Exhibit B***;

(i)  A certification from the Project Architect consenting to the assignment of the Architect Agreement to Lender and continued performance from Project Architect for Lender if Borrower defaults.  The form of Architect Certification is annexed hereto as ***Exhibit C***;

(j)  Uniform Commercial Code financing statements in favor of the Lender perfecting the Lender's security interests granted pursuant to the Mortgage in all tangible and intangible personal property now owned or hereafter acquired by Borrower and located on or used in connection with the Mortgaged Property (the "**UCCs**").  Borrower hereby authorizes the recording and filing, as applicable, of the UCCs; and

(k)  Such other documents as Lender or its counsel may reasonably require to evidence and secure the Loan.

2.4     Borrower shall execute and deliver, or cause to be executed and delivered, such additional documents and instruments as the Lender shall reasonably require in order to perfect the Lender's interest in any of the foregoing property.  The Note, Mortgage, Assignment of Leases and Rents, Assignment of Contracts, Assignment of Plans, UCCs, Guaranty of Payment, Guaranty of Completion, Environmental Indemnity, General Contractor's Certificate, Architect's

10

Case ID: 230901940

Certificate, Indemnity Agreement and any and all other documents and instruments referred to above (all of which, together with this Agreement (as from time to time amended, restated and extended are hereinafter collectively referred to as the "**Loan Documents**") shall be in form and substance reasonably satisfactory to the Lender, and all necessary filing and recording fees with respect thereto shall be paid by Borrower.

      2.5     <u>Loan Term and Extension Option</u>:

      (a) The term of the Construction Loan shall commence on the Closing Date and shall end on the Initial Maturity Date.

      (b) Notwithstanding the foregoing, provided the Construction Loan is not in default, the construction has been ninety (90%) percent completed, as verified by the Lender and its Construction Consultant, and upon written request of the Borrower (the "**Extension Notice**"), no fewer than thirty (30) days prior to the Initial Maturity Date, the Lender shall extend the term of the Construction Loan for an additional six (6) months  (the "**Extension Period**") ending on the date that is the sixth (6th) month anniversary of the Initial Maturity Date (the "**Extended Maturity Date**"), subject to satisfaction of the following conditions:  (a) no Default or Event of Default shall have occurred and is continuing during the term of the Loan Term or at any time after the delivery of the Extension Notice and prior to the Initial Maturity Date, (b) Lender shall have received a title continuation or title update from the Title Company indicating no change in the condition of title to the Mortgaged Property; (c) Borrower shall have paid to the Lender the non-refundable Extension Fee at least thirty (30) days prior to the Initial Maturity Date; (d) Borrower shall pay all reasonable costs and expenses incurred by Lender in connection with such extension, including underwriting, title and legal fees and costs; (e) Guarantors have reaffirmed Guarantors' obligations under the Guaranties and Environmental Indemnity; (f) there have been no material adverse changes in any Guarantor's financial condition; (g) Borrower certifies to Lender in writing that all representations, warranties and covenants contained herein continue to be true and correct in all material respects; (h) if required by Lender, Borrower replenishes and makes a cash deposit into the Interest Reserve for the Extension Period in such amount as determined by the Lender in its sole discretion; (i) Leases for not less than twenty-five (25%) percent of the Units at the Project have been executed and are in full force and effect and the tenants under such leases are in occupancy and paying rent; (j) Borrower has received and provided to Lender a temporary certificate of occupancy for the Project having only such conditions as are acceptable to Lender, in its sole discretion; and (k) the execution and delivery of Borrower of such documents as the Lender or its counsel may reasonably require in order to evidence such extension.

ARTICLE III
**BORROWER'S REPRESENTATIONS AND WARRANTIES**

      Knowing that Lender will rely on such representations and warranties as an incentive to make the Loan, Borrower hereby represents and warrants to Lender that:

      3.1     <u>Formation; Existence; Composition</u>.  Borrower is a limited liability company duly formed in the State of Delaware and validly existing and in good standing in the State of Delaware and the Commonwealth of Pennsylvania and has the power and authority to own and operate the Mortgaged Property in the Commonwealth of Pennsylvania. The managing members

11

Case ID: 230901940

of the Borrower are David Schreiber, who owns a 5.0% membership interest in the Borrower and David Daniel, who owns a 36.0% membership interest in the Borrower. The remaining 59% membership interests in the Borrower are owned by passive investors. True and correct copies of the certificate of formation and operating agreement of the Borrower, together with all amendments thereto (collectively, the "**Organizational Documents**"), have been furnished to Lender and the same are in full force and effect as of the date of this Agreement.

3.2     <u>Power and Authority; Authorization; Enforceability</u>.  Borrower has full power, authority and legal right to execute, deliver and comply with each of the Loan Documents to which it is a party and any other document or instrument relating to the Loan to be executed by Borrower, all actions of Borrower and other authorizations necessary or appropriate for the execution and delivery of and compliance with the Loan Documents and such other documents and instruments have been taken or obtained and the Loan Documents and such other documents and instruments constitute the respective valid and legally binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms.

3.3     <u>Governmental Approval of Loan Documents</u>.  No consent, approval, or other authorization of or by any Governmental Authority, court, or administrative agency is required in connection with Borrower's execution and delivery of, or compliance with, any of the Loan Documents or any other document or instrument relating to the Loan executed by Borrower.

3.4     <u>Conflict; Breach</u>.  Borrower's execution and delivery of, and compliance with, the Loan Documents will not conflict with or result in a breach of any applicable law, judgment, order, writ, injunction, decree, rule, or regulation of any Governmental Authority, court, or administrative agency or of any provision of the Organizational Documents or of any agreement or other document or instrument to which Borrower is a party or by which Borrower or any of its property is bound, and such actions by Borrower will not result in the creation or imposition of any lien, charge or encumbrance upon any property of Borrower or of anyone other than the Lender.

3.5     <u>Financial Statements</u>.  All financial statements of Borrower and Guarantors heretofore given and hereafter to be given to Lender, are and will be true and complete in all material respects as of their respective dates and fairly represent the financial conditions of the businesses or persons to which they pertain on the dates and for the periods then ended.

3.6     <u>No Litigation</u>.  There is no action, suit, proceeding or investigation pending or threatened in writing against Borrower and/or any Guarantor and/or the Mortgaged Property in any court or by or before any other Governmental Authority, that, would be reasonably likely to have a Material Adverse Effect.

3.7     <u>Marketable Title</u>.  The Borrower has good and marketable, equitable and beneficial title to the Mortgaged Property and any other collateral for the Loan, subject only to Permitted Encumbrances.

3.8     <u>Compliance with Laws and Regulations</u>:  To Borrower's knowledge after due and diligent inquiry, the Mortgaged Property and the use thereof comply in all material respects with all Legal Requirements, except as disclosed on the City of Philadelphia License and Inspection

Case ID: 230901940

Certification Statement, which violation shall be cured as part of the Borrower's completion of the Improvements. All necessary action has been taken to permit construction of the Improvements according to the Plans and full use of the Improvements for their intended purpose under applicable laws, ordinances, Environmental Laws and regulations, including without limitation zoning, use, building or other applicable codes, and any covenant, easement, condition or restriction affecting the Mortgaged Property. No notice or claim of violation of law or regulation respecting the Project has been received by or on behalf of Borrower. All Governmental Approvals, permits, consents, and authorizations by any Governmental Authority necessary for: (a) the construction of the Project in accordance with the Plans; and (b) the construction and use of all roadways, driveways, curb cuts and other vehicular or other access to and egress from the Project, as shown on the Plans have been obtained, are valid, are in full force and effect and have been complied with by the Borrower.

3.9     Utilities:   All utility services necessary for the construction and use of the Improvements are available to the Mortgaged Property or will be available upon completion of construction.

3.10    Priority of Liens:  The Mortgage when properly recorded and this Agreement and any Uniform Commercial Code financing statements when properly filed in connection therewith will constitute valid first liens against the property described therein, prior to all other liens and encumbrances, including those which may hereafter accrue, except for such matters as shall have been disclosed or excepted on the Title Policy or are Permitted Encumbrances. There are no mechanics', materialmen's or other similar liens or claims which have been filed for work, labor or materials affecting the Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the Mortgage. None of the Permitted Encumbrances, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Mortgage, this Agreement and the other Loan Documents, or would result in a Material Adverse Effect.

3.11    Condemnation:  There are no proceedings pending, or, threatened in writing, to acquire by power of condemnation or eminent domain, the Project, the Mortgaged Property, or any interest therein, or to enjoin or similarly prevent the construction or use of the Improvements.

3.12    Accuracy and Completeness of Information.  To Borrower's knowledge after due and diligent inquiry,, Borrower covenants that all information, reports, statements, and other papers and data furnished to Lender pursuant to any provision or term of this Agreement or any of the Loan Documents shall be, at the time the same is so furnished, complete and correct in all material respects.

3.13    Approval of Plans and Budgets.  The Plans prepared by an architect licensed in Pennsylvania and submitted to the Lender are a true and accurate reflection of the Project (when completed) and have been approved as required by all Governmental Authorities. The Budget attached hereto as ***Exhibit D*** is a good faith current estimate in all material respects of all costs necessary to construct the Project in accordance with the Plans and the cost of construction of the Project, is not expected to exceed the cost set forth in the Budget. In the event any amount

USRE 257 – Loan Agreement
4839-4449-2748, v. 6

Case ID: 230901940

allocated to any line item in the final Budget is reduced, the Lender's obligations to fund such amounts will be reduced accordingly.

3.14   <u>Compliance with Documents</u>.  As of the date hereof, no Event of Default has occurred hereunder, and no event has or shall have occurred and be continuing, which, with the lapse of time or the giving of notice, or both, would constitute an Event of Default.

3.15   <u>No Misrepresentation or Material Nondisclosure</u>.  To Borrower's knowledge after due and diligent inquiry, Borrower has not made and will not make to the Lender, in this Agreement, any untrue statement of a material fact, or suppress or omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. To the best of Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make the financial statements, rent rolls, reports, certificates or other documents submitted in connection with the Loan inaccurate, incomplete or otherwise misleading in any material respect or that otherwise is reasonably likely to have a Material Adverse Effect on, the Mortgaged Property, Borrower or any Guarantor or their respective business, operations or condition (financial or otherwise).  In addition, there is no fact or circumstance presently known to Borrower which has not been disclosed to Lender and which would have a Material Adverse Effect on, or is reasonably likely to have a Material Adverse Effect on the Mortgaged Property, Borrower or any Guarantor or their respective business, operations or condition (financial or otherwise).

3.16   <u>Bankruptcy; Insolvency</u>.

(a)   None of Borrower, any direct or indirect owner of Borrower or any Guarantor, as the case may be, has applied for or consented to the appointment of a receiver, trustee or liquidator of itself, himself or herself or any of its, his or her property, admitted in writing its, his or her inability to pay its, his or her debts as they mature, made a general assignment for the benefit of creditors, been adjudicated as bankrupt or insolvent or filed a voluntary petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or taking advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it, him or her in any proceeding under any such law, and no action has been taken by it, him or her for the purpose of effecting any of the foregoing.  No order, judgment or decree has been entered by any court of competent jurisdiction approving a petition seeking reorganization of Borrower, any Guarantor, or all or a substantial part of the assets of Borrower, any Guarantor, or appointing a receiver, sequestrator, trustee or liquidator of it, him or her or any of its, his or her property.

(b)   None of Borrower or any other Obligor, as the case may be, has failed: (A) to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations or (B) failed to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds.

3.17   <u>Patriot Act, etc</u>.  No Obligor nor any owner of a direct or indirect interest in an Obligor nor any individual with significant responsibility managing the Borrower: (i) is listed on

14

Case ID: 230901940

any Government Lists (as defined below), (ii) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (iii) has been previously indicted for, or convicted of, any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense (as defined below), or (iv) is currently under investigation by any governmental authority for alleged criminal activity. The term **"Government Lists"** means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by Office of Foreign Assets Control (**"OFAC"**), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC, or (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America. The term **"Patriot Act Offense"** means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under: (i) the criminal laws against terrorism, (ii) the criminal laws against money laundering, (iii) the Bank Secrecy Act, as amended, (iv) the Money Laundering Control Act of 1986, as amended, or the (v) Patriot Act, as amended. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.

3.18   <u>Business Purpose of Loan</u>.  Borrower will use the proceeds of the Loan solely for the purpose of carrying on a business or commercial enterprise and not for personal, family, agricultural, or household purposes.

3.19   <u>Incorporation of Representations and Warranties</u>.  The request by the Borrower for an advance of Loan proceeds shall constitute a certification by the Borrower that the representations and warranties contained herein are true and correct as of the date of such request.

3.20   <u>Continuing Effectiveness</u>.  All representations and warranties contained herein shall be deemed continuing and in effect at all times prior to Conversion and shall be deemed to be incorporated by reference in each Borrower's Request for Loan Advance and shall constitute an affirmation by Borrower that the representations and warranties in Article III of this Agreement and the other Loan Documents remain true and correct as of the date of such Request for Loan Advance unless Borrower specifically notifies Lender of any change therein.

ARTICLE IV
**CONSTRUCTION LOAN ADVANCES AND CLOSING**

4.1   Lender shall not be bound pursuant to this Agreement to make any disbursement of the Loan (**"Advance"**) unless the following conditions have been satisfied:

(a) No Event of Default shall have occurred and be continuing under the Loan Documents;

15

Case ID: 230901940

(b) The Plans and Budget have been submitted to the Lender and found acceptable. Any material deviation to the Plans and Budget must have Lender's prior approval. A full stamped copy of the Plans shall be delivered to the Lender and Construction Consultant prior to Closing;

(c) The Lender shall be furnished with, and shall have approved, copies of any agreements with any Governmental Authorities pertaining to development of the Mortgaged Property, including any obligations of Borrower to construct municipal improvements, such as streets, roads, curbs, sidewalks, fire hydrants, street lighting and the like. If no such agreements exist, Borrower shall so certify at Closing. Any and all sums paid or to be paid by Borrower pursuant to any of the aforesaid agreements shall be set forth in the Budget;

(d) Borrower shall have submitted to the Lender and its counsel evidence of Governmental Approvals issued by the appropriate Governmental Authorities (the sufficiency of which shall be in the sole discretion of the Lender and its counsel), showing that the Project has received all Governmental Approvals required;

(e) Borrower shall submit for the Lender's approval, and assign to the Lender, the General Contractor Agreement, the Architect Agreement, and Borrower's contract with its engineer(s), if any;

(f) Borrower shall submit to the Lender evidence that public water and sewer facilities and other necessary utilities, such as electricity, telephone service and gas, if included in the Plans, are available to service the full needs of the Mortgaged Property, and valid and enforceable agreements to supply such services will have been entered into with the suppliers thereof. To the extent assignable, Borrower shall assign to the Lender any and all Governmental Approvals and Permits;

(g) The Borrower shall have provided to the Lender, original (or certified copies or insurance binders, if available) prepaid insurance policies for builders risk and general public liability insurance issued by insurance companies reasonably acceptable to the Lender and in form and content reasonably acceptable to the Lender (but nonetheless in accordance with Section 7 of the Mortgage) naming the Lender as Mortgagee and as Lender Loss Payee, respectively, in compliance with Section 7 of the Mortgage. Such policies shall contain a 30-day notice of cancellation clause to the Lender. In addition, to the extent required pursuant to Section 7 of the Mortgage, evidence of public liability insurance and worker's compensation coverage from all contractors working on the Project listing the Borrower and the Lender as additional insured shall be provided to the Lender prior to the contractor commencing work. The Lender shall have the right to require additional types and amounts of coverage as the same shall be customary for similar construction projects in Philadelphia, Pennsylvania, but nonetheless subject to the limitations in Section 7 of the Mortgage. If the Lender shall receive any notice pursuant to Section 42 Pa.C.S. § 8143(b) from a person having or claiming to have a lien or encumbrance on the Mortgaged Property that is subordinate to the lien of the Mortgage, Lender shall not be liable to Borrower if Lender shall thereafter fail or refuse to make any future Advance requested by Borrower to be made pursuant to this Article IV unless Lender's title insurer shall have agreed to endorse Lender's policy of mortgagee title insurance to ensure the lien of the Mortgage in the full amount of all Advances theretofore made by Lender, including the one then being requested by Borrower, as a first lien on the Mortgaged Property.

16

Case ID: 230901940

Borrower covenants and agrees that Borrower will comply with all of the provisions of the Pennsylvania Contractor and Subcontractor Payment Act, 73 P.S. § 501 et seq., as applicable.

(h) Borrower shall cause to be delivered to Lender an environmental assessment report or reports of one or more qualified environmental engineering or similar inspection firms approved by Lender in form, scope and substance satisfactory to Lender, which report or reports shall indicate a condition of the Mortgaged Property in all respects satisfactory to Lender in its sole discretion and upon which report or reports Lender is expressly entitled to rely. The Lender may order such additional testing and sampling as Lender shall determine to be necessary, in its sole discretion. Any environmental consultant or engineer used for such analyses shall be satisfactory to the Lender and the Borrower shall be responsible for all reasonable expenses incurred in performing the required analyses;

(i) The Mortgaged Property will, at the time of closing of the Loan, be in full compliance with all Environmental Laws to the extent any such non-compliance would cause a Material Adverse Effect on the Mortgaged Property or Project. The Borrower shall be responsible for all expenses incurred in satisfying the requirements outlined hereinabove, regardless of whether the Loan is closed;

(j) The Borrower shall provide, for the Lender's approval, test boring engineering reports and such other site analyses as the Lender may reasonably require, that the ground is adequate for the proposed construction; and

(k) All oil storage tanks shall be removed from the Mortgaged Property which removal shall be effected in compliance with all applicable Federal, state and municipal storage tank laws, rules and regulations, with evidence of removal and legal compliance provided to the Lender and its counsel.

4.2     Conditions Precedent to First Advance.  The Lender's obligation to make the first Advance of funds under the Loan ("**First Advance**") shall be subject to the satisfaction of the following conditions precedent:

(a) Satisfaction of all conditions set forth in Section 4.1 hereof;

(b) The Borrower shall be in material compliance with all terms and conditions of this Agreement and there shall have occurred no Event of Default hereunder;

(c) No uncured order or notice shall have been given by any Governmental Authority stopping construction or stating that the work or construction is in violation of any law, ordinance, code or regulation;

(d) The Title Policy shall have been continued to the date of the Advance and shall confirm that the Lender has a continued first priority lien on the Mortgaged Property and that no subordinate lien, except such as are listed as exceptions to title or exclusions from coverage in the Title Policy being issued by the Title Company to the Lender concurrently with the recording of the Mortgage, or claims exist;

(e) The Borrower shall have submitted to the Lender a written certification and request for an advance ("**Request for Loan Advance**") signed by the Borrower in the form attached

17

Case ID: 230901940

hereto as ___**Exhibit E**___ (or in such alternative form acceptable to Lender in its sole discretion) and made a part hereof not less than five (5) Business Days before the date that the Borrower desires an Advance;

       (f)  Completion of a satisfactory inspection of the Mortgaged Property and the Project by the Lender and the Construction Consultant;

       (g)  The Borrower shall provide to the Lender lien waivers (or partial lien waivers, if applicable) in the form attached hereto as ___**Exhibit F**___, and made a part hereof, from the General Contractor and all subcontractors with regard to all Advances prior to the then pending Advance;

       (h)  The Borrower shall supply evidence reasonably satisfactory to the Lender that all demolition, excavation and building permits required for construction have been issued by the Governmental Authorities and that the Improvements when completed will comply with all Legal Requirements, including but not limited to building, zoning and environmental regulations;

       (i)  Receipt of a location survey (or redate thereof) of the Mortgaged Property prepared by a surveyor licensed in Pennsylvania, which survey shall locate all property lines, foundations, building setback lines and easements;

       (j)  Receipt of the financial statements for the Borrower and each Guarantor as required by this Agreement;

       (k)  Receipt of the General Contractor Certificate requiring the General Contractor to continue performance on Lender's behalf without additional cost in the event of a default by Borrower under any of the Loan Documents;

       (l)  Receipt of the Project Architect's Certification consenting to the assignment of the Project Architect's Agreement and the assignment of any other agreements made by other design contractors or engineers substantially in the form attached hereto of ___**Exhibit G**___;

       (m) Evidence that all amounts necessary to complete construction of the Improvements, including contingencies, shall be available from sources and at such times as are approved by Lender;

       (n)  The Borrower shall have submitted payment receipts and invoices from the General Contractor and all subcontractors with contracts in excess of $50,000.00, evidencing that they have been paid in full (subject to retainage) for all work performed and/or materials supplied to the Borrower.

       (o)  The representations and warranties made by Borrower and Guarantors in the Loan Documents or otherwise made by or on behalf of Borrower or Guarantors in connection therewith or after the date thereof shall have been true and correct in all respects on the date on which made and shall continue to be true and correct in all respects on the date of the First Advance.

       (p)  The Borrower shall have submitted such additional documents as the Lender may reasonably require;

18

Case ID: 230901940

(q) [*Reserved*];

(r) The Budget shall contain contingency requirements in amounts satisfactory to Lender. Changes in the Budget shall require Lender approval.

(s) The Lender shall at all times be satisfied that the undisbursed portion of the Construction Loan will be sufficient to complete the Project free of all liens, in the aggregate and individually as to each line item category in the Budget, including payment of all costs associated with the Project and any construction work performed, but for which no payment has been made, in accordance with the Plans previously provided to the Lender (such condition being herein referred to as "**in balance**"). If at any time the Lender determines in its sole discretion that the Construction Loan is not "in balance", the Lender may notify Borrower of such determination, and the amount by which the Construction Loan is not "in balance". Within ten (10) days following notice from Lender that the Construction Loan is not "in balance", Borrower shall deposit with the Lender funds sufficient, in the Lender's sole judgment, to bring the Construction Loan back "in balance".

(t) Payment by Borrower of all fees and expenses required by this Agreement, to the extent due and payable, including, without limitation, Lender's reasonable attorneys' fees and expenses.

(u) Approval by Lender's Construction Consultant of a Plan and Cost Review report with respect to the Project.

(v) Delivery by Borrower of a complete list of all passive investors owning membership interests in the Borrower. All such information is subject to Lender's standard KYC approval procedure.

4.3 <u>Conditions to Subsequent Advances</u>: Without limiting the generality of the foregoing, Lender's obligation to make subsequent Advances is conditioned upon meeting all of the conditions of Section 4.2 above in the same manner in which they were satisfied for the First Advance and without reimposing any one-time requirement, which shall continue to be satisfied as of the date of such subsequent Advance and upon all of the following:

(a) No Event of Default shall have occurred and be continuing under the Loan Documents or event or condition which, with the giving of notice or the passage of time, or both, could become an Event of Default hereunder;

(b) Lender shall have been furnished with a notice of title continuation or an endorsement to the Title Policy issued to Lender in connection with the First Advance of the Loan, which continuation or endorsement shall increase the coverage of the Title Insurance Policy by the amount of the Advance through the pending disbursement clause (but not the overall policy amount which shall be for the full amount of the Loan Amount for the Permanent Loan), amend the effective date of the Title Insurance Policy to the date of such Advance, continue to insure the lien of the Mortgage subject to no liens or encumbrances other than the Permitted Encumbrances and which shall state that since the last disbursement of the Loan there have been no changes in the state of title to the Mortgaged Property (other than Permitted Encumbrances) and that there are no additional survey exceptions not previously approved by Lender;

USRE 257 – Loan Agreement
4839-4449-2748, v. 6

Case ID: 230901940

(c) the continued effectiveness of this Agreement, the Note, and each of the Loan Documents;

(d) Notwithstanding anything contained in this Agreement to the contrary, the sum of $100,000.00 will be held back from the Construction Loan and not Advanced until such time as Borrower demonstrates compliance with the terms and conditions of the Post Closing Agreement; and

(e) Borrower has provided to Lender, and Lender has approved, all of the items listed as numbers 2 through 8 of the Post Closing Agreement.

4.4    Conditions Precedent to Final Advance.  The Lender's obligation to make the final Advance (the "**Final Advance**") under the Construction Loan shall be subject to the satisfaction of the following conditions precedent:

(a) Satisfaction of all conditions set forth in Section 4.1, 4.2 and 4.3 hereof;

(b) Receipt by the Lender of such title insurance endorsements as it may reasonably require;

(c) Receipt by the Lender of the permanent certificate of occupancy for the Project, or a temporary certificate of occupancy subject only to conditions reasonably acceptable to the Lender;

(d) Receipt by the Lender of an "as-built" survey prepared by an engineer or surveyor licensed in Pennsylvania locating all property lines, building setback lines, easements and the Project and all other permits and licenses necessary for occupancy and use thereof;

(e) Receipt and approval by the Lender of a Certificate of Substantial Completion (AIA Form No. G704) executed by the Project Architect or General Contractor or similar certification in form and substance acceptable to the Lender;

(f) Receipt and approval by Lender of the report from the Construction Consultant verifying that the Project is completed in accordance with the Plans;

(g) Receipt by the Lender of final lien waivers duly executed by the General Contractor and all subcontractors for the Project; and

(h) Receipt of a Property Certificate from the City of Philadelphia Licenses and Inspections department confirming that: (i) all violations disclosed on the Property Certificate No. PC-2020-019560 dated November 11, 2020 have been corrected and removed from the department's records; and (ii) no new violations have been filed by the City of Philadelphia against the Project and the Property.

USRE 257 – Loan Agreement
4839-4449-2748, v. 6

Case ID: 230901940

4.5     Amount and Frequency of Advances/Borrower's Equity.

(a) The proceeds of the Construction Loan will be allocated in the manner provided for in the Budget and the Loan Allocation Chart attached hereto as ***Exhibit H*** and made a part hereof.

(b) Borrower shall invest a minimum of $5,425,000.00 cash equity for the Project, including acquisition and construction costs (the "**Equity Requirement**"). The Equity Requirement shall be comprised of: (i) $4,900,000.00, representing the value of the land, as determined by the Lender's appraiser (the "**Land Equity**"); (ii) $275,000.00, representing Soft Costs; and (iii) $250,000.00, representing the Developer's Fee. The Borrower's investment of cash equity shall be subject to verification by the Lender. The Lender shall not be required to accept any portion of the Equity Requirement in a form other than cash. Borrower's contribution of the Land Equity has been satisfied as of the Closing Date. The balance of the Equity Requirement shall be made as required by Lender as construction progresses. Borrower's Equity will remain in place through the Maturity Date and will not be reimbursed by the Lender.

(c) The Borrower shall fund those expenses not allocated as Lender expenses, including all Soft Costs in the amount of $275,000.00. Soft Costs will be the Borrower's responsibility as incurred and will be subject to satisfactory review by the Lender. Borrower agrees to provide evidence to Lender in the form of an accounts payable schedule. Paid receipts, invoices and cancelled checks showing payment of Soft Costs must be provided to Lender prior to the first Advance. The Lender will not include as part of the Borrower's payment of Soft Costs, any monies paid by Borrower for overhead or a developer's fee.

(d) Each Advance by the Lender shall: (i) reimburse the Borrower for construction costs incurred and paid for by the Borrower; or (ii) cover expenses of construction costs for construction completed and inspected by the Lender but not yet paid for by Borrower. The Lender shall only release funds for work-in-place and shall not pay for materials on site or for deposits on any items.   In no event shall the Lender make more than one (1) Advance to Borrower in any calendar month.

(e) Advances for direct construction costs, including hard costs, less the Retainage of ten percent (10%) or such amount as required under the General Construction Agreement, will be made upon the request of the Borrower which request shall be approved and executed by the Borrower's engineer/architect (AIA format).   In addition, each Request for Loan Advance shall require the reasonable approval of the Construction Consultant. The Borrower shall pay a fee for each inspection. Such Advances shall be in amounts not exceeding the cost of labor and material for which payment is requested. The Lender shall: (i) release a portion of the accumulated retainage to Borrower in an amount determined by the Lender; and (ii) reduce Retainage to five (5%) percent when the Project reaches eighty-five (85%) percent completion as confirmed by Borrower, Project Architect and Construction Consultant. The Release of the balance of the Retainage shall not be made until (A) construction of the Improvements has been fully completed in substantial accordance with final Plans approved by the Lender, (B) the Borrower has obtained valid completion certificates of occupancy (including a temporary certificate of occupancy) as may be required by any Governmental Authority, (C) Construction Consultant or Lender's engineer and Project Architect

21

Case ID: 230901940

have executed Sign Offs on each line item of the Budget and (D) Lender receives final lien waivers from all subcontractors.

(f) Notwithstanding anything else herein contained, the Lender shall have the right, without the specific consent of the Borrower, to apply any funds which it agrees to advance hereunder (i) to bring about the completion of the Improvements, and (ii) to the payment of any closing costs, taxes, special assessments, or any other charges which could be or become a lien on the Mortgaged Property, or any part thereof, or any interest on the Loan, or any premium on any insurance policy affecting the Mortgaged Property.

(g) If at any time the Lender determines that the funds hereby agreed to be advanced or the undisbursed balance thereof are insufficient to complete the Improvements to the Mortgaged Property or for any other charge or expense which may have been incurred or may be assumed by the Lender in connection with the Loan, the Borrower agrees to deposit such deficiency in the Operating Account at the Lender, as defined herein, within five (5) days of demand by Lender. Lender shall be under no obligation to make any further Advance until any amount so demanded is so deposited.

(h) No Advances will be permitted for deposits or stored materials.

4.6     Interest Reserve.  A portion of the Construction Loan specified in the Budget (the "**Interest Reserve**") has been reserved for payments of interest as it accrues and becomes due and payable on the Construction Loan with an additional amount to serve as a cushion in case of an increase in interest rates.  The Interest Reserve shall not be disbursed for any purpose other than the payment of interest on the Construction Loan unless otherwise agreed to by Lender in its sole and absolute discretion.  Lender shall advance portions of the Interest Reserve directly to Lender to satisfy obligations for the payment of interest under the Note from time to time as the same becomes due and payable until such time as: (a) the Interest Reserve is fully depleted; or (b) an Event of Default has occurred and Lender elects to cease funding of interest payments from the Interest Reserve.  If at any point during the Term of the Construction Loan the Lender determines that the balance of the Interest Reserve is less than the interest costs for the Term of the Construction Loan, the Borrower and/or the Guarantors shall make a cash deposit into the Interest Reserve sufficient to bring the Interest Reserve up to the level required by the Lender. Interest shall accrue on funds advanced from the Interest Reserve as and when such Advances are made.

## ARTICLE V
## BORROWER COVENANTS

5.1     General.  The Borrower covenants and agrees from the Closing Date, and as long as the Borrower remains indebted to the Lender, the Borrower shall:

(a) Promptly pay when due principal, interest and all other fees and charges due pursuant to the Note and this Agreement;

(b) Preserve and keep in full force and effect its existence and retain title to the Mortgaged Property and the other collateral securing the Loan;

22

Case ID: 230901940

(c) Pay when due all taxes, assessments, water charges, sewer charges and all other charges levied on or against the Mortgaged Property, and upon written request, submit to the Lender official receipts evidencing such payments;

(d) Obtain and maintain the insurance required by the Lender; and

(e) Borrower shall in no event or under any circumstance have the right to reallocate any portion of the Budget prior to the Completion Date or to reallocate any savings in a Budget Line Item to any other line item of the Budget, without in each instance obtaining the prior approval of the Lender, which approval may be withheld in the sole and absolute discretion of the Lender, or to cause a reallocation to occur that in the opinion of the Lender, its counsel or the title company will be in contravention of any applicable law or Legal Requirement, or that in the opinion of the Lender, its counsel or the title company will adversely affect or impair in any manner whatsoever the lien or priority of the lien of the Mortgage. Each category of cost ("**Budget Line Item**") shall be delineated in the Budget and only those that are approved may be disbursed out of the Loan proceeds, subject to satisfaction of all applicable conditions to Advances hereunder, being so indicated.

5.2    Use of Proceeds:    Use the proceeds of the Construction Loan solely and exclusively for the purposes of constructing the Improvements in accordance herewith, which shall be subject to no change except with Lender's prior approval, and to pay such fees, closing costs and other non-construction expenses relating to the Loan, the construction of the Improvements, or the discharge of Borrower's obligations under this Agreement as Lender has approved or may from time to time approve.

5.3    Liens and Encumbrances:    Keep the Project and all other assets of Borrower free from all Liens and encumbrances except Permitted Encumbrances; to pay promptly all Persons supplying work or materials for the construction of the Improvements; immediately discharge by bond or otherwise, any mechanic's or other Lien filed against the Project or the Borrower.

5.4    Construction Commencement and Completion.    Subject to delays caused by Force Majeure, the Borrower shall commence construction within sixty (60) days of the Closing. At all times, the Borrower shall diligently proceed with construction in accordance with the Plans in a good, substantial and workmanlike manner in accordance with all Legal Requirements and all applicable laws, ordinances, codes, rules and regulations. Borrower shall correct all violations at the Project now or hereafter existing in accordance with all Legal Requirements. Construction of the Project shall be completed and Borrower shall have obtained a valid and subsisting permanent or temporary certificate of occupancy (if subject to conditions, such conditions acceptable to Lender) with respect to the Mortgaged Property on or before the Completion Date.

5.5    Changes to Plans.    Borrower shall not authorize or permit any changes to the Plans, or working drawings which changes affect the scope or cost of the Project without the prior written approval of Lender, and of all Governmental Authorities to the extent such approval is required by law or regulation. Notwithstanding the foregoing, no approval of the Lender shall be required for any revision to the approved Plans if such revision would increase the cost of the Project by less than $35,000.00.

23

Case ID: 230901940

5.6     Construction Inspections.  The Lender, the Construction Consultant and/or their representatives shall have the right at all reasonable times upon reasonable prior notice (in no event less than one (1) business day) and subject to safety rules, to enter upon the Mortgaged Property and inspect the work of construction, provided, that not more than one inspection shall be performed for each draw request unless the Lender reasonably determines that a reinspection is necessary for the draw request in question.  The Construction Consultant shall review the Plans, shall make monthly inspections of the Project and shall report to the Lender as to the progress of construction.  The Borrower shall pay the Lender the Lender's then-standard fees or expenses associated with such inspections and the other requirements of this Section.  As of the date of this Agreement, the Lender's inspection fee is $775.00 per inspection.  The Borrower shall permit the Lender to examine all records and other documents relating to the Mortgaged Property and the Project upon reasonable advanced notice (no less than twenty-four (24) hours), except upon emergent conditions or an emergency requiring immediate review, which will require less notice.

5.7     Updated Appraisals.  Throughout the term of the Loan, including any extension, if any, the Lender reserves the right, from time to time, to order an updated appraisal. The Borrower shall be responsible for payment of all costs associated with the appraisal updates: (a) prior to Conversion, to confirm the gross sell-out or "as-is" value of the Mortgaged Property; (b) one (1) time during the term of the Permanent Loan; and (c) at any time that an updated appraisal is required following an Event of Default.

5.8     Notice of Claims.  The Borrower shall promptly notify the Lender in writing upon obtaining knowledge of all pending or threatened litigation affecting the Borrower, any Guarantor or the Mortgaged Property.

5.9     Indemnification.  The Borrower shall defend, indemnify and hold the Lender harmless from all claims, losses, expenses, liabilities or damages (including reasonable counsel fees and disbursements) of any nature arising out of or in any way relating to the Mortgaged Property and/or the construction and occupancy of the Project or arising out of the transactions contemplated hereby unless solely resulting from the gross negligence or willful misconduct of the Lender or its agents.  This section is not limited by any exculpatory provisions herein and shall survive the discharge, foreclosure and assignment of the Mortgage and the execution, delivery, performance and repayment of this Agreement and the Note.

5.10    Further Assurances.  Upon Lender's request, the Borrower will take any actions and execute any further documents as the Lender deems reasonably necessary or appropriate to carry out the purposes of this Agreement.

5.11    Financial Reporting and Covenants.  During the term of the Loan, the Borrower:

(a) Shall deliver or cause to be delivered to the Lender as soon as available to Borrower, and in any event no later than ninety (90) days from the close of each calendar year during the term hereunder, each in form and substance reasonably acceptable to the Lender:

(i)     the annual financial statements of the Guarantors as of the end of and for such calendar year in form substantially similar to those previously

24

Case ID: 230901940

delivered by such Guarantor to the Lender. All such financial statements shall be prepared by either such Guarantor or such Guarantor's independent certified public accountants (which accountants shall be reasonably acceptable to the Lender) and certified by such Guarantor as presenting fairly in all material respects the Guarantor's financial condition; and

(ii)    operating income statement and operating expense statements of the Mortgaged Property (together with a current rent roll for the Mortgaged Property) as of the end of and for the immediately preceding calendar year, as prepared on an unaudited basis by either the internal management of Borrower or the independent certified public accountants of Borrower (which accountants shall be reasonably satisfactory to the Lender) and certified by a principal of Borrower as presenting fairly in all material respects the financial condition and results of operations of Borrower and the Mortgaged Property.

(b) Shall provide or cause to be provided to the Lender true and correct copies of Borrower's and Guarantors' filed federal (and equivalent foreign) income tax returns within thirty (30) days from the filing of same with the appropriate officials. Furthermore, Borrower shall timely file or cause to be timely filed all foreign, federal, state and local tax returns applicable to Borrower and/or Guarantors (or any extensions for filing in connection with same) and pay all such required taxes.

(c) Acknowledges that failure by Borrower to provide, or cause to be provided by the Obligor(s), the above financial information in the time periods required, may, in Lender's sole, non-reviewable discretion, upon ten (10) days written notice to Borrower, result in an increase in the rate of interest under the Note by one percentage point (1%) per annum for the period during which the financial information remains outstanding, and that any such rate increase shall be in addition to all other remedies available to Lender under this Agreement and the Note.

(d) Shall deliver any other information as may be reasonably requested from time to time by the Lender.

5.12    Leasing.

(a) Commercial Leases.  Borrower shall not enter into any commercial lease or similar agreement for space in the Mortgaged Property without obtaining the Lender's prior written approval of all of the terms and conditions thereof, and once approved, Borrower shall not amend or modify or cancel any such lease or similar agreement except as specifically provided for therein without obtaining the Lender's prior written approval.

(b) Residential Lease.  Borrower shall not enter into any lease or similar agreement for residential space in the Mortgaged Property without obtaining the Lender's prior written approval of all of the terms and conditions thereof, and once approved, Borrower shall not materially amend or modify or cancel any such lease or similar agreement except as specifically provided for therein without obtaining the Lender's prior written approval.  Notwithstanding anything in the immediately preceding sentence to the contrary, the Lender's consent shall not be required in connection with any residential lease at the Mortgaged Property entered into by Borrower in the

25

Case ID: 230901940

normal course of business in a manner which is consistent with sound and customary leasing and management practices for similar properties in the community in which the Mortgaged Property is located and which is at a rental and on terms consistent with the terms for similar leases in the market area of the Mortgaged Property and written on a standard form previously approved by the Lender.  It is acknowledged and agreed that the form of lease attached hereto, as ***Exhibit I*** has been approved by the Lender.

(c)     Each such lease shall contain subordination and attornment provisions in form and content acceptable to the Lender.  Borrower also agrees to include the following language in said leases:

"**NOTICE OF CONSTRUCTION LOAN.  The Tenant acknowledges through the execution of this Lease, that the Landlord has obtained/will obtain a construction, acquisition, or improvement loan.  That loan(s) will be/is secured by, among other things, a construction mortgage and security agreement encumbering the Mortgaged Property which is the subject of this Lease**".

5.13     Accounts.

(a) Borrower remains obligated to make all payments required under the Loan Documents irrespective of whether sufficient funds are available therefor in the Interest Reserve.

(b)     Borrower covenants and agrees to establish an operating account with the Lender (the "**Operating Account**") prior to or simultaneously with the execution and delivery of this Agreement and to maintain such account until the payment in full of the Loan.  All construction Advances of Loan proceeds with respect to the Mortgaged Property will be deposited into the Operating Account and utilized for the purpose of constructing the Project.

(c)     On or before the Conversion Date, Borrower shall establish and maintain with the Lender a tenant security account (the "**Security Deposit Account**") into which Borrower shall, immediately upon receipt, deposit all tenant security deposits provided for under all Leases affecting the Mortgaged Property.  Until full repayment of the Loan in accordance with the terms of the Loan Documents, Borrower shall not withdraw any funds from the Security Deposit Account without the prior written consent of Lender, unless such withdrawal is for the express and limited purpose of returning a tenant security deposit to a tenant under a Lease upon the expiration of such Lease.  Failure to maintain the Security Deposit Account will result in an increase in the Interest Rate equal to one half of one percent (0.50%), as set forth in the Note.

The Operating Account and the Security Deposit Account (collectively, the "**Reserve Accounts**") shall be non-interest bearing accounts of the type customarily maintained by the Lender or its servicing agent for similar purposes, unless such accounts are required to pay interest by Legal Requirements.  Borrower assumes all risk of loss with respect to amount on deposit in such accounts, other than loss resulting solely from the willful misconduct or gross negligence of the Lender as finally determined by a court of competent jurisdiction.  If an Event of Default shall occur, the Lender may, without notice or demand on Borrower, at its option: (i) withdraw any or all of the funds then remaining in such accounts and apply the same to the Loan, after deducting all costs of safekeeping, collection and delivery, in such manner as the Lender shall deem appropriate in its sole

26

Case ID: 230901940

discretion, and the excess, if any, shall be paid to Borrower, or (ii) exercise any and all rights and remedies of a secured party under any applicable Uniform Commercial Code or available at law or in equity. No such use of the funds contained in the Reserve Accounts shall be deemed to cure any Event of Default under any of the Loan Documents.

5.14    <u>Compliance with Laws</u>.   The Mortgaged Property shall be operated and maintained in accordance with all Legal Requirements.

5.15    <u>Additional Financing</u>.   Borrower shall not incur any additional indebtedness (except trade payables and equipment financing) whether or not secured by any lien or security interest on the Mortgaged Property or any other property encumbered in favor of the Lender to secure the Loan without obtaining the Lender's prior written consent thereto.

5.16    <u>Status of Title to Mortgaged Property</u>.   Borrower shall not transfer control or ownership of the Mortgaged Property or any part thereof, directly or indirectly, voluntarily or involuntarily, without the prior written approval of the Lender. Without the prior written consent of the Lender, Borrower shall not create or permit to exist any lien, encumbrance or security interest in favor of any third party with respect to the Mortgaged Property or any property, whether or not a fixture, installed thereon or stored thereat and Borrower shall keep all such property free from any such lien or security interest other than those created in favor of the Lender pursuant to the Loan Documents and liens for taxes not yet due and payable. In general, Borrower shall keep the title to the Mortgaged Property good and marketable and free of any matter which would prevent any title insurance company from certifying the lien of any mortgage to be executed in favor of a permanent lender or other mortgagee in substitution for or in payment of the Loan, as other than a good and valid lien upon the Mortgaged Property.

5.17    <u>Environmental Matters</u>.   Borrower shall not, and shall not permit any Tenant or other occupant of the Mortgaged Property to, store, use, generate, treat or dispose of any Regulated Substances or create, produce or generate any Contamination (each term being defined in the Environmental Indemnity Agreement) on the Mortgaged Property, except for: (i) those Regulated Substances which are used or present in the ordinary course of Borrower's business in compliance with all Environmental Laws, are listed on Schedule I to the Environmental Indemnity Agreement and have not been released into the environment in such a manner as to constitute Contamination, and (ii) those Regulated Substances which are naturally occurring on the Mortgaged Property, but only in such naturally occurring form. Borrower promptly shall advise the Lender in writing of and with respect to any pending or threatened claim, demand or action by any Governmental Authority or third party relating to any Regulated Substances or Contamination affecting the Mortgaged Property or the discovery of any Regulated Substances or Contamination at the Mortgaged Property or on any real property adjoining or in the vicinity of the Mortgaged Property. Borrower shall allow Lender and its agents reasonable access to the Project (except in cases of the presence of Contamination or release or disposal of Regulated Substances on the Mortgaged Property, in which case Lender may enter the Mortgaged Property at any time) and permit such inspections, tests and monitoring of the Project as Lender may reasonably require.

5.18    <u>Deficiencies</u>. Deposit with Lender within ten (10) days of Lender's demand therefor the amount of money equal to the difference between the undisbursed Construction Loan funds

27

Case ID: 230901940

(exclusive of Retainage) and the amount which Lender determines is necessary to keep the Project "in balance". Lender shall be under no obligation to make any further Advances until Borrower deposits the cash equity demanded by Lender.

5.19    <u>Maintenance of Existence</u>. Borrower shall maintain its existence as a limited liability company under the laws of the State of Delaware and shall remain in good standing in the State of Delaware and the Commonwealth of Pennsylvania. Borrower shall not amend the Organizational Documents or change its fiscal year, without in each case obtaining the prior written approval of Lender.

5.20    <u>Single Purpose, Bankruptcy Remote Entity</u>. Borrower has not and shall not:

(a)    engage in any business or activity other than the purchase, ownership, development, construction, leasing and/or sale of the Mortgaged Property and any activities incidental thereto;

(b)    acquire or own any assets other than: (A) the Mortgaged Property, and (B) such incidental personal property as may be necessary for the ownership of the Mortgaged Property;

(c)    merge into or consolidate with any person or entity, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(d)    fail to observe all organizational formalities or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable legal requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its organizational documents;

(e)    form or own any subsidiary or make any investment in any person or entity;

(f)    commingle its assets with the assets of any other person or entity;

(g)    incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation) other than: (A) the Loan and/or (B) trade and operational indebtedness incurred in the ordinary course of business with trade creditors on commercially reasonable terms and conditions;

(h)    assume or guaranty the debts of any other person or entity, hold itself out to be responsible for the debts of any other person or entity, pledge its assets for the benefit of any other person or entity, hold out its credit as being available to satisfy the obligations of any other person or entity, or acquire obligations or securities of any other person or entity; or

(i)    fail to remain in good standing under the laws of the State of Delaware and the Commonwealth of Pennsylvania.

28

Case ID: 230901940

5.21   <u>No Transfer of Equity Interests</u>.   No direct or indirect equity ownership in Borrower may be transferred, pledged or encumbered, directly or indirectly, without the prior written consent of Lender, which may be granted or withheld in Lender's sole, non-reviewable judgment.   Notwithstanding the foregoing, and provided there then exists no Event of Default or state of facts which with the giving of notice or passage of time, or both, would become an Event of Default, the following shall be permitted so long as the Permitted Transfer Conditions (defined below) are satisfied (the "**Permitted Transfers**"):

(i)   transfers of ownership interests in Borrower between individuals and/or legal entities or trusts owning equity interests in Borrower as of the date of this Agreement;

(ii)   transfers of ownership interests in Borrower by devise or descent or by operation of law upon the death or disability of the transferor; and/or

(iii)   transfers of ownership interests in Borrower to the owner's immediate family members (i.e., spouse, child, parent, sibling or grandchild of such owner) or a trust established for the benefit of such immediate family member.

The following items (i), (ii) and (iii) are each a "**Permitted Transfer Condition**" and collectively, the "**Permitted Transfer Conditions**":

(i)   Lender may establish a threshold level of percentage ownership interest of existing owners of Borrower to which all owners of Borrower shall adhere;

(ii)   the management of Borrower shall not be changed; and

(iii)   no owner of a direct or indirect interest in Borrower (A) is listed on any Government Lists, (B) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (C) has been previously indicted for, or convicted of, any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (D) is currently under investigation by any governmental authority for alleged criminal activity.

Borrower shall provide Lender with written notice and details of any Permitted Transfer within thirty (30) days prior to the transfer becoming effective under the Loan Documents (or as soon as reasonably practical following the death or disability of the transferor) so Lender can confirm compliance with the Permitted Transfer Conditions and the other applicable conditions in this sub-paragraph. If Borrower does not provide Lender with such written notice and details of the Permitted Transfer or satisfy the other applicable conditions in this sub-paragraph, the proposed Permitted Transfer shall constitute an Event of Default.

5.22   <u>Principal Office</u>.   Borrower shall maintain its principal office and/or the office where it keeps its books and records at the address set forth herein, unless it gives the Lender prior written notice of any proposed change in location thereof.

5.23   <u>Books and Records</u>.   Borrower shall keep complete and accurate books and records in accordance with generally accepted accounting principles consistently applied. Borrower shall furnish to the Lender all such written information relating to its affairs as may be reasonably requested by the Lender from time to time.

29

Case ID: 230901940

5.24   Audit. The Lender shall have the right at any time and from time to time to audit the books and records of Borrower and Borrower shall be obligated to make available for any such audit all books, records and other information that the Lender may reasonably request for such purpose and to cooperate fully with the Lender in connection therewith.

5.25   Changed Circumstances. Borrower shall promptly notify the Lender of any change in any fact or circumstance represented or warranted by Borrower herein and in any other documents furnished to the Lender in connection with this Agreement.

5.26   Lender's Fees and Costs. Borrower shall pay or reimburse the Lender for all costs and expenses incurred by the Lender in connection with the preparation, review, modification and, after the occurrence of an Event of Default hereunder, enforcement of the Loan Documents and collection of the Loan.

5.27   Change of General Contractor. In the event, during the term of the Construction Loan, a change is made in the General Contractor, the Borrower, prior to the advance of any additional funds under the Construction Loan, shall furnish to Lender the name and address of the new general contractor, together with a copy of any agreement with such new general contractor and a new certificate with such professional in the form attached as Exhibit B.

5.28   Changes to Project Team: Obtain the prior written consent of Lender before terminating or replacing the General Contractor or Project Architect.

5.29   List of Contractors, Subcontractors, and Materialmen: Notify Lender promptly of the names and addresses of all contractors, subcontractors and materialmen who are employed in connection with the construction of the Improvements, and whose names, addresses and work specialty were not heretofore supplied to Lender.

5.30   Subordinate Financing: The Borrower shall not obtain any subordinate financing, mezzanine financing or soft financing secured by the Mortgaged Property and will not, without the prior written consent of the Lender, which Lender may grant or withhold in its sole discretion, execute, deliver and record any subordinate mortgage or other instrument encumbering the Mortgaged Property including a purchase money wraparound mortgage, assignment of rents or of the Lender's interest in leases.

5.31   Loan Balancing. At any time and from time to time during the term of the Construction Loan, Lender shall have the right (but not the obligation) to notify Borrower that, in Lender's sole judgment that the cost of completing any Budget Line Item exceeds the remaining undisbursed portion of the Construction Loan allocated to such Budget Line Item plus any sums deposited with Lender pursuant to this Section 5.31 to pay for such deficiency and not previously disbursed (plus any applicable allocated or reallocated contingency and any allocated or reallocated cost savings achieved and permitted hereunder (the "**Shortfall**"). If Lender at any time shall so notify Borrower, Borrower shall within ten (10) days of Lender's notification as aforesaid, deposit with Lender an amount equal to such Shortfall, which Lender may from time to time apply, or allow Borrower to apply, to such costs. Borrower hereby agrees that Lender shall have a lien on and security interest in any sums deposited pursuant to this Section 5.31 and that Borrower shall have no right to withdraw any such sums except for the payment of the

30

Case ID: 230901940

aforesaid costs as approved by Lender. Lender shall have no obligation to make any further Advances until the sums required to be deposited pursuant to this paragraph have been exhausted, and the Loan is back "in balance". Any such sums not used as provided in this paragraph shall be released to Borrower when and to the extent that Lender determines in its sole discretion that the amount thereof is more than the excess, if any, of the remaining total Project related costs over the undisbursed balance of the Construction Loan, provided, however, that should an Event of Default occur, Lender shall at Lender's election, apply such amounts either to the remaining total Project costs or to the immediate reduction of outstanding principal and/or interest under the Note.

5.32   Tax Abatement.   Borrower represents that it intends to submit an application to the City of Philadelphia for the Tax Abatement. Borrower shall provide Lender with a copy of its application for the Tax Abatement promptly after the filing thereof. Following approval of the Tax Abatement, the Borrower will pay all required fees and take any and all other action necessary to implement the Tax Abatement. At all times after approval of the Tax Abatement, the Borrower will keep the Tax Abatement in full force and effect and will comply with all requirements of the City of Philadelphia with respect to the issuance and continuation of the benefits of the Tax Abatement. The Borrower will promptly deliver to Lender any notice received by Borrower with respect to the Tax Abatement, including, without limitation, the final approval and implementation of the Tax Abatement, any notice of default under the terms of the Tax Abatement, the modification, limitation or termination of the Tax Abatement or any of the benefits thereof.

5.33   Property Management. The Management Agreement, dated January 18, 2019 (the "**Management Agreement**") between Borrower and Yess Management LLC ("**Manager**") pursuant to which Manager operates the Property is in full force and effect and there is no default or violation by any party thereunder. The fees payable to Manager under the Management Agreement, and the terms and provisions of the Management Agreement, are subordinate to this Mortgage and the Manager shall attorn to Lender. The Management Agreement is the sole agreement relating to the management or operation of the Property as of the date hereof. Borrower shall not terminate, cancel, modify, renew or extend the Management Agreement, or enter into any other agreement relating to the management or operation of the Property with Manager or any other party without the prior written consent of Lender, in its sole, non-reviewable discretion. If at any time Lender consents to the appointment of a new Manager, such new Manager and Borrower shall, as a condition of Lender's consent, execute an Assignment and Subordination of Management Agreement in the form then used by Lender. Borrower at Lender's request, made at any time, shall terminate the Management Agreement, or any subsequent agreement relating to the operation and management of the Property approved by Lender and replace the Manager with a manager approved by Lender.

5.34   Advances Pursuant to Completion Guaranty. Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, Borrower hereby irrevocably and unconditionally authorizes Lender to make any disbursements of proceeds of the Loan to Guarantors in accordance with the Guaranty of Completion.

5.35   Accounting Methods.   Borrower shall maintain or cause to be maintained a system of accounting established and administered in accordance with GAAP, keep adequate

Case ID: 230901940

records and books of account in which complete entries will be made in accordance with GAAP, make provision in their accounts in accordance with GAAP for reserves for depreciation, obsolescence and amortization and all other proper reserves and accruals which in accordance with GAAP should be established.

5.36   Information Covenants. Borrower will furnish, or cause to be furnished, as the case may be, the following information to the Lender (which shall be in such form and in such detail as shall be satisfactory to the Lender) promptly upon notice thereof:

(a)   the commencement of any proceeding or investigation by or before any Governmental Authority and any action or proceeding in any court or before any arbitrator against or in any other way relating adversely to Borrower or the Mortgaged Property or which, if adversely determined, would singly or when aggregated with all other proceedings, investigations or actions, have a Material Adverse Effect on the financial condition of Borrower or the value of the Mortgaged Property;

(b)   any notice received from any administrative official or agency relating to any order, ruling, statute or other law or information which would have a Material Adverse Effect on the operations of the Mortgaged Property or the financial condition of Borrower;

(c)   any amendment of the Organizational Documents of the Borrower;

(d)   any "material adverse change" with respect to the Mortgaged Property or its value or the financial condition, business prospects or results of operations of Borrower;

(e)   any Event of Default hereunder or any event of default under any other material agreement to which Borrower or any other Obligor is a party or by which any of their respective properties may be bound; and

(f) any information received or sent by Borrower with respect to the Tax Abatement.

ARTICLE VI
**EVENTS OF DEFAULT**

6.1   The occurrence of any of the events or existence of any of the conditions described in this Article shall constitute an event of default under this Agreement ("**Event of Default**").

6.2   Borrower shall fail to repay the Construction Loan in full at maturity (whether on the Initial Maturity Date or, if applicable, the Extended Maturity Date) or the Permanent Loan Maturity Date or by acceleration or otherwise or shall fail to make any other payment of principal and/or interest, and/or real estate taxes and insurance escrow, as applicable, due to Lender under the Note or under any of the other Loan Documents within ten (10) days after the date when such payment shall become due and payable;

32

Case ID: 230901940

6.3     Except as otherwise specifically provided for in this Agreement, Borrower shall fail to observe or perform any of the covenants, conditions, undertakings or agreements on its part to be observed and performed under this Agreement or under any of the other Loan Documents within thirty (30) days after written notice from Lender of such non-compliance, provided, however, that if such non-compliance cannot with due diligence and good faith be cured, if Borrower shall in good faith and within such thirty (30) day period pursue the curing of such non-compliance diligently, such thirty (30) day period shall be extended for so long as may be reasonably necessary to cure such non-compliance, not to exceed, however, an additional sixty (60) days (i.e., ninety (90) days in the aggregate);.

6.4     Any representation, warranty, certification, financial information or other information made or furnished by or on behalf of the Borrower or any Guarantor in connection with the application for and closing of the Loan or made in this Agreement or under any other Loan Document shall be untrue in any material respect when made.

6.5     The institution of proceedings by or against the Borrower or any Guarantor under any bankruptcy or insolvency law, or any law for the benefit of creditors or relief of debtors, (provided, however, the institution of involuntary proceedings against the Borrower or a Guarantor shall not be an Event of Default if such proceedings shall be discharged or dismissed within sixty (60) days after the commencement date thereof), or a custodianship, trusteeship, receivership or assignment for the benefit of creditors shall be imposed upon the Borrower, any Guarantor or the Mortgaged Property (or a substantial part thereof) or sought by the Borrower or by any other person or a petition for debtor's relief under any state or federal bankruptcy, reorganization or insolvency law, shall be filed against or by the Lender or any Guarantor or by such other person;

6.6     The existence of any liens for taxes due with respect to the Mortgaged Property (other than liens for taxes not yet due and payable) unless such liens are being contested in good faith and adequate reserves with respect thereto have been deposited with the Lender, or carrier's, warehousemen's, mechanic's, materialmen's, repairmen's, construction or other liens which have not been vacated or bonded over and stayed within thirty (30) days after Borrower's actual or constructive notice that such lien or claim has been filed;

6.7     The voluntary termination or dissolution of the Borrower or the cessation of doing business by Borrower;

6.8     An Event of Default by the Borrower or any Guarantor under: (a) any other obligation owed to the Lender, now existing or hereafter arising; or (b) any indebtedness or obligation to any third party that entitles such third party to declare such indebtedness or obligation due prior to its date of maturity;

6.9     Other than a Permitted Transfer, any change whatsoever in the ownership or control of the Borrower, whether or not that change is voluntary, involuntary, by operation of law or direct or indirect;

6.10     In the event that proceedings shall have been instituted for foreclosure or collection of any mortgage, judgment, or lien affecting the Mortgaged Property or the occurrence

33

Case ID: 230901940

of an Event of Default under any mortgage entered into by Borrower or a principal thereof which is a lien upon the Mortgaged Property;

6.11    If the Environmental Protection Agency, or any other state or federal agency or any other person or entity asserts or creates a lien upon any or all of the Mortgaged Property by reason of the occurrences of a hazardous discharge, release or disposal of a Regulated Substance or environmental complaint or otherwise or asserts a claim against the Borrower, the Mortgaged Property, or the Lender for damages or cleanup costs related to a hazardous discharge, release or disposal of a Regulated Substance or environmental complaint and such lien and/or claim has not been dismissed and/or bonded within thirty (30) days after Borrower's actual or constructive notice that such lien or claim has been filed;

6.12    If there shall occur: (a) the entry of any judgment, issuance of any garnishment, attachment or distraint, the filing of any lien or of any government attachment against the Mortgaged Property, which entry, issuance, attachment or filing shall have continued unstayed and in effect for a period of forty-five (45) consecutive days, or (b) if a writ of execution or attachment or any similar process shall be issued or levied against all or any part of or interest in any of the properties or assets of the Borrower or any judgment involving monetary damages shall be entered against the Borrower or which shall become a lien on the Borrower's substantial properties or assets or any portion thereof or interest therein, or such execution, attachment or similar process is not released, bonded, satisfied, vacated or stayed within forty-five (45) days after its entry or levy;

6.13    If there shall occur the seizure or foreclosure of any of the properties or assets of the Borrower or any Guarantor, pursuant to process of law or by respect of legal self-help, unless said seizure or foreclosure is stayed or bonded within forty-five (45) days after the occurrence of same;

6.14    The death, disability or incapacity of a Guarantor unless Lender has been provided with a replacement Guarantor satisfactory to Lender in Lender's sole, non-reviewable judgment within ninety (90) days of the individual's death, disability or incapacity.

6.15    The permanent and/or material loss (that continues for more than forty-five (45) days) of any governmental license or permit needed for the construction of the Project;

6.16    There occurs any event which in the Lender's reasonable judgment materially adversely affects: (i) the business or financial conditions of the Borrower or any Guarantor; (ii) the ability of the Borrower or any Guarantor to perform any of its obligations under the Loan Documents; or (iii) the operations or value of the Mortgaged Property or other collateral or the Lender's security therein;

6.17    If the Mortgage shall not create or remain as a valid lien for the indebtedness secured hereby on the Mortgaged Property.

6.18    If the Improvements existing or to be constructed on the Mortgaged Property shall materially encroach upon the street or adjoining property or violate restrictive covenants of record or local zoning ordinances unless affirmative insurance can be provided by Lender's title insurance policy;

34

Case ID: 230901940

6.19    The cost of construction of the Project exceeds the cost therefor set forth in the Budget and Borrower has failed to promptly deposit with the Lender (or apply to the construction costs) after written notice from the Lender of the deficiency between the budgeted and actual costs;

6.20    The work of construction: (i) does not commence within sixty (60) days of the date hereof; or (ii) is suspended for a period of ninety (90) days or more, or the work of construction does not proceed in a timely manner with due diligence, subject to an event or condition beyond the control of Borrower, such as strikes, lock-outs or labor disputes, inability to obtain labor, utilities or materials or substitutes therefore, Acts of God, inclement weather, enemy or hostile action, riot, civil commotion, casualty, accidents, global pandemic or any other similar conditions ("**Force Majeure Event**"); provided however that any lack of funds shall not be deemed to be a Force Majeure Event and provided further than any such extension for a Force Majeure Event shall not exceed sixty (60) days;

6.21    The transfer of title to any portion of, or interest in, the Mortgaged Property or any other collateral securing repayment of the Loan or the transfer of any equity interests in the Borrower without the prior written consent of the Lender;

6.22    The existence of any financing, mortgage or other liens on or security interest in the Mortgaged Property or any other collateral, other than liens and security interests in favor of the Lender;

6.23    Any material deviation in the Project from the Plans without the prior written consent of the Lender, as determined by the Lender in its sole discretion;

6.24    Failure to complete the Project and satisfy all of the requirements of Section 3 of this Agreement as of the Completion Date;

6.25    The termination of the General Construction Contact or Architect's Agreement, without the Lender's prior written consent;

6.26    Failure by the Borrower to deposit with the Lender funds sufficient to bring the Construction Loan "in balance" within ten (10) days following a request from the Lender; or

6.27    Any Event of Default shall occur under the terms of any of the other Loan Documents.

ARTICLE VII
**REMEDIES UPON DEFAULT; MATERIAL ADVERSE CHANGE**

7.1    Upon the occurrence of any Event of Default, Lender shall have the absolute right, at its option and election and in its sole discretion, to exercise singly, concurrently, successively, alternatively or cumulatively any or all rights and remedies available to the Lender under the Mortgage and any of the other Loan Documents or with respect to any Collateral (as such term is defined in the Mortgage), or available to the Lender by law, equity, statute or otherwise, including, without limitation, the right to set off any sums deposited by Borrower with the Lender against the amounts due hereunder.  Upon the occurrence of an Event of Default, the

35

Case ID: 230901940

Lender may in addition to any other remedies which it may have, at its option and without prior demand or notice take any or all of the following actions:

7.2     Termination: Cancel Lender's obligations under this Agreement by written notice to Borrower and from time to time apply all or any part of the undisbursed Loan funds to payment of accrued interest under the Note and/or any other obligations of the Borrower hereunder.

7.3     Specific Performance:  Institute appropriate proceedings to specifically enforce performance of the terms and conditions of this Agreement, the Note and the Loan Documents or any of the foregoing.

7.4     Taking of Possession:  Take immediate possession of the Project as well as all other property to which title is held by Borrower as is necessary to fully complete all onsite and offsite Improvements and complete the construction and equipping of the Improvements to do anything in its sole judgment to fulfill the obligations of Borrower hereunder, including availing itself of and procuring performance of existing contracts, amending the same, or entering into new contracts with the same contractors or others and employment of watchmen to protect the Project from injury.  Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution in the premises to complete construction and equip and operate the Improvements, to use unadvanced Construction Loan funds or funds which Borrower may have deposited with Lender pursuant to this Agreement, or to advance funds in excess of the Construction Loan pursuant to this Agreement; to pay all taxes and assessments on the Mortgaged Property or Improvements not paid; to make such changes or additions to the Plans which Lender deems necessary or desirable to complete the Project in substantially the manner contemplated by the Plans; to retain or employ new general contractors, subcontractors, architects, engineers and inspectors as shall be required for such purposes; to pay, settle, or comprise all bills and claims, which may be incurred in connection with constructing and equipping the Improvements; to purchase any fixtures, equipment, machinery, furniture or any other personal property as Lender deems necessary or desirable for the completion of the construction and equipping of the Improvements or for clearance of title, or for compliance with applicable laws and regulations; to execute all applications and certificates in the name of Borrower which may be required; to prosecute and defend all actions or proceedings in connection with the Mortgaged Property or Improvements, fixtures, equipment, machinery, furniture or any other personal property; and to do any act which Borrower might do in its own behalf relating to the Mortgaged Property or Improvements, it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked.  All expenses incurred by Lender in exercising its remedies under this section shall be charged against Borrower and shall be secured by the Loan Documents.

7.5     Receivership:  In the Lender's sole and absolute discretion, apply _ex parte_ to a court of competent jurisdiction for the appointment of a receiver, without notice and without regard to the solvency of Borrower or the adequacy of any collateral, for the purpose of preserving the Project, preventing waste, and to protect all rights accruing to Lender by virtue of this Agreement or any of the Loan Documents, and expressly to do any further acts as Lender may determine to be necessary or appropriate to complete the development and construction of

USRE 257 – Loan Agreement
4839-4449-2748, v. 6

Case ID: 230901940

the Improvements. All expenses incurred in connection with the appointment of such receiver, or in protecting, preserving, improving, or operating the Mortgaged Property, shall be charged against Borrower and shall be secured by the Loan Documents. Borrower and each Guarantor consents to the appointment of a receiver in such circumstance and covenants and agrees that neither Borrower nor any Guarantor will contest, oppose or delay the Lender's application aforesaid.

7.6     Acceleration:  Accelerate maturity of the Note and any other indebtedness of Borrower to Lender, and demand payment of the principal sum due thereunder, with interest, advances, costs and attorneys' fees (including those for appellate proceedings), and enforce collection of such payment by foreclosure of the Mortgage or the enforcement of any other Loan Documents, or other appropriate action.

7.7     Foreclosure:  Foreclose on any collateral without waiving its rights to proceed against other collateral or other entities or individuals directly or indirectly responsible for repayment of the Loan.

7.8     Other:  Exercise any other right, privilege or remedy available to Lender as may be provided by applicable law.

7.9     Default Rate.  Upon an Event of Default or after the Initial Maturity Date or the Extended Maturity Date, or the Permanent Loan Maturity Date  whether or not the Lender has elected to accelerate the Debt evidenced by the Note, the Loan shall bear interest, payable on demand, at a rate, per annum, determined on a daily basis, calculated at the rate set forth in the Note for the Loan or the rate set forth in Section 8.1 for the Permanent Loan plus, in either case, five (5%) percentage points (500 basis points) per annum (the "**Default Rate**"), but in no event more than the highest rate permitted by the applicable usury law in respect of Borrower, until the unpaid balance of the principal sum, interest and any charges shall have been paid in full. Borrower acknowledges that: (i) the Default Rate is a material inducement to the Lender to make the Loan; (ii) the Lender would not have made the Loan in the absence of the agreement of Borrower to pay the Default Rate; (iii) the Default Rate represents compensation for increased risk to the Lender that the Loan will not be repaid; and (iv) the Default Rate is not a penalty and represents a reasonable estimate of (a) the cost to the Lender in allocating its resources (both personnel and financial) to the ongoing review, monitoring, administration and collection of the Loan, and (b) compensation to the Lender for losses that are difficult to ascertain.

7.10     Costs and Expenses.  Following the occurrence of any Event of Default, Borrower shall pay upon demand all reasonable costs and expenses (including all reasonable amounts paid to attorneys, accountants, real estate brokers, appraisers, and other advisors employed by the Lender), incurred by the Lender in the exercise of any of its rights, remedies or powers under any of the Loan Documents, as a secured or unsecured creditor, as the case may be of Borrower or any member of Borrower or any Guarantor in any federal or state bankruptcy proceedings, or with respect to any collateral with respect to such Event of Default, and any amount thereof not paid promptly following demand therefor together with interest thereon at the Default Rate from the date of such demand, shall become part of the Loan and shall be secured by the Mortgage and all other collateral. In connection with and as part of the foregoing, in the event that any of the Loan Documents is placed in the hands of an attorney for the collection of any sum payable

37

Case ID: 230901940

thereunder, Borrower agrees to pay reasonable attorneys' fees for the collection of the amount being claimed under such Loan Document, as well as all costs, disbursements, and allowances provided by law, the payment of which sums shall be secured by the Mortgage and all other collateral.

7.11     Setoff, Etc.  Borrower hereby grants to Lender a lien, security interest and a right of setoff as security for all liabilities and obligations to Lender, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Lender or any entity under the control of Lender, or in transit to any of them.  At any time after a default or Event of Default, without demand or notice, Lender may set off the same or any part thereof and apply the same to any liability or obligation of Borrower even though unmatured and regardless of the adequacy of any other collateral securing the Loan.  ANY AND ALL RIGHTS TO REQUIRE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS, COLLATERAL OR OTHER PROPERTY OF BORROWER, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.  Lender shall not be required to marshal any present or future security for, or guarantees of, the obligations or to resort to any such security or guarantee in any particular order and Borrower waives, to the fullest extent that it lawfully can: (i) any right it might have to require Lender to pursue any particular remedy before proceeding against Borrower and (ii) any right to the benefit of, or to direct the application of the proceeds of any Collateral until the obligations are paid in full.

7.12     Material Adverse Change means any set of circumstances or events which:

(a) has or could reasonably be expected to have any material adverse effect whatsoever upon the validity or enforceability of the Loan Documents,

(b) is or could reasonably be expected to be material and adverse to the business, properties, assets, financial condition, results of operations or prospects of Borrower taken as whole,

(c) impairs materially or could reasonably be expected to impair materially the ability of Borrower taken as a whole to duly and punctually pay or perform its obligations, or

(d) impairs materially or could be reasonably expected to impair materially the ability of the Lender to enforce its legal remedies pursuant to the Loan Document.

ARTICLE VIII
**CONVERSION TO PERMANENT LOAN**

8.1     (a)     Borrower acknowledges that as a material inducement for the Lender to make the Loan to Borrower, the Lender shall have the exclusive right to convert the Construction Loan to a permanent loan in the principal amount of up to $14,000,000.00, with the amount to be based on appraisals acceptable to the Lender with respect to the Mortgaged Property on an "as is" value subject to the conditions below (the "**Permanent Loan**"); provided, however, that:

38

Case ID: 230901940

(i)     No Event of Default shall have occurred at any time during the term of the Construction Loan which remains uncured and continuing;

(ii)    Lender received at least ninety (90) but not more than one hundred twenty (120) days written notice of Borrower of the exercise of the Conversion Option;

(iii)   The construction, rehabbing and renovation of all Improvements shall have been completed and written evidence thereof shall have been provided to the Lender in form and substance acceptable to the Construction Consultant and the Lender in their sole, non-reviewable discretion;

(iv)    Borrower shall have obtained, or caused to be obtained, a valid and subsisting final or temporary certificate of occupancy with respect to the Mortgaged Property which provides for a completely renovated and developed +/- 55,204 gross square foot 17-story elevator served at least 60 unit multi-family rental apartment building and related improvements that is otherwise acceptable to the Lender and the Lender's Construction Consultant in their sole, non-reviewable discretion;

(v)     Borrower shall have attained occupancy at the Mortgaged Property sufficient to maintain a minimum debt service coverage ratio of at least **1.25x** ("**Minimum Conversion DSCR**") as determined by the Lender in its sole discretion from the in-place income and expenses of the Mortgaged Property using actual (after taking into account any tax abatement) real estate taxes, the Permanent Loan Interest Rate, and a thirty (30) year amortization schedule and Borrower shall provide copies of all signed leases to the Lender from time to time and upon written request;

(vi)    The Lender shall have ordered, received and reviewed an updated appraisal, all at Borrower's sole cost and expense, which appraisal states that the maximum Loan to Value Ratio with respect to the Mortgaged Property is seventy (70%) percent based upon the "as stabilized" appraised value of the Mortgaged Property.  As used herein, "Loan to Value Ratio" shall be determined by Lender and shall mean the aggregate amount of the Debt of Borrower evidenced hereby, less any portion of such indebtedness fully secured by cash collateral deposited by Borrower as a percentage of the appraised value of all of the Mortgaged Property as determined pursuant to an Appraisal;

(vii)   The "**Conversion Date**" shall be the date that the Construction Loan is converted to the Permanent Loan;

(viii)  Borrower has provided evidence acceptable to the Lender in its sole discretion, that the Tax Abatement is in full force and effect with respect to the Mortgaged Property;

(ix)    Borrower shall have removed of record or caused to be removed of record, any and all violations issued with respect to the Mortgaged Property. In the event that Borrower is unable to remove the violations of record within the aforesaid time period, but is diligently pursuing such removal, the Lender, in its sole discretion, may afford Borrower additional time to remove such violations or record, which additional time period shall in no event extend beyond ninety (90) days following the Conversion Date;

USRE 257 – Loan Agreement
4839-4449-2748, v. 6

Case ID: 230901940

(x)      Borrower shall pay a Conversion Fee in the amount of $35,000.00, representing one-quarter of one percent (1/4%) of the of the aggregate amount of the Permanent Loan, together with all reasonable fees Lender including, but not limited to, legal fees incurred by Lender as a result of the preparation, execution and delivery to Borrower of such documents as Lender or its counsel may reasonably require in order to evidence Conversion;

(xi)      Borrower has demonstrated that occupancy of the Project and the Mortgaged Property is not less than ninety (90%) percent, with all such tenants in place and paying rent (or will be paying rent following the expiration of a market abatement period);

(xii)      Lender shall be in satisfactory receipt of all required construction advance criteria; and

(xiii)      Lender reserves the right to resize the Permanent Loan to meet the Minimum Conversion DSCR and Loan to Value Ratio for "as completed" and "as stabilized" values as determined by Lender in its sole discretion.

Upon Conversion, the Lender shall disburse to the Borrower the additional principal amount of the Permanent Loan in an amount equal to the difference between the amount set forth in Section 8.1(a) and the outstanding principal balance of the Construction Loan.

(b) Exit Fee.  Borrower acknowledges and agrees that, in the event the Construction Loan is prepaid in whole and/or is not converted to the Permanent Loan as set forth in Section 8.1(a) above for any reason prior to the Initial Maturity Date of the Extended Maturity Date, as applicable Borrower shall pay to the Lender an exit fee in an amount equal to $97,500.00, representing three-quarters of one (.75%) percent of the aggregate original amount of the Construction Loan (the "**Exit Fee**").

(c) Permanent Loan Terms.  Subject to any underwriting, due diligence and  financial information as may be required by the Lender in its sole, non-reviewable discretion, the basic terms of the Permanent Loan shall be as follows and be mutually agreeable to the Lender and Borrower:

(i)      The annual interest rate during the Permanent Loan shall be fixed for a consecutive period of sixty (60) months from the Conversion Date (the "**Initial Fixed Rate Term** at 225 basis points (2.25%) above the average weekly yield on United States Treasury securities and rounded up to the nearest one-eighth of one percent (0.125%) as published by the Federal Reserve Board (the "**Initial Fixed Interest Rate**"), as published by the Federal Reserve Board, adjusted to a constant maturity of five (5) years, and as determined forty-five (45) days prior to the Conversion Date. At the end of the Initial Fixed Rate Term, the new interest rate shall be fixed for the final five (5) years at 225 basis points (2.25%) above the average weekly yield on United States Treasury securities and rounded up to the nearest one-eighth of one percent (0.125%), as published by the Federal Reserve Board, adjusted to a constant maturity of five (5) years (the "**Adjusted Interest Rate**"), as forty-five (45) days prior to the last day of the Initial Fixed Rate Term. In no event shall the Initial Fixed Interest Rate or the Adjusted Interest Rate (collectively, the "**Permanent Loan Interest Rate**") ever be less than three and three-quarters (3.75%) percent per annum.

40

Case ID: 230901940

(ii)     The Permanent Loan Interest Rate shall be calculated using a time factor of 365/360 day year (366 in a leap year).

(iii)    The Permanent Loan shall follow an amortization schedule of thirty (30) years.

(iv)    The "**Permanent Loan Maturity Date**" shall be the day that is the tenth (10th) year anniversary of the first day of the first month following the Conversion Date.

(v)     During the term of the Permanent Loan, Borrower shall make equal monthly payments of principal and interest, which payments shall be due and payable commencing on the first day of the second full month following the Conversion Date and on the first day of each month thereafter until the Permanent Loan Maturity Date, when the unpaid principal balance plus all accrued and unpaid interest, fees and costs due on the Permanent Loan are due and payable.

(vi)    Payment and performance of each and every one of Borrower's obligations in connection with the Permanent Loan shall be absolutely and unconditionally guaranteed by Guarantors ("**Permanent Loan Guaranty**").  Notwithstanding anything to the contrary set forth in the Permanent Loan Guaranty or in any other Loan Document, so long as no Event of Default is then continuing and no amounts are then due and owing under the Permanent Loan the liability of Guarantors under the Permanent Loan Guaranty shall be released at such time as Borrower delivers, or causes to be delivered, to the Lender evidence, in form and substance reasonably satisfactory to the Lender, which demonstrates that the following conditions (the "**Termination Conditions**") are satisfied, as determined by the Lender in its sole discretion: (x) no Event of Default shall have occurred and be continuing under the Loan Documents; and (y) the debt service coverage ratio of the Mortgaged Property shall be no less than **1.25x** on an amortizing basis, as determined by the Lender and as evidenced by the filed tax returns of Borrower.

Once  Lender, in its sole and absolute discretion, has determined that the Termination Conditions have been satisfied, the Loan will become non-recourse to Guarantors, ___**provided however**___, that notwithstanding the termination of the Permanent Loan Guaranty, the Guarantors shall at all times during the Permanent Loan Term remain fully liable for all of the Lender's standard nonrecourse carve-outs and loss liability events pursuant to the Indemnity Agreement, as defined in the paragraph below.

(vii)   On the Closing Date of the Construction Loan, the Guarantors shall execute and deliver the Indemnity Agreement for Carve-Out Events for Non-Recourse Loans (the "**Indemnity Agreement**"), which provides that Guarantors and Borrower shall be liable for the Lender's standard "non-recourse carveouts" and loss liability events, as set forth on in such Indemnity Agreement.

(viii)  Borrower shall establish an escrow account with the Lender on the Conversion Date with an initial deposit in an amount as estimated and determined solely by the Lender for the payment of annual taxes, assessments, ground rentals, insurance premiums, and any other similar charges.  The Borrower shall, in addition to the monthly payments of principal

41

Case ID: 230901940

and interest, pay to the Lender monthly deposits on the account of real estate taxes, assessments levied against the Mortgaged Property and insurance premiums equal to one-twelfth of the annual charges estimated by the Lender in order to accumulate with the Lender sufficient funds to pay such taxes and assessments on the Mortgaged Property thirty (30) days prior to their due date.

(ix)    Borrower shall maintain the Operating Account in accordance with Section 5.13 for the Permanent Loan and shall in addition establish, as additional security for the Permanent Loan, an account (the "**Security Deposit Account**") with the Lender on the Conversion Date into which all tenant security deposits shall be deposited and shall maintain such account, or a replacement account with the Lender, and otherwise satisfactory to the Lender in its sole discretion, for so long as the Permanent Loan is outstanding.  Borrower agrees to deposit all tenant security deposits into the Security Deposit Account during the term of the Permanent Loan.  Failure to establish and maintain the Security Deposit Account with the Lender shall result in a one-half of one percent (0.50%) increase to the interest rate on the Permanent Loan until such time as Borrower delivers to the Lender evidence, in form and substance acceptable to the Lender, that Borrower is once again in compliance with this paragraph 8.1(c)(xi).

(x)    Borrower shall also pay a one-time tax service fee of $1,000.00 on or before the Conversion Date to the Lender.

(xi)    Borrower may prepay the Permanent Loan in whole, but not in part, prior to the maturity date of the Permanent Loan in accordance with Lender's then-current prepayment conditions, provided that Borrower shall also pay a prepayment fee to Lender simultaneously with the prepayment calculated on the amount prepaid and in accordance with the following schedules:

| Permanent Loan Year(s)* | Prepayment Fee | |
|---|---|---|
| 1 | 5% | (five percent) of the amount prepaid. |
| 2 | 4% | (four percent) of the amount prepaid. |
| 3 | 3% | (three percent) of the amount prepaid. |
| 4 | 2% | (two percent) of the amount prepaid. |
| 5 | 1% | (one percent) of the amount prepaid. |
| 6 | 5% | (five percent) of the amount prepaid. |
| 7 | 4% | (four percent) of the amount prepaid. |
| 8 | 3% | (three percent) of the amount prepaid. |
| 9 | 2% | (two percent) of the amount prepaid. |
| 10 | 1% | (one percent) of the amount prepaid. |

*Measured from the Conversion Date to and including the first anniversary of the initial payment and every anniversary thereafter.

42

Case ID: 230901940

A prepayment fee will not be assessed to Borrower if a full prepayment is made during the last ninety (90) day period of the 5th or 10th Year of the Term of the Permanent Loan or if paid with casualty or condemnation proceeds.

8.2     Financial Covenant.     Beginning with the first full year's operation of the Mortgaged Property following the Conversion Date and at all times during the Term of the Permanent Loan, Borrower shall be required to maintain a minimum Debt Service Coverage Ratio (as defined more fully below, "**DSCR**") of **1.00x** (the "**Performance DSCR Threshold**") measured annually for the trailing 12-month period ending December 31st of each year (each, a "**Testing Period**").

Subject to the last sentence of this paragraph, if Borrower fails to maintain the Performance DSCR Threshold for one (1) Testing Period, Borrower may cure said default by depositing all Excess Cash (as defined below) in a Blocked Account. Borrower shall commence depositing all Excess Cash into the Blocked Account within ten (10) business days of Lender providing written notice to Borrower of its failure to maintain the Performance DSCR Threshold. Thereafter, the deposits of Excess Cash by Borrower into the Blocked Account shall occur no less than monthly and shall continue until Borrower has demonstrated to Lender in its sole, non-reviewable discretion that it has maintained the Performance DSCR Threshold for no less than twelve (12) consecutive months. Borrower's failure to fund the Blocked Account with all Excess Cash deposits on a timely basis shall be an Event of Default. Upon achieving maintenance of the Performance DSCR Threshold, all funds held by Lender in the Blocked Account shall be released to Borrower, and no further Excess Cash deposit shall be required, after the next Testing Period so long as Borrower is in compliance with the Performance DSCR Threshold at such Testing Period and no Event of Default has occurred and is continuing. Upon the occurrence of any Event of Default (whether or not resulting from the failure to maintain the Performance DSCR Threshold), Lender in its sole, non-reviewable discretion may as a non-exclusive remedy apply funds in the Blocked Account toward: (a) repayment of the principal balance of the Loan; or (b) the payment of any other amounts then due from Borrower to Lender under the Note, the Mortgage or any other Loan Document.

Subject to the last sentence of this paragraph, if Borrower fails to maintain the Performance DSCR Threshold for two (2) consecutive Testing Periods, Borrower, as its exclusive cure, shall pay down the principal balance of the Loan in an amount required to meet the Performance DSCR Threshold, such amount to be determined by Lender in its sole, non-reviewable discretion. Borrower shall make such payment within ten (10) business days of Lender providing written notice to Borrower of such shortfall or it shall be an Event of Default. Borrower has only one opportunity to pay down the principal balance of the Loan if the Performance DSCR Threshold is not met; if at any time in the future the DSCR shall again fall below the Performance DSCR Threshold, it shall be an Event of Default.

No prepayments under this section shall be subject to the prepayment premiums under the Loan Documents.

For purposes of this section:

(a)     "**DSCR**" means, for each Testing Period, the quotient obtained by dividing (a) the Net Operating Income by (b) the Debt Service;

43

Case ID: 230901940

(b)    "**Debt Service**" means the sum of all regularly scheduled principal and interest payments due on the Loan;

(c)    "**Net Operating Income**" means the amount by which rental and other operating revenue for the Mortgaged Property exceeds direct operating expenses of whatever kind relating to the operation, maintenance and management of the Mortgaged Property that are incurred on a regular monthly or other periodic basis, as determined by the Lender in accordance with generally accepted accounting principles; and

(d)    "**Excess Cash**" shall mean all Net Operating Income of Borrower less regularly scheduled principal and interest payments on the Loan plus direct operating expenses paid to affiliates plus extraordinary revenue.

ARTICLE IX
**MISCELLANEOUS**

9.1    <u>Trust Fund</u>.  Borrower shall receive all Advances and hold the right to receive all Advances hereunder, as a trust fund in accordance with applicable law to be applied first for the purpose of paying the cost of the Improvements before using any part of such Advance for any other purpose.  Borrower shall indemnify and hold the Lender harmless from and against any and all claims, damages, judgments, liabilities and costs and expenses of every kind (including without limitation, reasonable counsel fees and disbursements and court costs) that the Lender may suffer by reason of the foregoing statements being untrue in any respect.

9.2    <u>Sign or Banner</u>. Borrower agrees that the Lender shall have the right to erect a sign or banner at the Mortgaged Property advertising its financing of the Project

9.3    <u>Limitation of the Lender's Liability</u>.  The rights and benefits of this Agreement shall not inure to the benefit of any third party.  Notwithstanding anything to the contrary contained in this Agreement or in any of the other Loan Documents, or any conduct or course of conduct by Borrower or the Lender or their respective Affiliates, agents or employees, neither this Agreement nor any such Loan Documents shall be construed as creating any rights, claims or causes of action against the Lender in favor of any person or entity other than Borrower.

9.4    <u>No Waiver</u>.  No course of dealing and no delay or omission by Lender in exercising any right or remedy hereunder or with respect to any Debt of Borrower to Lender shall operate as a waiver thereof or of any other right or remedy and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy.  Lender may remedy any default by Borrower to Lender or any other Person in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Borrower and shall be reimbursed for any and all of its expenses in so remedying such default.  All rights and remedies of Lender hereunder are cumulative.  Borrower agrees that Lender does not, and with regard to the obligations, shall not have any of the duties to Borrower as set forth in §5601(3)(b) of the Pennsylvania Decedents, Estates and Fiduciaries Code, 20 Pa. C.S. §5601(3)(b).  No failure or delay on the part of Lender in the exercise of any right, power, remedy or privilege shall operate as a waiver thereof, nor shall any single or partial exercise preclude any other or further exercise thereof, or the exercise of any other right, power, remedy or privilege.

44

Case ID: 230901940

9.5     Time of the Essence.  All dates and times for the performance of Borrower's obligations set forth herein shall be deemed to be of the essence of this Agreement.

9.6     Severability.  In the event that for any reason one or more of the provisions of this Agreement or their application to any person or circumstance shall be held to be invalid, illegal or unenforceable in any respect or to any extent, such provisions shall nevertheless remain valid, legal and enforceable in all other respects and to such extent as may be permissible.  In addition, any such invalidity, illegality or unenforceability shall not affect any other provision hereof, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

9.7     Notices.  All notices required to be given to any of the parties hereunder shall be in writing and shall be deemed to have been sufficiently given for all purposes when presented personally to such party, or sent by Federal Express or other nationally recognized overnight courier to such party at its address set forth below or sent by certified or registered mail, return receipt requested, to such party at its address set forth below:

| | |
|---|---|
| Borrower: | USRE 257 LLC<br>45 City Avenue<br>Unit 383<br>Bala Cynwyd, PA 19004<br>Attention:  David Daniel |
| with a copy to<br>Borrower's<br>counsel: | Blank Rome<br>One Logan Square<br>130 North 18th Street<br>Philadelphia, PA 19103<br>Attention:  Peter J. Soloff, Esq. |
| Lender: | Investors Bank<br>101 JFK Parkway<br>Short Hills, New Jersey 07078<br>Attention:  Commercial Real Estate |
| with a copy to<br>Lender's counsel: | Mandelbaum Salsburg P.C.<br>3 Becker Farm Road, Suite 105<br>Roseland, New Jersey 07068<br>Attention:  Robin F. Lewis, Esq. |

Such notice shall be deemed to be given when received if delivered personally, on the next business day if sent by an overnight commercial courier or two (2) days after the date mailed if sent by certified or registered mail, return receipt requested.  Any notice of any change in such address shall also be given in the manner set forth above.  Whenever the giving of notice is

Case ID: 230901940

required, the giving of such notice may be waived in writing by the party entitled to receive such notice.

9.8    Amendments.   No amendment, modification, termination or waiver of any provisions of this Agreement shall be effective unless in writing and signed by the Lender.

9.9    Governing Law.   This Agreement, the Note and all other documents evidencing or securing the Loan, and the rights and obligations of the parties hereto, shall be construed and interpreted in accordance with the internal laws of the Commonwealth of Pennsylvania without regard to principles of conflicts of laws.

9.10    Waiver of Jury Trial.   **BORROWER AND LENDER HEREBY WAIVE ANY AND ALL RIGHTS THAT THEY MAY HAVE NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN BORROWER AND LENDER OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT. IT IS INTENDED THAT THIS WAIVER OF JURY TRIAL SHALL APPLY TO ANY AND ALL CLAIMS, DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDING.**

9.11    Jurisdiction; Venue.   Borrower hereby agrees to the jurisdiction of the state and federal courts located in the Commonwealth of Pennsylvania for any and all issues arising either directly or indirectly in any action or proceeding between Borrower and Lender or their respective successors and assigns, out of or in any way connected with this Agreement.

9.12    Definitions; Number and Gender.   For purposes of this Agreement, the singular shall be deemed to include the plural and the neuter shall be deemed to include the masculine and feminine, as the context may require. In the event Borrower consists of more than one individual or entity, the obligations and liabilities hereunder of each of them shall be joint and several and the word "Borrower" shall mean all or some or any of them.

9.13    Conflicts Between Instruments.   In the event of any conflict between the provisions of this Agreement and the provisions of any of the other Loan Documents, the provisions of this Agreement shall prevail.

9.14    Captions.   The captions or headings of the paragraphs of this Agreement are for convenience only and shall not control or affect the meaning or construction of any of the terms or provisions of this Agreement.

9.15    Headings:   All descriptive headings of articles and sections in this Agreement are inserted for convenience only and shall not affect the construction or interpretation hereof.

9.16    Counterparts; Electronic Signatures:   This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument. A manually signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this

46

Case ID: 230901940

Agreement.   Lender is also entitled to rely on all ancillary and supporting documentation delivered by electronic transmission.

9.17   No Agency Relationship:   Lender is not the agent or representative of Borrower and this Agreement shall not make Lender liable to materialmen, contractors, craftsmen, laborers or others for goods delivered to or services performed by them upon the Project, or for debts or claims accruing to such parties against Borrower and there is no contractual relationship, either expressed or implied, between Lender and any materialmen, subcontractors, craftsmen, laborers, or any other person supplying any work, labor or materials for the Improvements.

9.18   Collateral Assignment:   Borrower hereby assigns to Lender all Borrower's right, title and interest in the following, whether now or hereafter existing:

(a)   The Plans and working drawings;

(b)   Borrower's books and records related to the Property or construction of the Improvements;

(c)   All contracts now or hereafter made by Borrower relating to the Property or the construction, equipping, architecture, engineering, marketing, management, sale or lease of all or any part of the Improvements;

(d)   All options and agreements with respect to additional real property for use or development in connection with the Project; and

(e)   Borrower agrees that upon any Event of Default under this Agreement, but not until such an event, Lender shall have the absolute right to make such use of the property so assigned as Lender shall desire, and, as to any such property which is also the subject of a security agreement or financing statement in favor of Lender, that Lender will not be limited to remedies available under the Uniform Commercial Code, but may at its option avail itself of the rights granted herein in addition to or in substitution for its Uniform Commercial Code remedies.

9.19   Successors and Assigns; etc.   This Agreement inures to the benefit of and binds the parties hereto and their respective successors and assigns, and the words "Borrower" and "Lender" whenever occurring herein shall be deemed to include such respective successors and assigns.  However, Borrower shall not voluntarily, or by operation of law, assign or transfer any interest which it may have under this Agreement or convey the Mortgaged Property, or any part thereof, without the prior written approval of Lender.  Lender may assign or otherwise transfer the Loan and any or all of the Loan Documents to any other person, and such other person shall thereupon become vested with all of the benefits in respect thereof granted to Lender herein or otherwise without the consent of or notice to Borrower.  Lender shall have the right to sell participations in the Loan to any other persons or entities without the consent of or notice to Borrower.  Borrower hereby consents that, without notice to Borrower, Lender may disclose to any prospective purchaser of any securities issued or to be issued by Lender, and any prospective or actual purchaser or transferee of any participation or other interest (whether in whole or in part) in the Loan  or any other loans made by Lender to Borrower, any financial or other information, data or material (including, without limitation, any tax returns) in Lender's possession relating to Borrower, Guarantors, indemnitors or the Loan.   Notwithstanding these

47

Case ID: 230901940

foregoing provisions, Lender may at any time pledge or assign all or any portion of such Lender's rights under this Agreement and the other Loan Documents to a Federal Reserve Bank; provided, however, that no such pledge or assignment shall release Lender from such Lender's obligations hereunder or under any other Loan Document.

    9.20    <u>Exhibits</u>: The Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

    9.21    <u>Entire Agreement</u>: This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written are superseded by the terms of this Agreement and the other Loan Documents. To the extent that Borrower has identical obligations under this Agreement and under any of the other Loan Documents, performance by Borrower of such obligations under this Agreement or any of the other Loan Documents shall be deemed performance by Borrower under all such Loan Documents and hereunder of such obligations. In addition, to the extent that Borrower is required to obtain the consent and/or approval of Lender under this Agreement and under any of the other Loan Documents, the giving of such consent and/or approval hereunder or under any of the other Loan Documents shall constitute such consent and/or approval of the matters specified therein for the purposes of all of the Loan Documents.

    9.22    <u>Marketing Materials.</u>  The Borrower shall present to the Lender copies of all marketing material, reports, strategies and studies for the Project, if any, on a continuing basis.

**[SIGNATURES FOLLOW]**

USRE 257 – Loan Agreement
4839-4449-2748, v. 6

Case ID: 230901940

IN WITNESS WHEREOF, the Borrower and the Lender have executed this Loan Agreement as of the date first written above.

**BORROWER:**

**USRE 257 LLC, a Delaware limited liability company**

**By: USRE 257 MM LLC, a Delaware limited liability company, its Manager**

By: _____
Name:  **David Daniel**
Title:   **Managing Member**

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF ___Montgomery___                    SS

On this, the __11__ day of November 2020, before me, the undersigned officer, personally appeared David Daniel, who acknowledged himself to be the Managing Member of **USRE 257 MM LLC**, a Delaware limited liability company, Manager of **USRE 257 LLC**, a Delaware limited liability company, and that he as such Managing Member being authorized to do so, executed the foregoing instrument for the purposes therein contained, by signing the name of the limited liability company, by himself as Managing Member.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
Eric Freundlich, Notary Public
Montgomery County
My commission expires February 7, 2022
Commission number 1281551
Member, Pennsylvania Association of Notaries

Loan Agreement

**LENDER:**

**INVESTORS BANK**

By: _James T. Schaeffer signature_____
Name: **James T. Schaeffer**
Title:   **Vice President**


STATE OF NEW JERSEY

COUNTY OF _Burlington_____                 SS


On this, the _10th_ day of November 2020, before me, the undersigned officer, personally appeared **James T. Schaeffer**, who acknowledged himself to be a Vice President of **INVESTORS BANK**, and that he as such Vice President being authorized to do so, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as a Vice President.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.


_signature_____
Notary Public
                                                        IAN MATTHEW BORGSTROM
                                                        NOTARY PUBLIC OF NEW JERSEY
My Commission Expires: My Commission Expires Jan. 5, 2025


Loan Agreement

Case ID: 230901940

*EXHIBIT A*



*First American Title*™ | Loan Policy of Title Insurance
ISSUED BY
**First American Title Insurance Company**

**Schedule A (Cont.)** | POLICY NUMBER
**PROFORMA**

File No. **PAFA20-4578 M/K**

### LEGAL DESCRIPTION

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected, situate in the 8th Ward of the City of Philadelphia and County of Philadelphia, Commonwealth of Pennsylvania and described according to a Plan and Survey thereof, made by William H.H. Ogden, Jr., Surveyor and Regulator of the 3rd District on the 11th day of March A.D., 1942 and re-checked by Ben H. Joseph, present Surveyor and Regulator of the 3rd District on the 27th day of August A.D., 1951 and re-checked by Thomas J, Johnston, Surveyor and Regulator of the 3rd District on the 14th day of November A.D., 1972, as follows:

BEGINNING at the intersection of the Northerly side of Spruce Street (58 feet wide) and the Easterly side of 16th Street; thence (1) North along the Easterly side of 16th Street and crossing a certain 3 feet wide alley 86 feet; thence (2) East and parallel with Spruce Street and running along the Northerly side of said 3 feet wide alley 44 feet to a point its extended line of a wall between these premises and the premises adjoining to the East known as 1531 Spruce Street; thence (3) South parallel with 16th Street and crossing the head of the aforesaid 3 feet wide alley and running through said wall and its extension thereof 86 feet to the Northerly side of Spruce Street; and thence (4) West along the Northerly side of Spruce Street 44 feet to the Easterly side of 16th Street and place of beginning.

BEING known as No. 257 South 16th Street.

BEING Parcel #88 1-0315-00.

TOGETHER with the free and common use, right, liberty and privilege of the aforesaid 3 feet wide alley, which extends across the Northernmost 3 feet of the above described premises into 16th Street in common with the owners, tenants and occupiers of the premises adjoining to the East.

Case ID: 230901940

**Exhibit B**

Case ID: 230901940

**INVESTORS BANK**

**MORTGAGE LOAN NOTE**

**$14,000,000.00**                              November ____30____, 2020
                                               Philadelphia, Pennsylvania

Construction and Permanent Mortgage Loan


     FOR VALUE RECEIVED, **USRE 257 LLC**, a Delaware limited liability company with a mailing address of 45 City Avenue, Unit 3838, Bala Cynwyd, Pennsylvania 19004 ("**Borrower**"), promises to pay to the order of **INVESTORS BANK**, a New Jersey chartered savings bank, at its office located at 101 JFK Parkway, Short Hills, New Jersey 07078 ("**Lender**"), at such office or at such other place as Lender may designate from time to time in writing, the principal sum of up to **FOURTEEN MILLION AND 00/100 ($14,000,000.00) DOLLARS** (the "**Loan Amount**") or as much thereof as has been advanced and is outstanding, together with interest and any and all other amounts which may be due and payable hereunder from time to time, in lawful money of the United States of America.

**DEFINITIONS:**

     **Business Day**: Means any day, other than Saturday or Sunday or a legal holiday on which banks in New Jersey or Pennsylvania are authorized or required by law to be closed for business.

     **Construction Loan**: Means a commercial mortgage loan in the amount of up to Thirteen Million and 00/100 ($13,000,000.00) Dollars, to be advanced in accordance with the terms and conditions of the Loan Agreement.

     **Interest Payment Date**: Means the first Business Day of each month.

     **Interest Period**: Means a period of one month. The initial Interest Period shall commence on the Closing Date and shall continue up to and including the last day of the calendar month with respect to the Closing Date and thereafter each Interest Period shall commence automatically, without notice to or consent from Borrower, on the next Interest Payment Date and continue up to, but shall not include, the first Business Day of the immediately following month; provided, however, (i) that no Interest Period shall end later than the Construction Loan Maturity Date, Permanent Loan Maturity Date or the Conversion Date, as applicable, (iii) if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (iv) interest shall accrue from and including the first day of such Interest Period to but excluding the date of payment of such interest. If, on the first day of the last Interest Period applicable hereto the remaining term of the Loan is less than one (1) month, said Interest Period shall be in effect only until the Conversion Date or Maturity Date, as applicable. If any Interest Period is scheduled to begin on a day which is not a Business Day, the Interest Period shall instead begin on the next

Case ID: 230901940

following Business Day (and the prior Interest Period shall continue up to but not include the next following Business Day), unless the next following Business Day is in the next calendar month in which case the Interest Period shall begin on the first preceding Business Day (and the prior Interest Period shall end on but not include the first preceding Business Day).

**Loan:** The Construction Loan and, following Conversion, the Permanent Loan to be made by the Lender hereunder in the maximum amount of the Loan Amount.

**Permanent Loan**: Shall have the meaning set forth in <u>Section B-1(a)</u> of this Note.

Capitalized terms not defined herein shall have the same meaning as set forth in that certain Loan Agreement, dated the date hereof, by and between Borrower and the Lender (the "**Loan Agreement**").

Subject to the Borrower's compliance with all conditions for Conversion, as set forth in the Loan Agreement, the Loan will, at Borrower's option, have a permanent term of ten (10) years (the "**Repayment Period**") [the Advance Period, as defined below, and, following Conversion (as defined in the Loan Agreement), the Repayment Period are, collectively, the "**Term**"].

## A. **THE CONSTRUCTION LOAN.**

        1.    ***LOAN:***   This Mortgage Loan Note (the "**Note**") evidences the Loan in the maximum principal amount of $14,000,000.00, the proceeds of which shall be funded and allocated in accordance with the terms of the Loan Agreement. The maximum amount of the Construction Loan shall be $13,000,000.00.

        2.   ***INTEREST RATE***:

    (a)   <u>Advance Period Interest Rate</u>. During the Advance Period, interest on the unpaid principal balance of the Loan from the date hereof until the entire principal balance has been paid shall be charged and payable at the Prime Rate, floating, but not in any event less than four and three-quarters (4.75%) percent per annum (the "**Advance Period Interest Rate**") (The Advance Interest Rate and the Permanent Interest Rate, as defined in Section B-2 below, shall individually and collectively be referred to as the "**Interest Rate**"). Changes in the Interest Rate shall take effect immediately upon the occurrence of any change in the Prime Rate (as defined herein), without notice to the Borrower. Interest is to be payable monthly on each Interest Payment Date for funds used and outstanding during the previous month. "**Prime Rate**" means the rate which appears on the Bloomberg Page PRIMBB (or on such other substitute Bloomberg page that displays the published prime rate), or the highest prime rate if more than one is published. If a Bloomberg page ceases to be available, the Lender may use the rate which is quoted by another source selected by the Lender for the purpose of a similar published prime rate. The Prime Rate is not necessarily the best or lowest rate of interest charged by the Lender in connection with extensions of credit to borrowers, subject to increase or decrease in such prime rate effective as of the day any such change occurs. The Lender's determination of the Prime Rate shall be conclusive and final.

Case ID: 230901940

(b)     Time Factor.   The Interest Rate shall be calculated using a time factor of 365/360 day year (366 in a leap year).

(c)     Interest Reserve.   So long as funds are available under the Interest Reserve provided for in the Loan Agreement, during the Advance Period, interest payments due hereunder will be automatically advanced by the Lender on each Interest Payment Date from the Interest Reserve and credited to the Loan.  In the event the Lender determines that there is insufficient available funds in the Interest Reserve to pay the interest payments due for the remaining term of the Advance Period, the Lender shall notify the Borrower to establish a Blocked Account at the Lender and make a cash deposit into the Blocked Account at the Lender, prior to the next interest payment due date, in an amount determined by the Lender. The interest payments will thereafter be advanced from the Blocked Account to pay the remaining interest payments due under this Note for the Advance Period.  During the Extension Period, the interest payments on the Loan will be advanced by the Lender from the Blocked Account established by the Borrower at the Lender in accordance with  Section 2.5 of the Loan Agreement.

(d)     Increased Interest Due.

(i)     The Interest Rate is subject to increase by one-half of one percent (.50%) per annum in the event that Borrower fails to open and fund at Closing the operating account for the deposit of all Advances and all rents received and the payment of expenses for the Mortgaged Property or fails to maintain that account with Lender until this Note is paid in full.  The increased Interest Rate shall revert back to the applicable Interest Rate set forth under this Note from the date that Borrower delivers to Lender evidence in form and substance acceptable to Lender that Borrower is once again in compliance with Section 5.13 of the Loan Agreement.  Any such rate increase shall be Lender's sole remedy under this Note and the Loan Agreement.

(ii)     The Interest Rate is subject to increase by one percent (1.00%) per annum in the event that Borrower fails to provide the financial information required in Section 5.11 of the Loan Agreement.  The increased Interest Rate shall revert back to the applicable Interest Rate set forth under this Note from the date that Borrower delivers to Lender evidence in form and substance acceptable to Lender that Borrower is once again in compliance with Section 5.11 of the Loan Agreement.  Any such rate increase shall be Lender's sole remedy under this Note and the Loan Agreement.

3.     **TERM:**
(a)     (i)     From time to time for a period of eighteen (18) months after the Closing Date (the "**Initial Advance Period**"), unless the Borrower enters into the Extension Period pursuant to subparagraph (ii) below, and if Borrower does enter into the Extension Period, then the Initial Advance Period shall be extended through the Extension Period (the Initial Advance Period, either alone or together with the Extension Period (as defined below), if applicable, being the "**Advance Period**"), the Lender, in its discretion, will make Advances from the Loan Amount, up to the total principal amount of Thirteen Million and 00/100 ($13,000,000.00) Dollars (the "**Construction Loan Amount**") upon and subject to the Borrower's compliance with all requirements for the making of Advances as set forth in the Loan Agreement. No further Advances will be made after the last day of the Advance Period. The Initial Advance Period shall terminate

Case ID: 230901940

on November _____, 2022 and the Extension Period, if utilized, shall terminate on November _____, 2022.

(ii)      Provided that the Loan is not in default and upon the written request of Borrower no fewer than thirty (30) days prior to the end of the Initial Advance Period, the Lender shall extend the Initial Advance Period for one additional six (6) month period (the "**Extension Period**") ending on the twenty-fourth (24th) month anniversary of the Closing Date, subject to the terms and conditions contained in <u>Section 2.5</u> of the Loan Agreement, which are incorporated by reference as if fully set forth herein. The last day of the Initial Advance Period or the Extension Period, if exercised, is the "**Construction Loan Maturity Date**"),

### 4.      *DISBURSEMENTS AND PAYMENTS; CONSTRUCTION LOAN MATURITY DATE.*

(a)      Borrower shall pay to Lender accrued interest only, commencing on the Interest Payment Date of the first calendar month following the first Advance under this Note and the Loan Agreement and continuing on the Interest Payment Date of every month thereafter until the last day of the Advance Period (the "**Construction Loan Maturity Date**"), when all outstanding principal, interest, fees and other charges owing under the Loan shall be due and payable to Lender, subject to Borrower's right to convert the Construction Loan to a permanent loan as described below.

(b)      So long as no Event of Default is then continuing, regularly scheduled payments shall be applied first to any accrued and unpaid interest, next to any applicable tax and insurance escrows, then to principal, then to any unpaid collection costs and other fees and expenses incurred by the Lender, and any remaining amounts to late charges. Following the occurrence of an Event of Default, the Lender shall be entitled to apply any and all amounts received or otherwise held by the Lender on account of the Loan in such order, manner, portion and priority as the Lender shall determine in its sole discretion.

### 5.      *PREPAYMENTS.*

During the Advance Period, the Loan may be prepaid in whole but not in part at any time prior to the last day of the Advance Period without prepayment premium or fee.

### B.  THE PERMANENT LOAN.

### 1.  *CONVERSION TO PERMANENT LOAN.*

(a)      Borrower acknowledges that as a material inducement for the Lender to make the Loan to Borrower, Borrower shall convert the Construction Loan to a permanent loan in the principal amount of the lesser of $14,000,000.00 or seventy percent (70%) of the loan-to-value ratio based on appraisals reasonably acceptable to the Lender with respect to the Mortgaged Property on an "as is" value subject to the conditions below (the "**Permanent Loan**"); provided, however, that:

Case ID: 230901940

(i)     No Event of Default shall have occurred at any time during the term of the Construction Loan which remains uncured;

(ii)    The Lender received at least ninety (90) days but not more than one hundred twenty (120) days prior written notice from Borrower to convert the Construction Loan to the Permanent Loan;

(iii)   Borrower shall have attained not less than ninety (90%) percent, with all such tenants in place and paying rent and Borrower shall provide copies of all signed leases to the Lender from time to time and upon written request;

(iv)    The Mortgaged Property must have achieved a minimum debt service coverage ratio of at least **1.25x**, as determined by the Lender in its sole discretion on a pro forma basis from the in-place income and expenses of the Mortgaged Property using actual (after taking into account any tax abatement) real estate taxes, the Permanent Loan Interest Rate, and a 30 -year amortization schedule;

(v)     The Project shall have achieved Completion, in accordance with the terms and conditions of the Loan Agreement;

(vi)    The Lender shall have ordered, received and reviewed an updated appraisal, all at Borrower's sole cost and expense, which appraisal states that the maximum Loan to Value Ratio with respect to the Mortgaged Property is seventy (70%) percent, based upon the "as stabilized" appraised value. As used herein, "Loan to Value Ratio" shall be determined by the Lender and shall mean the aggregate amount of the Debt of Borrower evidenced hereby, less any portion of such indebtedness fully secured by cash collateral deposited by Borrower as a percentage of the appraised value of all of the Mortgaged Property as determined pursuant to an appraisal;

(vii)   Borrower shall have removed of record or caused to be removed of record, any and all violations issued with respect to the Mortgaged Property. In the event that Borrower is unable to remove the violations of record by the Conversion Date, but is diligently pursuing such removal, the Lender, in its sole discretion, may afford Borrower additional time to remove such violations or record, which additional time period shall in no event extend beyond ninety (90) days following the Conversion Date;

(viii)  Borrower shall pay a Conversion Fee of one-quarter of one percent (1/4%) of the aggregate amount of the Permanent Loan, together with all reasonable fees incurred by Lender including, but not limited to, legal fees incurred by Lender as a result of the preparation, execution and delivery to Borrower of such documents as Lender or its counsel may reasonably require in order to evidence such conversion;

(ix)    The Lender shall be in satisfactory receipt of all required construction advance criteria as set forth and required in the Loan Agreement; and

(x)     Borrower has provided evidence satisfactory to the Lender in its sole discretion, that the Tax Abatement has been granted, is in place and in full force and effect with respect to the Mortgaged Property.

The Lender reserves the right to resize the Permanent Loan to meet the Minimum DSCR and Loan to Value Ratio for "as completed" and "as stabilized" values as determined by Lender in its sole discretion.

Case ID: 230901940

(b)      The "**Conversion Date**" shall be the date that the Construction Loan is converted to the Permanent Loan;

2.      *PERMANENT LOAN TERMS*.  Subject to any underwriting, due diligence and financial information as may be required by the Lender in its sole, non-reviewable discretion, the basic terms of the Permanent Loan shall be as follows and shall in all other respects be consistent with Section 8.1(c) of the Loan Agreement and be mutually agreeable to the Lender and Borrower:

(a)      The annual interest rate during the Permanent Loan shall be fixed for a consecutive period of sixty (60) months (the "**Initial Fixed Rate Term**"), set prior to the Conversion Date at 225 basis points (2.25%) above the average weekly yield on United States Treasury securities (the "**Initial Fixed Interest Rate**"), as published by the Federal Reserve Board, adjusted to a constant maturity of five (5) years (the "**Index**").   At the end of the Initial Fixed Rate Term, the new interest rate shall be fixed for the next sixty (60) months at 225 basis points (2.25%) above the average weekly yield on United States Treasury securities as published by the Federal Reserve Board, adjusted to a constant maturity of five (5) years (the "**Adjusted Interest Rate**"). In no event shall the Initial Fixed Interest Rate or the Adjusted Interest Rate (the "**Permanent Loan Interest Rate**") be less than three and three-quarters (3.75%) percent per annum. The Index will be determined three (3) days prior to the Conversion Date.

(b)      The Permanent Loan Interest Rate shall be calculated using a time factor of 365/360 day year (366 in a leap year).

(c)      The Permanent Loan shall follow an amortization schedule of thirty (30) years.

(d)      The term of the Permanent Loan shall be for ten (10) years.

(e)      The "**Permanent Loan Maturity Date**" shall be the day that is the tenth (10th) year anniversary of the first day of the first month following the Conversion Date.

(f)      During the term of the Permanent Loan, Borrower shall make equal monthly payments of principal and interest, which payments shall be due and payable commencing on the first day of the second full month following the Conversion Date and on the first day of each month thereafter until the Permanent Loan Maturity Date, when the unpaid principal balance plus all accrued and unpaid interest, fees and costs due on the Permanent Loan are due and payable.

(g)      Payment and performance of each and every one of Borrower's obligations in connection with the Permanent Loan shall be absolutely and unconditionally guaranteed by Guarantors ("**Permanent Loan Guaranty**").   Notwithstanding anything to the contrary set forth in the Permanent Loan Guaranty or in any other Loan Document, so long as no Event of Default is then continuing and no amounts are then due and owing under the Permanent Loan the liability of Guarantors under the Permanent Loan Guaranty shall be released at such time as Borrower delivers, or causes to be delivered, to the Lender evidence, in form and substance reasonably satisfactory to the Lender, which demonstrates that the following conditions are satisfied as determined by the Lender in its sole discretion: (i) No Event of Default which has not

Case ID: 230901940

heretofore been cured shall have occurred under the Loan Documents; and (ii) the debt service coverage ratio of the Mortgaged Property shall be no less than **1.25x** on an amortizing basis as determined by the Lender and as evidenced by the filed tax returns of Borrower.

Once Lender, in its sole and absolute discretion, has determined that the aforementioned conditions have been satisfied, the Guarantors' Permanent Guaranty shall be converted into the Lender's standard nonrecourse carve-out indemnity for the remaining term of the Permanent Loan.

(h)     On the Closing Date, the Guarantors shall execute and deliver the Indemnity Agreement for Carve-Out Events for Non-Recourse Loans (the "**Indemnity Agreement**"), which provides that Guarantors and Borrower shall be liable for the Lender's standard "non-recourse carveouts", which shall include, without limitation, fraud, willful misrepresentation, misapplication or misappropriation, material physical waste, certain bankruptcy events, and certain covenant and indemnity violations including environmental indemnities.

(i)     Upon Conversion, the Lender shall disburse to the Borrower the additional principal amount of the Permanent Loan in an amount equal to the difference between the amount set forth in Section 8.1(a) of the Loan Agreement and the Loan Amount.

(j)     Borrower shall establish an escrow account with the Lender on the Conversion Date with an initial deposit in an amount as reasonably estimated and determined solely by the Lender for the payment of annual taxes, assessments, ground rentals, insurance premiums, and any other similar charges. The Borrower shall, in addition to the monthly payments of principal and interest, pay to the Lender monthly deposits on the account of real estate taxes, assessments levied against the Mortgaged Property and insurance premiums equal to one-twelfth of the annual charges estimated by the Lender in order to accumulate with the Lender sufficient funds to pay such taxes and assessments on the Mortgaged Property thirty (30) days prior to their due date.

(k)     Borrower shall maintain the Operating Account in accordance with Section 5.13 of the Loan Agreement for the Permanent Loan and shall in addition establish, as additional security for the Permanent Loan, an account (the "**Security Deposit Account**") with the Lender on the Conversion Date into which all tenant security deposits shall be deposited and shall maintain such account, or a replacement account with the Lender, and otherwise satisfactory to the Lender in its sole, non-reviewable discretion, for so long as the Permanent Loan is outstanding. Borrower agrees to deposit all tenant security deposits into the Security Deposit Account during the term of the Permanent Loan. Failure to establish and maintain the Security Deposit Account and/or continue to maintain the Operating Account with the Lender during the Term of the Permanent Loan shall result in a one-half of one percent (0.50%) increase to the interest rate on the Permanent Loan per account until such time as Borrower delivers to the Lender evidence, in form and substance acceptable to the Lender, that Borrower is once again in compliance with Section 8.1(c)(x) of the Loan Agreement.

Case ID: 230901940

(l)        On the Conversion Date, the Permanent Loan will begin and the Borrower shall pay stub interest from the Conversion Date though the month end of that month based on the Permanent Loan Interest Rate.

(m)        Borrower shall also pay a one-time tax service fee of $1,000.00 on or before the Conversion Date to the Lender.

(n)        Borrower may prepay the Permanent Loan in whole, but not in part, prior to the maturity date of the Permanent Loan in accordance with the Lender's then-current prepayment conditions, provided that Borrower shall also pay a prepayment premium to the Lender simultaneously with the prepayment calculated on the amount prepaid and in accordance with the following schedule:

| Permanent Loan Year(s)* | Prepayment Fee | |
|---|---|---|
| 1 | 5% | (five percent) of the amount prepaid. |
| 2 | 4% | (four percent) of the amount prepaid. |
| 3 | 3% | (three percent) of the amount prepaid. |
| 4 | 2% | (two percent) of the amount prepaid. |
| 5 | 1% | (one percent) of the amount prepaid. |
| 6 | 5% | (five percent) of the amount prepaid. |
| 7 | 4% | (four percent) of the amount prepaid. |
| 8 | 3% | (three percent) of the amount prepaid. |
| 9 | 2% | (two percent) of the amount prepaid. |
| 10 | 1% | (one percent) of the amount prepaid. |

*Measured from the Conversion Date to and including the first anniversary of the initial payment and every anniversary thereafter.

A prepayment fee will not be assessed to Borrower if a full prepayment is made during the last ninety (90) day period of the 5th or 10th Year of the Term of the Permanent Loan.

A prepayment fee will not be assessed to Borrower as to an amount prepaid with insurance proceeds or a condemnation award applicable to any collateral securing payment of the Permanent Loan.

(o)        <u>Financial Covenant</u>.  Beginning with the first full year's operation of the Mortgaged Property following the Conversion Date and at all times during the Term of the Permanent Loan, Borrower shall be required to maintain a minimum Debt Service Coverage Ratio (as defined more fully below as **DSCR**) of **1.00x** (the "**Performance DSCR Threshold**") measured annually for the trailing 12-month period ending December 31st of each year (each, a "**Testing Period**").

Case ID: 230901940

Subject to the last sentence of this paragraph, if Borrower fails to maintain the Performance DSCR Threshold for one (1) Testing Period, Borrower may cure said default by depositing all Excess Cash (as hereinafter defined) in a Blocked Account. Borrower shall commence depositing all Excess Cash into the Blocked Account within ten (10) business days of the Lender providing written notice to Borrower of its failure to maintain the Performance DSCR Threshold. Thereafter, the deposits of Excess Cash by Borrower into the Blocked Account shall occur no less than monthly, and shall continue until Borrower has demonstrated to the Lender in its sole, non-reviewable discretion that it has maintained the Performance DSCR Threshold for no less than twelve (12) consecutive months. Borrower's failure to fund the Blocked Account with all Excess Cash deposits on a timely basis shall be an Event of Default. Upon achieving maintenance of the Performance DSCR Threshold, all funds held by the Lender in the Blocked Account shall be released to Borrower, and no further Excess Cash deposit shall be required after the next Testing Period so long as Borrower is in compliance with the Performance DSCR Threshold at such Testing Period and no Event of Default has occurred and is continuing. Upon the occurrence of any Event of Default (whether or not resulting from the failure to maintain the Performance DSCR Threshold), the Lender in its sole, non-reviewable discretion may as a non-exclusive remedy apply funds in the Blocked Account toward: (a) repayment of the principal balance of the Loan; or (b) the payment of any other amounts then due from Borrower to the Lender under the Note, the Mortgage or any other Loan Document.

Subject to the last sentence of this paragraph, if Borrower fails to maintain the Performance DSCR Threshold for two (2) consecutive Testing Periods, Borrower, as its exclusive cure, shall pay down the principal balance of the Loan in an amount required to meet the Performance DSCR Threshold, such amount to be determined by the Lender in its sole, non-reviewable discretion. Borrower shall make such payment within ten (10) Business Days of the Lender providing written notice to Borrower of such shortfall or it shall be an Event of Default. Borrower has only one opportunity to pay down the principal balance of the Loan if the Performance DSCR Threshold is not met; if at any time in the future the DSCR shall again fall below the Performance DSCR Threshold, it shall be an Event of Default.

No prepayments under this section shall be subject to the prepayment premiums under the Loan Documents.

For purposes of this section:

      (i)    **"DSCR"** means, for each Testing Period, the quotient obtained by dividing (a) the Net Operating Income by (b) the Debt Service;

      (ii)    **"Debt Service"** means the sum of all regularly scheduled principal and interest payments due on the Loan;

      (iii)    **"Net Operating Income"** means the amount by which rental and other operating revenue for the Mortgaged Property exceeds direct operating expenses of whatever kind relating to the operation, maintenance and management of the Mortgaged Property that are incurred on a regular monthly or other periodic basis, as determined by the Lender in accordance with generally accepted accounting principles; and

Case ID: 230901940

(iv)   **"Excess Cash"** shall mean all Net Operating Income of Borrower less regularly scheduled principal and interest payments on the Loan plus direct operating expenses paid to affiliates plus extraordinary revenue.

C.   <u>GENERAL PROVISIONS</u>.

1.   *DEFAULT RATE*:   Upon the occurrence of an Event of Default or after the Construction Loan Maturity Date or the Permanent Loan Maturity Date, as applicable, whether or not the Lender has elected to accelerate the Debt evidenced by this Note, the Loan shall bear interest, payable on demand, at a rate, per annum, determined on a daily basis, calculated at the then-applicable Interest Rate as set forth above plus, in either case, five (5%) percentage points (500 basis points) per annum (the "**Default Rate**"), but in no event more than the highest rate permitted by the applicable usury law in respect to the Borrower, until the unpaid balance of this Note and interest shall have been paid in full.   Borrower acknowledges that: (a) the Default Rate is a material inducement to the Lender to make the Loan; (b) the Lender would not have made the Loan in the absence of the agreement of Borrower to pay the Default Rate; (c) the Default Rate represents compensation for increased risk to the Lender that the Loan will not be repaid, and (d) the Default Rate is not a penalty and represents a reasonable estimate of: (i) the cost to the Lender in allocating its resources (both personnel and financial) to the ongoing review, monitoring, administration and collection of the Loan, and (ii) compensation to the Lender for losses that are difficult to ascertain.

2.   *FEES*:

(a)   <u>Late Fee</u>.   If the Lender does not receive the entire amount of any payment required under this Note within fifteen (15) days of its due date, including without limitation, the Construction Loan Maturity Date or the Permanent Loan Maturity Date, as applicable, in addition to and not in limitation of any other rights or remedies which the Lender may have with respect thereto under any of the Loan Documents or with respect to any Collateral (as hereinafter defined), the Borrower shall pay a late fee of five percent (5%) of any such payment not received (including tax and insurance escrows, if applicable), such late charge to be immediately due and payable without demand by the Lender.   As to a loan with a balloon payment on the Maturity Date, the five (5%) percent late charge shall not apply to the balloon portion of the payment; but simply to the portion representing the regularly scheduled payment.   Borrower acknowledges that its failure to pay any amount due hereunder within such fifteen (15) day period will result in the Lender incurring additional expense in servicing the Loan, the loss of the use of the money due, and frustration to the Lender in meeting its loan commitments, that the damages to the Lender in connection with such late payment are extremely difficult and impractical to ascertain, and that five percent (5%) of the amount not paid within such fifteen (15) day period is a reasonable estimate of the damages incurred by the Lender in connection with any such late payment.   The amount of any such "late charge" not paid promptly following demand therefor shall be payable pursuant to this Note and secured by the Collateral.   The failure to pay the late charge as provided above shall, at the Lender's option, constitute an Event of Default under the Loan Documents.

(b)   <u>Exit Fee</u>.   Borrower acknowledges and agrees that, in the event the Construction Loan is not converted to the Permanent Loan as set forth in <u>Article VIII</u> of the Loan Agreement for any reason and is subsequently prepaid, Borrower shall pay to the Lender an exit

Case ID: 230901940

fee in an amount equal to Ninety-Seven Thousand Five Hundred and 00/100 ($97,500.00) Dollars, representing three-quarters of one percent (.75%) of the aggregate Construction Loan Amount (the "**Exit Fee**").

3.        ***COLLATERAL AND GUARANTIES***:  Repayment of this Note is secured by an Open End Mortgage, Security Agreement and Fixture Filing (the "**Mortgage**") of even date herewith made by Borrower to the Lender creating a mortgage lien on certain real property designated as Parcel No. 881031500 on the tax maps of the City of Philadelphia, Commonwealth of Pennsylvania and located at 257 South 16th Street, City of Philadelphia, as more fully described in Exhibit A attached to the Mortgage (the "**Mortgaged Property**"), the assignment of contracts, licenses and permits, and other collateral (collectively, the "**Collateral**") and supported by a Guaranty of Payment and Suretyship Agreement (the "**Guaranty**") and a guaranty of lien free completion (the "**Guaranty of Completion**") executed by David Daniel, an individual and David Schreiber, an individual (individually, the "**Guarantor**" and collectively, the "**Guarantors**"), an Environmental Indemnity Agreement (the "**Environmental Indemnity**") executed by the Borrower and Guarantors, and an Indemnity Agreement ("**Indemnity Agreement**") executed by the Borrower and Guarantors, all of even date herewith and made in favor of the Lender.

Any security interests in any other collateral given to the Lender by the Borrower or Guarantors in connection with any other obligation to the Lender shall also secure repayment of this Note and performance of Borrower's obligations under the Guaranty, Guaranty of Completion and the Environmental Indemnity.

4.        ***EVENTS OF DEFAULT***:  It shall be an Event of Default under this Note upon the occurrence of any of the following events:

(a)       Borrower shall fail to repay the Loan in full at maturity (whether on the Construction Maturity Date or the Permanent Loan Maturity Date, as applicable) or by acceleration or otherwise or shall fail to make any other payment of principal and/or interest, and/or real estate taxes and insurance escrow, as applicable, due to the Lender under this Note or under any of the other Loan Documents within ten (10) days after the date when such payment shall become due and payable; or

(b)       Except as otherwise provided for in this Note, the Borrower shall fail to observe or perform any of the covenants or agreements on its part to be observed or performed under this Note or under any of the other Loan Documents within thirty (30) days after written notice from the Lender of such non-compliance; or

(c)       Any Event of Default shall occur under the terms of any of the other Loan Documents.

5.        ***REMEDIES; CONFESSION OF JUDGMENT***:  Upon the occurrence of any Event of Default, then the entire unpaid Loan Amount hereunder, plus all interest accrued thereon, plus all other sums due and payable to the Lender under the Loan Documents shall, at the option of the Lender, become due and payable immediately without presentment, demand, notice of nonpayment, protest, notice of protest or other notice of dishonor, all of which are hereby expressly waived by Borrower.

Case ID: 230901940

Upon the occurrence of any Event of Default, the Lender may forthwith exercise singly, concurrently, successively, or otherwise any and all rights and remedies available to the Lender under the Loan Agreement and the Mortgage and any of the other Loan Documents or with respect to any Collateral, or available to the Lender by law, equity, statute or otherwise, including, without limitation, the right to set off any sums deposited by Borrower with the Lender against the amounts due hereunder.

**IN ADDITION TO ANY OTHER RIGHT OR REMEDY, THE FOLLOWING PARAGRAPHS SET FORTH A WARRANT OF AUTHORITY FOR AN ATTORNEY TO CONFESS JUDGMENT AGAINST BORROWER. IN GRANTING THIS WARRANT OF ATTORNEY TO CONFESS JUDGMENT AGAINST BORROWER, BORROWER HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, AND AFTER CONSULTING WITH SEPARATE COUNSEL OF BORROWER (OR INDEPENDENTLY ELECTING NOT TO DO SO), UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS BORROWER HAS OR MAY HAVE TO PRIOR NOTICE AND AN OPPORTUNITY FOR HEARING UNDER THE RESPECTIVE CONSTITUTIONS AND LAWS OF ANY STATE AND THE COMMONWEALTH OF PENNSYLVANIA.**

**AFTER THE OCCURRENCE OF ANY EVENT OF DEFAULT HEREUNDER, BORROWER IRREVOCABLY AUTHORIZES AND EMPOWERS THE PROTHONOTARY, CLERK OF COURT, ANY ATTORNEY OF ANY COURT OF RECORD IN THE COMMONWEALTH OF PENNSYLVANIA TO APPEAR FOR BORROWER IN ANY AND ALL ACTIONS AND TO ENTER JUDGMENT AGAINST BORROWER FOR THE ENTIRE PRINCIPAL SUM REMAINING DUE HEREUNDER, AND FOR ANY OTHER OF THE LIABILITIES, AND FOR INTEREST AND COSTS TOGETHER WITH AN ATTORNEYS' COMMISSION OF FIFTEEN PERCENT (15%) OF THE AMOUNT THEN DUE, BUT IN NO EVENT LESS THAN FIVE THOUSAND DOLLARS ($5,000.00), WITH OR WITHOUT DECLARATION OR STAY OF EXECUTION, AND WITH RELEASE OF ERRORS. NOTWITHSTANDING THE ATTORNEY'S COMMISSION SET FORTH ABOVE WHICH IS INCLUDED IN THE WARRANT OF AUTHORITY FOR THE PURPOSE OF ESTABLISHING A SUM CERTAIN, THE AMOUNT OF ATTORNEYS' FEES THAT LENDER MAY RECOVER SHALL NOT EXCEED THE ACTUAL ATTORNEYS' FEES INCURRED BY LENDER. IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL HEREOF, SUCH VERIFIED COPY SHALL BE SUFFICIENT WARRANT FOR ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR AND CONFESS JUDGMENT AGAINST BORROWER AS PROVIDED HEREIN. JUDGMENT MAY BE CONFESSED FROM TIME TO TIME UNDER THE AFORESAID POWERS, WHICH SHALL NOT BE EXHAUSTED BY ONE EXERCISE THEREOF EVEN IF PREVIOUSLY STRICKEN PURSUANT TO THE PENNSYLVANIA RULES OF CIVIL PROCEDURE.**

**BORROWER, BEING FULLY AWARE OF THE RIGHT TO NOTICE AND A HEARING CONCERNING THE VALIDITY OF ANY AND ALL CLAIMS THAT MAY BE ASSERTED AGAINST BORROWER BY LENDER BEFORE A JUDGMENT CAN BE ENTERED HEREUNDER OR BEFORE EXECUTION MAY BE LEVIED ON SUCH JUDGMENT AGAINST ANY AND ALL PROPERTY OF BORROWER, HEREBY**

Case ID: 230901940

**WAIVES THESE RIGHTS AND AGREES AND CONSENTS TO JUDGMENT BEING ENTERED BY CONFESSION IN ACCORDANCE WITH THE TERMS HEREOF AND EXECUTION BEING LEVIED ON SUCH JUDGMENT AGAINST ANY AND ALL PROPERTY OF BORROWER, IN EACH CASE WITHOUT FIRST GIVING NOTICE AND THE OPPORTUNITY TO BE HEARD ON THE VALIDITY OF THE CLAIM OR CLAIMS UPON WHICH SUCH JUDGMENT IS ENTERED.**

6.      ***COSTS AND EXPENSES***:  Following the occurrence of any Event of Default, Borrower shall pay to the Lender, upon demand from time to time, all reasonable costs and expenses (including all reasonable amounts paid to attorneys, accountants, real estate brokers, and other advisors employed by the Lender), incurred by the Lender in the exercise of any of its rights, remedies, or powers under any of the Loan Documents as a secured or unsecured creditor, as the case may be, of Borrower, any general partner of Borrower, or any guarantor of the Loan, or with respect to the Collateral or otherwise with respect to any and all such Events of Default, and any amount thereof not paid promptly following demand therefor shall be added to the principal sum hereunder and shall bear interest at the Default Rate from the date of such demand until paid in full, and shall be secured by the Collateral.  In connection with and as part of and without limiting the foregoing, in the event that any of the Loan Documents is placed in the hands of an attorney for the collection of any sum payable thereunder, Borrower agrees to pay reasonable attorneys' fees for the collection of the amount being claimed under the Loan Documents, as well as all costs, disbursements and allowances provided by law, the payment of which sums shall be secured by the Collateral.  Nothing in this Section C-6 shall limit the obligation of Borrower to pay any and all costs and expenses for which Borrower is otherwise liable under any of the Loan Documents.

7.      ***WAIVERS***:  Except as to notices that are specifically provided for herein or in any of the other Loan Documents, Borrower hereby waives presentment, demand, notice of nonpayment, protest, notice of protest or other notice of dishonor, and any and all other notices in connection with any default in the payment of, or any enforcement of the payment of, the amounts due under the Loan Documents.  To the extent permitted by law, Borrower waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. Borrower agrees that Lender does not, and with regard to the Note and Obligations, shall not have any of the duties to Borrower as set forth in §5601(3)(b) of the Pennsylvania Decedents, Estates and Fiduciaries Code, 20 Pa. C.S. §5601(3)(b).

8.      ***CHANGES***:  This Note can only be changed by an agreement in writing signed by the Borrower and the Lender.

9.      ***NOTE BINDING ON BORROWER AND SUCCESSORS***:  All obligations under this Note are the joint and several unconditional obligations of Borrower and its successors and assigns. The release of Borrower, the Mortgaged Property, any Collateral or any Guarantor shall not release any other Borrower, the Mortgaged Property, Collateral, or any Guarantor from its/his obligations under any of the Loan Documents, as applicable.

10.     ***GOVERNING LAW; JURISDICTION AND VENUE***:  This Note shall be, construed according to the laws of the Commonwealth of Pennsylvania and the Borrower irrevocably agrees to the exclusive jurisdiction of the federal or state courts of the Commonwealth of Pennsylvania to determine any questions of fact or law arising under this Note applicable to

Case ID: 230901940

contracts made and to be performed in Pennsylvania, including those laws which govern applicable statutes of limitations and in any and all disputes, actions, or proceeding between the Lender and Borrower, whether arising hereunder or under any other agreement or undertaking; and Borrower irrevocably agrees to service of process by certified mail, return receipt requested, to Borrower at the address listed in the records of the Lender.  Borrower further agrees that the proper venue for such disputes, actions, or proceedings shall be Philadelphia County; except that any foreclosure action shall be brought in the county where the Mortgaged Property is located.  However, nothing herein contained shall in any manner prevent or preclude Lender from bringing any one or more actions against Borrower in any jurisdiction in the United States or elsewhere.

11.    *ACTIONS INVOLVING THIS NOTE*: If this Note is referred to any attorney for collection, the Borrower agrees to pay all costs and expenses of collection, including, without limitation, court costs and reasonable attorneys' fees.

12.    **WAIVER OF JURY TRIAL: BORROWER AND LENDER (BY ACCEPTANCE OF THIS NOTE) MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT TO ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENTS EXECUTED OR CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF LENDER RELATING TO THE ADMINISTRATION OF THE LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS.  FURTHER, THE PARTIES HERETO AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.  EXCEPT AS PROHIBITED BY LAW, IN ANY LITIGATION ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT, OR OTHER LOAN, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.  BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.  THIS WAIVER, AND THE WAIVER OF A JURY TRIAL, CONSTITUTE MATERIAL INDUCEMENTS FOR LENDER TO ACCEPT THIS NOTE AND MAKE THE LOAN.  BORROWER FURTHER ACKNOWLEDGES THAT THE PROVISIONS OF THIS SECTION 12 HAVE BEEN FULLY DISCLOSED TO IT AND THE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS.  NEITHER PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED.**

13.    *NO USURY:* The Lender and the Borrower intend to comply at all times with applicable usury laws.  If at any time such laws would ever render usurious any amounts called for

Case ID: 230901940

under this Note or the Loan Documents, then it is the Borrower's and the Lender's express intention that such excess amount shall be immediately credited (but not deemed a prepayment) on the principal balance of this Note (or, if this Note has been fully paid, refunded by the Lender to the Borrower), and the provisions hereof shall be immediately reformed and the amounts thereafter collectible under this Note reduced, without the necessity of the execution of any further documents, so as to comply with the then applicable law, but so as to permit the recovery of the fullest amount otherwise called for under this Note.  Any such crediting or refund shall not cure or waive any Event of Default by the Borrower under this Note or the other Loan Documents.  If at any time following any reduction in the interest rate payable by the Borrower as a result of this Section C-13 there remains unpaid any principal amount under this Note and the maximum interest rate not prohibited by applicable law is increased or eliminated, then the interest rate payable under this Note shall be readjusted, to the extent not prohibited by law, so that the U.S. dollar amount of interest payable hereunder shall be equal to the U.S. dollar amount of interest which would have been paid by the Borrower without giving effect to the reduction in interest resulting from compliance with applicable usury laws.  The Borrower agrees that in determining whether or not any interest payable under this Note or the Loan Documents exceeds the highest rate not prohibited by law, any non-principal payment (except payments specifically stated in this Note or in the Loan Documents to be "interest"), including, without limitation, prepayment fees and late charges, shall, to the maximum extent not prohibited by law, be an expense, fee, premium or penalty rather than interest.

14.   ***REMEDIES CUMULATIVE, ETC***:

(a)   The rights and remedies of the Lender under this Note and each and every one of the Loan Documents, or with respect to any Collateral, or now or hereafter existing at law or in equity, by statute, or other legislative enactment or otherwise, is intended to be exclusive of any other right or remedy, and each and every such right or remedy shall be cumulative and concurrent and at the sole, non-reviewable discretion of the Lender may be pursued singly, successively, or together and exercised as often as the Lender shall desire.  Time is of the essence under this Note.  The failure of the Lender to exercise any such right or remedy, or any delay therein, shall in no event be construed as a waiver or release thereof.  Nothing contained in this Section C-14 shall be construed as limiting the Lender to the remedies mentioned above.

(b)   The recovery of any judgment by the Lender and/or the levy of execution under any judgment upon any Collateral shall not affect in any manner or to any extent the lien of any security interest in such Collateral, or any rights, remedies, or powers of the Lender under any of the Loan Documents or with respect to any Collateral, but such liens and such security interest, and such rights, remedies and power of the Lender shall continue unimpaired as before.  Further, the exercise by the Lender of its rights and remedies and the entry of any judgment by the Lender shall not affect in any way the interest rate payable hereunder or under any of the other Loan Documents on any amounts due to the Lender, but interest shall continue to accrue on such amounts at the Default Rate.

(c)   Borrower agrees that the Lender may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the Loan Documents (and Borrower hereby waives any notice of any of the foregoing), and that the Loan Documents may be amended, supplemented or modified by the Lender and other signatory parties and that the Lender may resort

Case ID: 230901940

to any Collateral in such order and manner as it may think fit, or accept the assignment, substitution, exchange, pledge, or release of all or any portion of any Collateral, for such consideration, or none, as it may require, without in any way affecting the validity of any liens over or other security interest in the remainder of any such Collateral (or the priority thereof or the position of any subordinate holder of any lien or other security interest with respect thereto); and any action taken by the Lender pursuant to the foregoing shall in no way be construed as a waiver or release of any right or remedy of the Lender, or of any Event of Default, or of any liability or obligation of Borrower, under any of the Loan Documents.

(d)       Borrower agrees that any suit, action or proceeding against it to enforce this Note may be commenced in any federal or state court in the Commonwealth of Pennsylvania and Borrower hereby waives any objections which Borrower may have now or hereafter have based on venue and/or *forum non-conveniens* of any such suit, action, or proceeding, and Borrower hereby irrevocably submits to the jurisdiction of any such court in any suit, action, or proceeding.

15.       *SEVERABILITY:*  In the event that for any reason one or more of the provisions of this Note or their application to any person or circumstance shall be held to be invalid, illegal or unenforceable in any respect or to any extent, such provisions shall nevertheless remain valid, legal and enforceable in all such other respects and to such extent as may be permissible.  In addition, any such invalidity, illegality or unenforceability shall not affect any other provisions of this Note, but this Note shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

16.       *NOTICES:*  All notices required to be given to any of the parties hereunder shall be in writing and shall be deemed to have been sufficiently given for all purposes when presented personally to such party or sent by Federal Express or other nationally recognized overnight courier to such party at its address set forth below or sent by certified or registered mail, return receipt requested, to such party at its address set forth below:

Borrower:                          USRE 257 LLC
                                   45 City Avenue
                                   Unit 383
                                   Bala Cynwyd, PA 19004
                                   Attention:  David Daniel

with a copy to                     Blank Rome
Borrower's                         One Logan Square
counsel:                           130 North 18th Street
                                   Philadelphia, PA 19103
                                   Attention:  Peter J. Soloff, Esq.

Lender:                            Investors Bank
                                   101 JFK Parkway
                                   Short Hills, New Jersey 07078
                                   Attention:  Commercial Real Estate

Case ID: 230901940

| | |
|---|---|
| with a copy to | Mandelbaum Salsburg P.C. |
| Lender's counsel: | 3 Becker Farm Road, Suite 105 |
| | Roseland, New Jersey 07068 |
| | Attention:  Robin F. Lewis, Esq. |

Such notice shall be deemed to be given when received if delivered personally, on the next business day if sent by an overnight commercial courier or two (2) days after the date mailed if sent by certified or registered mail, return receipt requested.  Any notice of any change in such address shall also be given in the manner set forth above.  Whenever the giving of notice is required, the giving of such notice may be waived in writing by the party entitled to receive such notice.

17.    ***DEFINITIONS; NUMBER AND GENDER; INTERPRETATION***:  In the event Borrower consists of more than one individual or entity, the obligations and liabilities hereunder of each of them shall be joint and several and the word "Borrower" shall mean all or some or any of them.  For purposes of this Note, the singular shall be deemed to include the plural and the neuter shall be deemed to include the masculine and feminine, as the context may require; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to "attorneys' fees" shall be deemed to be followed by the words "and disbursements"; and references to sections or exhibits are to those of this Note unless otherwise indicated.  The references herein to the Loan Documents or any one of them shall include any supplements to or any amendments of or restatements of such Loan Documents or any one of them.

18.    ***INCORPORATION BY REFERENCE:***  All of the terms and provisions of the Loan Documents, to the extent not inconsistent herewith, are hereby incorporated herein by reference. Further reference is made to Article VIII of the Loan Agreement, which provisions are hereby incorporated by reference as if fully set forth in this Note.

19.    ***CAPTIONS***:  The captions or headings of the paragraphs/sections in this Note are for convenience only and shall not control or affect the meaning or construction of any of the terms or provisions of this Note.

20.    ***USE OF PROCEEDS***:  The proceeds of this Note are to be used for business, commercial, investment or other similar purposes and no portion thereof will be used for any personal, family, or household use.

21.    ***CROSS-DEFAULT:***  The occurrence of an Event of Default shall constitute a default under any other loan or other financial accommodation from the Lender and/or its affiliates to Borrower or any Guarantor and a default under any other loan or other financial accommodation from the Lender and/or its affiliates to Borrower or any Guarantor shall constitute an Event of Default under this Note and each and every one of the other Loan Documents.

22.    ***NON-RECOURSE***:  The liability of Borrower under this Note is, subject to certain exceptions set forth below, enforceable only to the extent of Borrower's interest in the Mortgaged

Case ID: 230901940

Property and in any other Collateral given to the Lender in connection with the Loan.  Subject to certain exceptions set forth below, there shall be no personal liability on the part of Borrower or any of its principals outside of their respective interests in the Mortgaged Property and in any other Collateral given to the Lender in connection with the Loan, and except as specifically provided herein and provided that the **Release Date** (as defined in the Guaranty of Payment) shall have occurred,  the Lender shall not sue for, seek, or demand any deficiency judgment against Borrower or its principals in any action or proceeding brought to enable the Lender to enforce and realize upon its security interest in the Mortgaged Property except to the extent necessary to fully realize the security in the Collateral granted under the  Loan Documents.  The provisions of this Section C 22 shall not, however: (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document, (b) impair the right of the Lender to name the Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage, (c) affect the validity or enforceability of any guaranty or indemnity agreement made in connection with the Loan, if applicable, (d) impair the right of the Lender to obtain the appointment of a receiver, (e) impair the enforcement of the Assignment of Leases and Rents, (f) constitute a prohibition against the Lender to commence any other appropriate action or proceeding in order for the Lender to fully realize the security granted by the Mortgage or to exercise its remedies against the Mortgaged Property, or (g) constitute a waiver of the Lender to enforce the liability and obligation of Borrower and any other Guarantor by money judgment or otherwise, to the extent of: (i) any loss, damage, cost, expense, liability, claim, or other obligations incurred by the Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with any "Loss Liability Events" set forth in the Indemnity Agreement or (ii) any obligations or liabilities arising out of or in connection with any "Full Recourse Events" set forth in the Indemnity Agreement or (iii) any obligations or liabilities arising out of or in connection with any matters set forth in the Guaranty and Suretyship Agreement, the Guaranty of Completion or the Environmental Indemnity Agreement, all of even date herewith in favor of the Lender and made in connection with the Loan.

**SIGNATURE TO FOLLOW ON NEXT PAGE**

Case ID: 230901940

**IN WITNESS WHEREOF,** Borrower, intending to be legally bound hereby, has executed the Note the day and year first above written.

**USRE 257 LLC, a Delaware limited liability company**

**By: USRE 257 MM LLC, a Delaware limited liability company, its Manager**

By: _____

Name: **David Daniel**
Title: **Managing Member**

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF _Montgomery_                SS

On this, the __11__ day of November 2020, before me, the undersigned officer, personally appeared David Daniel, who acknowledged himself to be the Managing Member of **USRE 257 MM LLC,** a Delaware limited liability company, Manager of **USRE 257 LLC,** a Delaware limited liability company, and that he as such Managing Member being authorized to do so, executed the foregoing instrument for the purposes therein contained, by signing the name of the limited liability company, by himself as Managing Member.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

Commonwealth of Pennsylvania - Notary Seal
Eric Freundlich, Notary Public
Montgomery County
My commission expires February 7, 2022
Commission number 1281551
Member, Pennsylvania Association of Notaries

_____
Notary Public

My Commission Expires: 02/07/2022

Promissory Note

**Exhibit C**

Case ID: 230901940

CERTIFIED TRUE COPY

PREPARED BY:

Robin F. Lewis, Esq.
Mandelbaum Salsburg PC
105 Becker Farm Road, Suite 105
Roseland, New Jersey 07068

RETURN RECORDED DOCUMENT TO:

Robin F. Lewis, Esq.
Mandelbaum Salsburg P.C.
105 Becker Farm Road, Suite 105
Roseland, New Jersey 07068

PROPERTY OPA #: 881031500

## OPEN-END MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

**(This is an Open-End Mortgage and Security Agreement that secures future advances pursuant to 42 Pa.C.S. Section 8143 and 8144, Act. No. 126 of 1990)**

### USRE 257 LLC
(the "Mortgagor")

- and -

### INVESTORS BANK
(the "Mortgagee")

DATED:  November 11, 2020
and effective as of November 30, 2020

**OPEN-END MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING**
**(This is an Open-End Mortgage and Security Agreement that secures future advances pursuant to 42 Pa.C.S. Section 8143 and 8144, Act. No. 126 of 1990)**

THIS OPEN-END MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING) (this "**Mortgage**"), made as of the 11th day of November, 2020 and effective as of the 30th day of November, 2020, between **USRE 257 LLC**, a Delaware limited liability company having a mailing address of 45 City Avenue, Unit 383, Bala Cynwyd, Pennsylvania 19004 (the "**Mortgagor**"); and **INVESTORS BANK**, a New Jersey chartered bank, having an office at 101 JFK Parkway, Short Hills, New Jersey 07078 (the "**Mortgagee**").

Mortgagor is the owner of the fee estate commonly known as 257 South 16th Street, City of Philadelphia, Commonwealth of Pennsylvania, OPA No. 881031500, as more fully described in **Exhibit A** attached hereto and made a part hereof (the "**Real Property**").

The Mortgagor is indebted to Mortgagee in the principal sum of up to $14,000,000.00, which sum is to be paid according to the Mortgagor's Mortgage Loan Note (the "**Note**"), of even date herewith and payable to the order of Mortgagee, and which sum represents the proceeds of a construction/permanent loan (the "**Loan**") to be disbursed to Mortgagor by Mortgagee in accordance with the terms of that certain Loan Agreement, dated as of the date hereof, by and between the Mortgagor and Mortgagee (the "**Loan Agreement**") for the construction and renovation of improvements on Mortgaged Property (the "**Project**").

This Mortgage, together with the Note, the Loan Agreement, the Assignment of Contracts, Licenses and Permits ("**Assignment of Contracts**"), the Absolute Assignment of Leases and Rents (the "**Assignment of Leases**"), that certain Guaranty and Suretyship Agreement, dated as of the date hereof, executed by David Daniel, an individual, and David Schreiber, an individual (individually and collectively as the context requires "**Guarantor**") in favor of Mortgagee (the "**Guaranty**"), that certain Guaranty of Completion executed by Mortgagor and Guarantor (the "**Completion Guaranty**"), that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Mortgagor and Guarantor in favor of Mortgagee (the "**Environmental Indemnity**"), and that certain Indemnity Agreement dated as of the date hereof, executed by Mortgagor and Guarantor in favor of Mortgagee  (the "**Indemnity Agreement**") and any and all other documents evidencing and securing the Loan are herein referred to, collectively, as the "**Loan Documents**."

NOW, THEREFORE, to secure payment of the Note with interest aforesaid, including, without limitation, all present and future advances thereunder and all extensions, modifications and renewals thereof and the performance of the covenants and agreements contained herein, together with all other sums recoverable by Mortgagee under the terms of the Loan Documents, together with all existing and future liabilities of Mortgagor to Mortgagee under the Loan Documents (said indebtedness, interest and all other sums and liabilities are hereinafter collectively referred to as the "**Aggregate Debt**") and to secure Mortgagor's obligations and

2

Case ID: 230901940

liabilities under the terms of the Note, and intending to be legally bound hereby and in consideration thereof, the Mortgagor hereby GRANTS, BARGAINS, SELLS, ALIENATES, ENFEOFFS, CONVEYS, ASSIGNS, TRANSFERS, RELEASES, PLEDGES, and MORTGAGES to Mortgagee all of its right, title and interest in, with power of sale, the Real Property.

TOGETHER with the buildings, structures and improvements now and hereafter constructed thereon, and the fixtures and equipment now and hereafter installed therein, all of which shall be deemed real property, together with all right, title and interest of the Mortgagor now owned, or hereafter acquired, in and to the following (the Real Property together with the following property being hereinafter collectively called the "**Mortgaged Property**"):

(a)     all buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter erected or located on the Mortgaged Property ("**Improvements**");

(b)     all streets, lanes, alleys, passages, ways, water courses, easements, rights, liberties, privileges, tenements, hereditaments and appurtenances whatsoever thereunto belonging to or in any way made appurtenant hereafter, and the reversions and remainder, with respect thereto ("**Appurtenances**");

(c)     all machinery, apparatus, equipment, furniture, furnishings, fixtures, inventory, goods, appliances, and other property of every kind and nature whatsoever, together with replacements thereof and accessories, parts or accessions thereto, now owned or hereafter acquired by Mortgagor or in which Mortgagor has or shall have an interest, and whether or not now or hereafter located on the Mortgaged Property, and any and all proceeds of any of the foregoing ("**Equipment**");

(d)     all building materials, building machinery and building equipment delivered on site to the Mortgaged Property during the course of, or in connection with, the construction of, or reconstruction of, or remodeling of any building and improvements from time to time during the term of this Mortgage ("**Building Equipment**");

(e)     all general intangibles relating to the development or use of the Mortgaged Property, including, but not limited to, all licenses, development rights,  permits and agreements from or with all boards, agencies, departments, public utilities, governmental or otherwise, all names under which or by which the Mortgaged Property or Improvements may at any time be operated or known and all rights to carry on business under any such names or any variations thereof, all trademarks and goodwill in any way relating to the Mortgaged Property, all shares of stock or other evidence of ownership of any part of the Mortgaged Property owned by Mortgagor in common with others, and all documents of membership in any owners or members association or similar group having responsibility for managing or operating any portion or all of the Mortgaged Property ("**Intangibles**");

(f)     all awards or payments, including interest thereon, which may be made with respect to the Mortgaged Property and Improvements, whether from the exercise of the right of eminent domain (including any transfer made in lieu of the exercise of said right), or for

4836-3234-5548, v. 4

Case ID: 230901940

any other injury to or decrease in the value of the Mortgaged Property or Improvements including, without limitation, all awards or payments of estimated compensation, all damages to the Mortgaged Property or Improvements resulting from any taking, all machinery and equipment dislocation expenses, all settlement amounts, all apportionments of taxes, reimbursement of attorneys and engineers fees, all moving expenses and all business dislocation expenses ("**Awards**");

(g)      all insurance policies covering the Mortgaged Property or Improvements and all proceeds of any unearned premiums on any such insurance policies including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Mortgaged Property or Improvements ("**Insurance Policies**");

(h)      all leases, agreements of sale and other agreements affecting the use or occupancy of any portion or all of the Mortgaged Property or Improvements, whether heretofore or hereafter executed and all rights of to payment under any such lease or agreement ("**Leases and Agreements**");

(i)      all rents, receipts, issues, profits and other income of any and all kinds (including deposits) received or receivable and due or to become due from the sale or lease of any property, goods or materials or from the rendering of services including, but not limited to (i) the lease or sale of all or a portion of the Mortgaged Property or Improvements, or (ii) the operation of any income-producing facility on the Mortgaged Property or Improvements (all of such proceeds, receipts and income are hereinafter referred to as the "**Income and Rents**" and all such rights are hereinafter referred to as the "**Accounts Receivable**");

(j)      any securities or guaranties held by Mortgagor with respect to any of the Intangibles, Awards, Leases and Agreements or Accounts Receivable, and any notes, drafts, acceptances, chattel paper, documents, or other instruments evidencing the same ("**Securities**");

(k)      all funds deposited by Mortgagor with Mortgagee pursuant to the Loan Agreement or otherwise, including, without limitation, the Reserve Accounts (as each such term is defined in the Loan Agreement), all escrows, all reserves, deferred payments, deposits, refunds, cost savings and payments of any kind relating to the Improvements ("**Deposits**");

(l)      all plans and specifications prepared for renovations to or construction of the Improvements and all studies, data and drawings related thereto; and also all contracts and agreements relating to the aforesaid plans and specifications or to the aforesaid studies, data and drawings, or to the renovations to or construction of Improvements ("**Plans**");

(m)      the right, in the name and on behalf of itself or Mortgagor, to appear in or defend any action or proceeding brought with respect to the Mortgaged Property or Improvements (including without limitation, any condemnation or arbitration proceedings) and to commence any action or proceedings to protect the interest of Mortgagee in the Mortgaged Property and Improvements;

4836-3234-5548, v. 4

Case ID: 230901940

(n)     all refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Project as a result of tax certiorari or any applications or proceedings for reduction of taxes;

(o)     all easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Mortgaged Property and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Mortgaged Property to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Mortgagor of, in and to the Mortgaged Property and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(p)     All Equipment now owned, or the ownership of which is hereafter acquired, by Mortgagor which is so related to the Mortgaged Property and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Mortgaged Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Mortgaged Property, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, plumbing, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Mortgagor's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "**Fixtures**").  Notwithstanding the foregoing, "Fixtures" shall not include any property which tenants are entitled to remove pursuant to leases except to the extent that Mortgagor shall have any right or interest therein;

(q)     all proceeds of any of the foregoing, including, without limitation, proceeds of insurance and condemnation awards, whether cash, liquidation or other claims or otherwise; and

(r)     Any and all other rights of Mortgagor in and to the items set forth in Subsections (a) through (q) above.

Case ID: 230901940

***This Mortgage is intended to be a construction mortgage within the meaning of
13 Pa. C.S.A. § 9334.***

TO HAVE AND TO HOLD the Mortgaged Property unto Mortgagee, its successors and assigns forever. All right, title and interest of Mortgagor in and to all extensions, improvements, betterments, renewals, substitutes and replacements of, and all additions and appurtenances to the Mortgaged Property hereafter acquired by, or released to, Mortgagor or constructed, assembled or placed by Mortgagor on the Real Property, and all conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case, without any further mortgage, pledge, conveyance, assignment or other act by Mortgagor, shall become subject to the lien of this Mortgage as fully and completely, and with the same effect, as though now owned by Mortgagor and specifically described herein. Notwithstanding the foregoing, Mortgagor shall, at its own cost, make, execute, acknowledge, deliver and record any and all such further acts, deeds, conveyances, mortgages, notices of assignment, transfers, assurances and other documents as Mortgagee shall from time to time require for better assuring, conveying, assigning, transferring and confirming unto Mortgagee of the Mortgaged Property and the other rights hereby conveyed or assigned or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign for carrying out the intention of facilitating the performance of the terms of this Mortgage. In addition, Mortgagor hereby agrees that this Mortgage is a security agreement under the Uniform Commercial Code and creates in Mortgagee a security interest thereunder in, among other things, all Equipment, Building Equipment, Intangibles, Awards, Insurance Policies, Leases and Agreements, Income and Rents, Accounts Receivable, Securities, Deposits and Plans. Upon the filing of this Mortgage in the office of the recorder of deeds in and for the county where the Real Property is located, this Mortgage shall also be effective as a financing statement filed in such office as a fixture filing. Mortgagor shall, at its own cost and expense, execute, deliver and file any financing statements, continuation certificates and other documents Mortgagee may require from time to time to perfect and maintain in favor of Mortgagee a security interest under the Uniform Commercial Code in such Equipment, Building Equipment, Intangibles, Awards, Insurance Policies, Leases and Agreements, Income and Rents, Accounts Receivable, Securities, Deposits, Fixtures and Plans. Without limiting the generality of any of the foregoing, Mortgagor hereby irrevocably appoints Mortgagee attorney-in-fact for Mortgagor to execute, deliver and file any of the documents referred to hereinabove for and on behalf of Mortgagor. Mortgagor shall not change its jurisdiction of formation or its chief executive office without giving Mortgagee at least thirty (30) days' prior written notice thereof. Mortgagor hereby irrevocably authorizes Mortgagee to prepare and file and/or record, as applicable, new financing statements in the same form as the financing statements delivered to Mortgagee on the date hereof except for the change of address and unless the standard form accepted by the State or Commonwealth where the Real Property is located has changed, in which event such financing statement shall be in the new form. Upon any Event of Default hereunder or under any of the other Loan Documents, Mortgagee shall have in addition to any other rights and remedies hereunder or under the other Loan Documents, all of the rights and remedies granted to a secured party under the Uniform Commercial Code with respect to all personal property. To the extent permitted by law, Mortgagor agrees that the items set forth on the financing statements shall be treated as part of the Real Property and Improvements regardless of the fact that such items are set forth on the financing statements.

Case ID: 230901940

PROVIDED ALWAYS, and these presents are upon this express condition, that if Mortgagor or its successors or assigns shall well and truly pay or cause to be paid unto Mortgagee, its successors or assigns, the Aggregate Debt secured by this Mortgage, then this Mortgage, and the estate hereby granted, shall cease, be void and no further force and effect, and Mortgagee shall furnish to Mortgagor a satisfaction of this Mortgage in proper form for recording, but Mortgagee shall not be required to bear any expense or cost in connection with such satisfaction or the recording thereof.

THIS MORTGAGE also secures advances made by Mortgagee with respect to the Mortgaged Property for the payment of taxes, assessments, maintenance charges, and insurance premiums, costs incurred by Mortgagee for the protection of the Mortgaged Property or the lien of this Mortgage, including reasonable attorneys' fees, and expenses incurred by Mortgagee by reason of the occurrence of an Event of Default hereunder,  and the priority of such advances, costs and expenses shall relate back to the date of this Mortgage, or to such later date as required by applicable law.

The Mortgagor covenants as follows:

1.      PAYMENT OF LOAN; COMPLIANCE WITH LOAN DOCUMENTS:

The Mortgagor shall pay the indebtedness evidenced by the Note and secured by this Mortgage in accordance with the terms of the Note.  The Mortgagor shall comply with the terms and provisions of each and all of the Loan Documents.  Any capitalized terms used herein and not defined shall have the meaning set forth in the Loan Agreement. All the covenants, conditions and agreements contained in (a) the Loan Agreement, (b) the Note and (c) all and any of the other Loan Documents, are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein.

2.      TITLE WARRANTY:

As of the date hereof: (a) Mortgagor is seized of an indefeasible estate in fee simple in the Mortgaged Property other than as indicated in that certain Title Report No. PAFA20-4578 M/K, issued by Land Services USA, Inc., as agent for First American Title Insurance Company; (b) this Mortgage is and shall remain a valid and enforceable lien on the Mortgaged Property subject only to the matters referred to in subparagraph (a) hereof; (c) Mortgagor shall preserve such title, and all of its rights in and to the Mortgaged Property, and shall forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and entities whomsoever; and (d) Mortgagor has full power and lawful authority to mortgage the Mortgaged Property and grant a security interest therein in the manner and form herein done or intended hereafter to be done.

3.      REPAIR:

(a)      The Mortgagor shall keep all buildings, structures and other improvements existing or to be constructed on the Mortgaged Property from time to time, in good repair, working order and safe condition, and the Mortgagor shall from time to time make all necessary and proper repairs, replacements and improvements thereto.  The Improvements, the Fixtures, the Equipment and the Building Equipment shall not be

Case ID: 230901940

removed, demolished or materially altered (except for normal replacement of Fixtures, Equipment or Building Equipment, tenant finish and refurbishment of the Improvements) without the prior express written consent of Mortgagee (such consent not to be unreasonably withheld, delayed or conditioned), or as otherwise permitted by the Loan Agreement. The Mortgagor shall not do, and shall not permit to be done, any act which may in any way materially impair or materially and adversely affect Mortgagee's rights hereunder. Mortgagor shall promptly repair, replace or rebuild any part of the Mortgaged Property which may be destroyed by any casualty or become damaged, worn or dilapidated or which may be affected by any Condemnation, and shall complete and pay for any structure at any time in the process of construction or repair on the Mortgaged Property. All alterations, replacements or additions made pursuant to this Section 3 shall automatically become and constitute a part of the Mortgaged Property and shall be covered by the lien of this Mortgage.

(b)     Subject to the Mortgagor's intended construction and development activities as more particularly described in, and subject to the terms and conditions of the Loan Agreement, Mortgagor shall not commit or suffer any waste of the Mortgaged Property or make any change in the use of the Mortgaged Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Mortgaged Property, or take any action that might invalidate or allow the cancellation of any Title Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Mortgaged Property or the security of this Mortgage.

4.      COMPLIANCE WITH LAW:

The Mortgagor shall, in all material respects, comply with, and maintain the Mortgaged Property in compliance with, all applicable laws and requirements of all governmental authorities to the extent any such non-compliance would cause a material adverse effect on the Mortgaged Property or Project.

5.      TAXES; NO CREDIT FOR TAXES PAID:

Subject to the provisions of Section 6 hereof, Mortgagor shall pay all taxes of every kind and nature (including real and personal property, income, gross receipts, franchise, profits, sales and withholding taxes), all general and special assessments, water and sewer rents and charges, and all levies, permits, inspection and license fees and other public charges now or hereafter levied or assessed against the Mortgaged Property as liens or assessments (hereinafter individually called a "**Tax**" and collectively the "**Taxes**") as the same shall become due and payable from time to time and before interest or penalties accrue thereon; provided, however, that Mortgagor shall not be required to pay any Tax to the extent that nonpayment thereof is permitted while the validity thereof is being contested, so long as: (a) Mortgagor notifies Mortgagee in writing of its intention to contest the validity thereof, (b) the validity thereof is being contested in good faith by Mortgagor, (c) Mortgagor deposits with Mortgagee if Mortgagee so requests an amount deemed sufficient to make such payment if the contest is unsuccessful and (d) no Event of Default is continuing nor does there exist any fact or circumstance which with notice or the passage of time or both could constitute an Event of Default.  Notwithstanding the

4836-3234-5548, v. 4

Case ID: 230901940

foregoing, Mortgagor shall under no circumstances permit the Mortgaged Property to be sold or advertised for sale for nonpayment of any Tax. Mortgagor shall not apply for or claim any deduction from the taxable value of the Mortgaged Property because of the existence of the Note or this Mortgage. Subject to Mortgagor's right to contest any Tax as hereinabove provided, Mortgagor shall deliver to Mortgagee receipts evidencing the payment of such Tax on or before the last day on which any Tax may be paid without interest or penalties or as soon thereafter as such receipts are available.

6.    TAX AND INSURANCE ESCROW:

From and after the Conversion Date, Mortgagor shall pay or cause to be paid to Mortgagee on the first day of each month a sum equal to one-twelfth (1/12) of the amount of: (a) all annual real estate taxes and assessments as estimated from time to time by Mortgagee, becoming due with respect to the Mortgaged Property, (b) all premiums, computed on an annual basis, for the insurance required to be carried pursuant to Section 4(e) hereof insuring the Mortgaged Property against loss or damage by flood, if applicable and (c) upon the request of Mortgagee, which request will not be made until after the occurrence of an Event of Default hereunder, all premiums, computed on an annual basis, for all other insurance required to be carried pursuant to Section 4 hereof (inclusive of escrows required under clause (b) above). All such amounts (hereinafter, the "**Escrows**") shall be held by Mortgagee in such manner as it sees fit without any obligation to collateralize same; provided however, that if and to the extent that Mortgagee is required under applicable law to collateralize the Escrows for the benefit of Mortgagor, Mortgagor shall also have the right to charge a reasonable service fee in connection therewith unless prohibited under such law. Mortgagor shall provide Mortgagee with copies of bills for all amounts required to be escrowed upon the reasonable request of Mortgagee from time to time. The Escrows shall be applied to the payment of the respective items in respect of which the Escrows were deposited, or at Mortgagee's option, to the payment of any such items in clause a, b or c above in such order of priority as Mortgagee shall determine, as the same become due and payable. If, prior to the date upon which any of the aforesaid items shall be due and payable, the amount of Escrows then on deposit therefor shall be insufficient to pay such item, Mortgagor within five (5) days after demand is made therefor shall deposit the amount of such deficiency with Mortgagee. Upon the occurrence and during the continuance of an Event of Default hereunder, Mortgagee may at its option apply the Escrows or any part thereof in payment of any unpaid portion of the Aggregate Debt. If, when making any assignment of this Mortgage, the then Mortgagee may pay over to its assignee the then balance of the Escrows. Upon such assignment, Mortgagee shall have no further obligation to Mortgagor with respect to such deposits.

7.    INSURANCE: The Mortgagor shall keep in effect upon the Mortgaged Property:

(a)    All insurance policies required hereby shall be: (i) issued by companies which shall have an A.M. Best Rating Guide Stability Rating of A or better, and a Financial Rating of VI or better, (ii) on forms, in amounts, and with deductibles, all of which are reasonably acceptable to Mortgagee, and (iii) shall be maintained throughout the term of the Loan without cost to Mortgagee. All policies shall be

4836-3234-5548, v. 4

Case ID: 230901940

deposited with Mortgagee (if required by Mortgagee) and shall contain such provisions as Mortgagee deems reasonably necessary or desirable and which are commercially reasonable for similar buildings in Pennsylvania to protect its interest, including without limitation, to the extent permitted by approved state forms, a provision that such policy shall not be cancelled, altered or in any way limited in coverage or reduced in amount unless Mortgagee is given thirty (30) days prior written notice or ten (10) days prior written notice of non-payment of premium.

(b)     During construction of the Project, Mortgagor's insurance certificate shall identify the following types of coverage.    Mortgagor shall provide an Acord 28. Mortgagor shall keep in effect upon the Mortgaged Property a "Special Perils" Builder's Risk insurance policy against loss or damage by fire and such other hazards, including theft of construction materials and contents from the site, in such amounts, in such types and containing such provisions as Mortgagee may reasonably specify.  The policy must be written on a Builder's Risk Completed Value form, for the full insurable replacement cost valuation of the improvements to be constructed as per Mortgagee's appraisal.   Such insurance shall name Mortgagee (Investors   Bank,   ISAOA/ATIMA,   Construction   Lending Administration, Robbinsville Town Center Office, 2300 Route 33, Robbinsville, NJ 08691), as "Additional Interest/ First Mortgage and First Loss Payee/Lender's Loss Payable" in an amount equal to 100% of the full replacement cost and shall provide 30 day notice of cancellation to Mortgagee. Such insurance shall provide coverage for 100% of recurring Hard and Soft Costs inclusive of Delay in Opening.  Such coverage shall also be at an Agreed Amount and there shall be no Coinsurance. The insurance policy must also provide full coverage for Windstorm and Hail and Named Windstorms.  The insurance policy shall be required to contain full coverage for equipment breakdown and hot and cold testing.  There shall be no deductible over $50,000 except for Excess Flood ($500,000), Named Windstorms (up to 5% of Total Insurable Value).  Mortgagor shall identify any other locations which share the Builder's Risk limits of insurance. Permission to occupy must be granted with no limitation and must be set forth on the insurance certificate.  Any building materials that are in transit, storage or located at off-site prep yards must be fully insured. If the Project is located within a Special Flood Hazard Area: (i) NFIP coverage is required for each building with a limit equal to the lesser of the replacement cost of the proposed improvements or the maximum NFIP limit, with a deductible not to exceed $50,000 and (ii) Excess Flood insurance in an amount reasonably acceptable to Mortgagee. In the event, the construction is an Addition/Renovation project, Mortgagee requires: (i) full coverage for any existing structure must be maintained and (ii) Law & Ordinance coverage in an amount reasonably acceptable to Mortgagee. Mortgagor must deliver a full copy of the Builder's Risk Policy along with the corresponding endorsements adding Mortgagee and Borrower interests.  Mortgagee shall require an insurance review by its outside insurance consultant for all insurance coverage.

Case ID: 230901940

(c)     During Construction and except as otherwise permitted by Mortgagee, the Mortgagor and the General Contractor and/or Construction Manager, as applicable shall also keep in effect the following insurance coverage:   (i) Commercial General Liability ("**CGL**") insurance, insuring Mortgagor, the General Contractor and/or Construction Manager, as applicable, and naming Mortgagee (Investors Bank, ISAOA/ATIMA, PO Box 704108, Dallas, Texas 75370-4108) as an additional insured protecting Mortgagor and Mortgagee against liability for bodily injury or property damage occurring in, on or adjacent to the Mortgaged Property in commercially reasonable amounts, with a combined single limit of not less than One Million Dollars ($1,000,000.00) per occurrence for each person and for property damage, Two Million Dollars ($2,000,000.00) General Aggregate, plus a minimum of $5,000,000 per occurrence, $5,000,000.00 Aggregate, (ii) the certificate must show any deductible or self-insured retention amount (SIR) that applies to the CGL or Umbrella/Excess in the amounts approved by Mortgagee; (iii) there must be Products /Completed Operations coverage through the statute of repose in the local jurisdiction with the Mortgaged Property is located; (iv) Mortgagee must be listed as an Additional Insured on all Mortgagor policies and Mortgagee and Mortgagor must be listed as an Additional Insured on all General Contractor policies; (v) General liability endorsements adding Mortgagor and Mortgagee interests must be provided with a 30-day Notice of Claim to Mortgagee; (vi) General Contractor must show evidence of Worker's Compensation, Employer's Liability and Commercial Automobile  Liability (Hired/Non-Owned Auto insurance required if no Autos are owner); (vii) Mortgagor must provide evidence of Commercial Automobile Liability coverage if any Autos are owned or coverage for Hired/Non-Owned Autos if they do not own any Autos (an endorsement on the General Liability policy is acceptable; (viii) Mortgagee's interests must be shown on Certificate as Certificate Holder/Additional Insured with 30-day notice of cancellation to Mortgagee on all certificates; and (ix) Mortgagor to confirm whether terrorism coverage is included or excluded.

(d)     Following completion of the construction of the Project, or as reasonably required by Mortgagee, Mortgagor shall provide and maintain in force at all times: (a) hazard/casualty insurance insuring all Improvements, Building Equipment and Equipment which now are or hereafter become a part of the Mortgaged Property for perils covered by an all risk insurance policy with an ordinance or law coverage endorsement containing both replacement costs and agreed amount endorsements or options naming Mortgagee (Investors Bank, ISAOA/ATIMA, P.O. Box 704108, Dallas, Texas 75370-4108), as "First Mortgagee and First Loss Payee/Lender's Loss Payable" in an amount equal to 100% of the full replacement cost; (b) commercial general liability insurance for the Mortgaged Property, naming Mortgagee (Investors Bank, ISAOA/ATIMA, P.O. Box 704108, Dallas, Texas 75370-4108) as an additional insured protecting Mortgagor and Mortgagee against liability for bodily injury or property damage occurring in, on or adjacent to the Mortgaged Property in commercially reasonable amounts, with a combined single limit of not less than "One Million Dollars ($1,000,000 per occurrence, Two Million Dollars ($2,000,000) General Aggregate, plus a

11

Case ID: 230901940

minimum of $5,000,000 per occurrence, $5,000,000 Aggregate Umbrella for each person and for property damage; (c) boiler and machinery insurance if the Mortgaged Property has a boiler or is an office building; (d) rental value insurance for the perils specified herein for one hundred percent (100%) of the rents (including operating expenses, real estate taxes, assessments and insurance costs which are any lessee's liability) for a period of twelve (12) months; and (e) insurance against any other hazards as may be reasonably required by Mortgagee, including, without limitation, ordinance and law coverage and insurance against loss and damage by flood if any portion of the Improvements is located in an area identified as having special flood hazards, in such amounts as may be determined by Mortgagee. A minimum insurance carrier rating of A/VI by A.M. Best shall apply to all insurance companies.

(e)  Any policy or policies with respect to all of the above-mentioned insurance (the "Policy") (i) shall be issued by an insurer acceptable to Mortgagee, (ii) shall contain a provision that Mortgagee shall be given thirty (30) days' prior written notice of material change or cancellation of said Policy and that no such change or cancellation shall be effective as to Mortgagee in the absence of such notice, and (iii) shall contain such other provisions as shall from time to time be required by Mortgagee. Any such Policy may provide for customary deductibles provided the limits thereof are satisfactory to Mortgagee. Not less than fifteen (15) days' prior to any date upon which any premium for such insurance shall be due and payable and subject to the terms of Section 5 hereof, Mortgagor shall deliver to Mortgagee satisfactory evidence that such premium has been paid, and further, not less than fifteen (15) days' prior to the expiration date of any Policy, Mortgagor shall deliver to Mortgagee satisfactory evidence of the renewal of such Policy. In the event of the foreclosure of the Mortgage or other transfer of Mortgagor's interest in the Mortgaged Property in satisfaction of the Aggregate Debt, all right, title and interest of Mortgagor to any Policy then in force covering the Mortgaged Property shall pass to the transferee of the Mortgaged Property.

(f)   The Mortgagor shall also carry such other insurance insuring risks, as may reasonably be required by Mortgagee, as the same shall be customary in Pennsylvania for construction projects of a similar nature as Project.

(g)  If the Mortgaged Property is located in an area which has been identified by the Secretary of Housing and Urban Development as a Flood Hazard Area, then the Mortgagor shall obtain a flood insurance policy covering the Mortgaged Property in an amount not less than the outstanding principal balance of the Note or the maximum limit of coverage available, whichever is less. Such policy shall name Mortgagee as first Mortgagee under a Standard Mortgagee Clause with respect to the improvements and loss payee with respect to personal property or other assets securing the Loan.

(h)  The Project Architect must provide evidence of Architects Errors and Omissions coverage reasonably acceptable to Mortgagee.

8.      CASUALTY LOSS:

(a)      Mortgagor shall notify Mortgagee in writing within five (5) business days of the occurrence of any damage to or destruction affecting the Mortgaged Property. Mortgagor hereby directs any insurer to pay directly to Mortgagee any moneys payable under any Policy, and Mortgagor hereby appoints Mortgagee as attorney-in-fact to endorse any draft therefor. Sums paid to Mortgagee by any insurer may be retained on deposit with Mortgagee and, after deducting therefrom any expenses incurred in the collection thereof, including without limitation, reasonable attorneys' and expert witness' fees and costs, shall be applied as follows:

(i)      *Provided, that:* (V) no Event of Default shall be continuing, (W) the Improvements, Building Equipment and Equipment can, in Mortgagee's sole discretion be restored at least six (6) months prior to the Maturity Date (as defined in the Note), (X) in Mortgagee's judgment upon restoration: (1) the value of the Improvements, Building Equipment and Equipment shall at least equal their value immediately prior to such casualty and (2) the income following restoration of the building and leasing thereof will be sufficient to cover operating expenses of the Mortgaged Property and debt service on the Loan with the same debt service coverage ratio as reasonably determined by Mortgagee as existed as of the date hereof or immediately prior to such casualty, whichever is greater, and (Y) there are sufficient sums available, as reasonably determined by Mortgagee, for repairs and restoration and for payments of all amounts to become due under the Loan Documents during the repairs and restoration, and (Z) **Intentionally Omitted** (collectively, the "**Proceeds Release Conditions**"), Mortgagee will make 75% of the net insurance proceeds available to Mortgagor for restoration and will release the remaining 25% of the net insurance proceeds after completion of the restoration and the rental of the restored portion of the Mortgaged Property at a rental acceptable to Mortgagee.  In the event the estimated costs of restoration exceed 25% of the outstanding principal balance of the Loan, the plans and specifications pertaining to such restoration shall be subject to the prior written approval of Mortgagee.  Disbursement of the insurance proceeds will be made periodically pursuant to such plans and specifications pertaining to the restoration.

To the extent that the insurance proceeds held by Mortgagee are insufficient to pay the hard and soft costs of the restoration, Mortgagor shall be required to pay all amounts necessary in order to complete such restoration.  Mortgagee shall not be required at any time to disburse any insurance proceeds if the undisbursed balance is, in its sole opinion, insufficient to timely complete the lien free restoration of the Mortgaged Property in accordance with the plans and specifications.  It is intended that no trust shall be created by the receipt and retention by Mortgagee of any insurance proceeds, but only a debtor-creditor relationship between mortgagee and mortgagor for an amount equal to the insurance proceeds held, nor shall there be any obligation on Mortgagee to pay any interest on insurance proceeds held by Mortgagee.

Case ID: 230901940

(ii)     If the Proceeds Release Conditions are not satisfied, such insurance proceeds may be applied, at Mortgagee's option, to the prepayment of the Note.

(b)     Regardless of the cause of the damage or destruction or the availability or sufficiency of insurance proceeds, until all indebtedness secured hereby shall be fully paid, Mortgagor shall be obligated to repair, restore, and rebuild any Improvements, Building Equipment and Equipment so damaged or destroyed. Repair and restoration of the Improvements, Building Equipment and Equipment shall be commenced promptly after the occurrence of the loss and shall be prosecuted to completion diligently, the Improvements, Building Equipment and Equipment being so restored and rebuilt as to be of at least equal value and substantially the same character as prior to such damage and destruction.

(c)     In the event that Mortgagor is to be reimbursed out of the insurance proceeds for the costs of repairs and restoration, such proceeds shall be made available from time to time upon the furnishing to Mortgagee of satisfactory evidences of the estimated cost of completion thereof and such architect's certificates, waivers of lien, contractor's sworn statements, and other evidence of cost and of payment and of the continued priority of the lien hereof over any potential liens of mechanics and materialmen as Mortgagee may require and approve.   No payment made by Mortgagee prior to the final completion of the work shall, together with all payments theretofore made, exceed seventy-five percent (75%) of the net insurance proceeds made available to Mortgagee at the time of payment, and at all times the undisbursed balance of said proceeds shall be at least sufficient to pay for the cost of completion of the work free and clear of liens.   Any proceeds remaining after payment of the cost of rebuilding and restoration shall, at the option of Mortgagee, either be applied in reduction of the indebtedness secured hereby or paid to Mortgagor.

(d)     Should such damage or destruction occur after foreclosure or sale proceedings have been instituted, the proceeds of any such insurance policy or policies, if not applied in rebuilding or restoration of the Improvements, Building Equipment and Equipment, shall be used to pay the indebtedness then due and owing in the event of a non-judicial sale or the amount due in accordance with any decree of foreclosure or deficiency judgment that may be entered in connection with such proceedings, and the balance, if any, shall be paid to the owner of the equity of redemption if such owner shall then be entitled to the same, or otherwise as any court having jurisdiction may direct.  Following any foreclosure sale, or other sale of the Mortgaged Property by Mortgagee pursuant to the terms hereof, Mortgagee is authorized without the consent of Mortgagor to assign any and all insurance policies to the purchaser at the sale and to take such other steps as Mortgagee may deem advisable to cause the interests of such purchaser to be protected by any of such insurance policies.

4836-3234-5548, v. 4

Case ID: 230901940

9.     CONDEMNATION:

(a)     Mortgagor shall promptly notify Mortgagee of the commencement of any proceedings for the condemnation of the Mortgaged Property (a **"Taking"**) or any portion thereof.  Mortgagee may participate in any such proceeding and may be represented therein by counsel of its selection at the expense of Mortgagor. Mortgagor from time to time will deliver to Mortgagee all instruments requested by it to permit or facilitate such participation. In the event of such condemnation proceedings, the award or compensation payable is hereby assigned to and shall be paid to Mortgagee.  The proceeds of any award or compensation so received shall, at the option of Mortgagee, either be applied to the prepayment of the Aggregate Debt or be paid over to Mortgagor for restoration of the Mortgaged Property.

(b)     Provided that the Proceeds Release Conditions are satisfied and Mortgagor, promptly after the condemnation award is settled and/or awarded, proceeds with the restoration, replacement, rebuilding or repair (hereinafter collectively referred to as **"Restoration"**) of the Mortgaged Property as nearly as possible to the condition it was in immediately prior to such Taking, then all awards received by Mortgagee, on account of such Taking, less the actual cost, fees and expenses, if any, incurred in connection with the adjustment of the loss, shall be paid by Mortgagee, out of such awards as restoration progresses, as the same may be certified by an architect approved by Mortgagee, upon the written request of Mortgagor, which request shall be accompanied by a title company or official search, or other evidence satisfactory to Mortgagee, showing that there have not been filed with respect to the Mortgaged Property any vendor's, contractor's, mechanic's, laborer's or materialman's statutory or similar liens which have not been bonded or otherwise discharged of record, except such as will be discharged upon payment of the sum requested.

If the award, less the actual cost, fees and expenses, if any, incurred in connection with the Taking, shall be insufficient to pay the entire cost of such Restoration, Mortgagor will promptly pay the deficiency. It is intended that no trust shall be created by the receipt and retention by Mortgagee of any proceeds of a Taking, but only a debtor-creditor relationship between Mortgagee and Mortgagor for an amount equal to such proceeds, nor shall there be any obligation on Mortgagee to pay any interest thereon.

10.     NO ADDITIONAL LIENS ON FIXTURES:

The Mortgagor shall not remove or suffer to be removed from the Mortgaged Property any fixtures owned by the Mortgagor or in the future to be incorporated into, installed in, annexed or affixed to the Mortgaged Property (unless such fixtures have been replaced with similar fixtures of equal or greater utility and value and free of liens or required to be removed in accordance with any lease or unit sales contract of sale); nor will the Mortgagor execute or cause to be executed any security interest upon any such fixtures, additions to, substitutions or replacements thereof, or upon any fixtures in the future to be installed in, annexed or affixed to the Mortgaged Property.

4836-3234-5548, v. 4

Case ID: 230901940

11.   SECURITY INTEREST AND SECURITY AGREEMENT:

(a)   _Security Interest_.  This Mortgage is also intended to encumber and create a security interest in, and Mortgagor hereby grants to Mortgagee a security interest in, all sums on deposit with Mortgagee pursuant to the provisions of this Mortgage or of any other Loan Document and all fixtures, chattels, accounts, equipment, inventory, contract rights, general intangibles and other personal property included within the Project, all renewals, replacements of any of the aforementioned items, or articles in substitution therefor or in addition thereto or the proceeds thereof (said property is hereinafter referred to collectively as the "**Collateral**"), whether or not the same shall be attached to the Mortgaged Property or the Improvements in any manner.  It is hereby agreed that to the extent permitted by law, all of the foregoing property is to be deemed and held to be a part of and affixed to the Mortgaged Property and the Improvements.  The foregoing security interest shall also cover Mortgagor's leasehold interest in any of the foregoing property which is leased by Mortgagor.  Notwithstanding the foregoing, all of the foregoing property shall be owned by Mortgagor and no leasing or installment sales or other financing or title retention agreement in connection therewith shall be permitted without the prior written approval of Mortgagee.  Mortgagor shall, from time to time upon the request of Mortgagee, supply Mortgagee with a current inventory of all of the property in which Mortgagee is granted a security interest hereunder, in such detail as Mortgagee may reasonably require.  Mortgagor shall promptly replace all of the Collateral subject to the lien or security interest of this Mortgage when worn or obsolete with Collateral comparable to the worn out or obsolete Collateral when new and will not, without the prior written consent of Mortgagee, remove from the Mortgaged Property or the Improvements any of the Collateral subject to the lien or security interest of this Mortgage except such as is replaced by an article of equal suitability and value as above provided, owned by Mortgagor free and clear of any lien or security interest except that created by this Mortgage and the other Loan Documents.  All of the Collateral shall be kept at the location of the Project except as otherwise required by the terms of the Loan Documents.  Mortgagor shall not use any of the Collateral in violation of any applicable statute, ordinance or insurance policy.

(b)   _Security Agreement_.  This Mortgage constitutes a security agreement between Mortgagor and Mortgagee with respect to the Collateral in which Mortgagee is granted a security interest hereunder, and, cumulative of all other rights and remedies of Mortgagee hereunder, Mortgagee shall have all of the rights and remedies of a secured party under any applicable Uniform Commercial Code.  Mortgagor hereby agrees to execute and deliver on demand and hereby irrevocably constitutes and appoints Mortgagee the attorney-in-fact of Mortgagor to execute and deliver and, if appropriate, to file with the appropriate filing officer or office, such security agreements, financing statements, continuation statements or other instruments as Mortgagee may request or require in order to impose, perfect or continue the perfection of the lien or security interest created hereby.  To the extent specifically provided herein, Mortgagee shall have the right of possession of all cash, securities, instruments, negotiable instruments, documents, certificates and any other evidences of cash or other property or evidences of rights to cash rather than property, which are now or hereafter a part of the Project, and Mortgagor shall promptly deliver the same to Mortgagee, endorsed to Mortgagee, without further

4836-3234-5548, v. 4

Case ID: 230901940

notice from Mortgagee. Mortgagor agrees to furnish Mortgagee in writing with notice of any change in the name, identity, organizational structure, residence, or principal place of business or mailing address of Mortgagor thirty (30) days prior to the effective date of any such change. Expenses of retaking, holding, preparing for sale, selling or the like (including, without limitation, Mortgagee's reasonable attorneys' fees and legal expenses), together with interest thereon at the Default Rate (as defined in the Note) from the date incurred by Mortgagee until actually paid by Mortgagor, shall be paid by Mortgagor on demand and shall be secured by this Mortgage and by all of the other Loan Documents securing all or any part of the Aggregate Debt. Mortgagee shall have the right to enter upon the Mortgaged Property and the Improvements or any real property where any of the property which is the subject of the security interest granted herein is located to take possession of, assemble and collect the same or to render it unusable, or Mortgagor, upon demand of Mortgagee, shall assemble such property and make it available to Mortgagee at the Project, or at a place which is mutually agreed upon or, if no such place is agreed upon, at a place reasonably designated by Mortgagee to be reasonably convenient to Mortgagee and Mortgagor. If notice is required by law, Mortgagee shall give Mortgagor at least ten (10) days' prior written notice of the time and place of any public sale of such property, or adjournments thereof, or of the time of or after which any private sale or any other intended disposition thereof is to be made, and if such notice is sent to Mortgagor, as the same is provided for the mailing of notices herein, it is hereby deemed that such notice shall be and is reasonable notice to Mortgagor. No such notice is necessary for any such property which is perishable, threatens to decline speedily in value or is of a type customarily sold on a recognized market. Any sale made pursuant to the provisions of this Section 11(b) shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with a foreclosure sale as provided in this Mortgage upon giving the same notice with respect to the sale of the Project hereunder as is required with respect to any such foreclosure sale.

(c)     <u>Fixtures</u>. Certain of the personal property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Mortgaged Property, described or referred to in this Mortgage, and this Mortgage, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Mortgaged Property that is or may become fixtures.

12.     NO FURTHER ENCUMBRANCES:

At no time throughout the term of this Mortgage (unless required by law) shall the Mortgagor create, incur, assume or suffer to exist any mortgage, lien, security interest, encumbrance, attachment, levy, distraint or other judicial process of any kind on or with respect to any portion of the Mortgaged Property or any interest therein. At Mortgagee's election, and without notice to Mortgagor, Mortgagee may make but is not obligated to make, any payments which Mortgagor has failed to make under any prior lien, but such payment by Mortgagee shall not release Mortgagor from Mortgagor's obligations or constitute a waiver of Mortgagor's default hereunder. Any sum so expended by

Case ID: 230901940

Mortgagee shall be secured by this Mortgage, together with interest thereon at the rate stipulated in the Note from the date such payment is made by Mortgagee until the date of repayment by Mortgagor. Notwithstanding the foregoing, Mortgagor shall have the right, at its sole cost and expense, to contest in good faith by any lawful means any tax liens, provided that it notifies Mortgagee in writing of its intention to do so and deposits with Mortgagee, if Mortgagee so requests, an amount deemed sufficient by Mortgagee to satisfy such tax claims if it is ultimately determined that Mortgagor is responsible therefor. Any other liens shall be bonded or discharged within 30 days of filing.

13.   NO TRANSFER OF TITLE:

At no time throughout the term of this Mortgage shall the Mortgagor sell, convey, transfer or alienate any interest in the Mortgaged Property or the Mortgagor or any part thereof, or permit or effect any other transfer of title (collectively, a "**Transfer**") to the Mortgaged Property or any interest therein. No interest in the Mortgagor may be assigned, transferred, conveyed, pledged or otherwise disposed of.

14.   INSPECTION OF BOOKS/RECORDS:

Mortgagee shall have the right, at Mortgagee's sole cost and expense, upon five (5) business days notice to Mortgagor and during normal business hours, to inspect and make copies of Mortgagor's books, records and income tax returns. In addition, upon reasonable notice, Mortgagee, its agents, accountants and attorneys shall have the right to examine and audit the books and records of Mortgagor pertaining to the income, expenses and operation of the Mortgaged Property during normal business hours at any office of Mortgagor where the books and records are located. This Section 14 shall apply throughout the term of the Note and without regard to whether an Event of Default has occurred or is continuing.

15.   LEASES:

(a)   As further security for the payment of the Loan secured hereby, the Mortgagor hereby absolutely and unconditionally assigns to Mortgagee, effective irrespective of any Event of Default, hereunder, the rents, income and profits, including use and occupancy payments, and any payments realized from indemnifications running for the benefit of the Mortgagor, from said Mortgaged Property and all leases now or hereafter affecting said Mortgaged Property, together with any security deposits by tenants thereunder, it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. However, except for proceeds received pursuant to indemnification where there is physical damage to the Mortgaged Property or where title is otherwise affected or burdened, and subject to the provisions of the Loan Agreement, the Assignment of Leases and Section 18(e) herein, Mortgagee grants to Mortgagor a revocable license to collect, receive, use and apply all rents and other such payments, and Mortgagee hereby appoints the Mortgagor its attorney-in-fact for such purpose. Mortgagee shall have the immediate right after any Event of Default hereunder with or without notice or demand, with or without

Case ID: 230901940

the commencement of any action to foreclose this Mortgage and without the appointment of a receiver, to enter upon the Mortgaged Property, let the same, collect all rents therefrom and apply the rents, after payment of all charges and expenses, on account of the Loan secured hereby, whether then matured or not. If the Mortgagor is an occupant of the Mortgaged Property, the Mortgagor agrees to surrender the possession of the Mortgaged Property to Mortgagee immediately upon any Event of Default hereunder upon demand by Mortgagee, and if the Mortgagor remains in possession after such demand, such possession shall be pursuant to a license granted by Mortgagee and revocable at the will of Mortgagee, and the Mortgagor, as licensee, agrees to pay monthly in advance to Mortgagee such fees for the Mortgaged Property so occupied as Mortgagee may reasonably demand, and in default of so doing, the Mortgagor shall vacate the Mortgaged Property upon request of Mortgagee or may be dispossessed by summary proceedings or otherwise. In case of the appointment of a receiver of rents and profits of the Mortgaged Property, the covenants of this paragraph may be enforced by such receiver. Mortgagee may, but shall not be obligated to, make any tenant, licensee or other person in possession or occupancy under a written lease or otherwise, a party defendant to any foreclosure proceeding, and the Mortgagor, for itself and any subsequent owner of said Mortgaged Property, hereby waives any right it may have to require that any such tenant, licensee or person be made a party defendant in such proceeding.

(b)     The Mortgagor expressly covenants and agrees that any leases affecting the Mortgaged Property heretofore or hereinafter entered shall, in accordance with the terms and conditions of the Loan Agreement, contain language which shall make the leases expressly subordinate to this Mortgage, failure of which shall constitute an Event of Default under this Mortgage.

(c)     The Mortgagor covenants and agrees not to lease voluntarily the whole or any part of the Mortgaged Property to the United States of America, or any of its agencies, or to any person or entity having diplomatic immunity, without the prior written consent of Mortgagee. The Mortgagor will not, without the prior written consent of Mortgagee, assign the rents or any part thereof, from said Mortgaged Property; nor consent to the cancellation or surrender of, or accept prepayment of rents under, any lease now or hereafter covering said Mortgaged Property or any part thereof; nor modify any such lease so as to shorten the term, decrease the rent, accelerate the payment of rent or change the terms of any renewal option, except with respect to a default under such lease; and such purported assignment, cancellation, surrender, prepayment or modification made without the written consent of Mortgagee shall be void as against Mortgagee. The leases shall provide that each tenant shall be required to execute an attornment agreement and, to the extent that such tenant shall require a non-disturbance agreement, Mortgagee shall enter into same on its standard form. The Mortgagor will upon reasonable demand of Mortgagee enter into an agreement with Mortgagee with respect to any lease hereafter executed covering said Mortgaged Property or any part thereof, subjecting such lease(s) to the provisions of this Section 15(c). The Mortgagor will not enter into or execute any lease covering any part of the

Case ID: 230901940

Mortgaged Property, unless, in addition to the other requirements contained in this Mortgage, said lease contains an indemnity provision by which the prospective tenant covenants and agrees to keep, defend, save and hold harmless the Mortgagor from any and all liability, loss, cost, damage or expense arising under any applicable environmental laws, rule or regulations and which results from such tenant's use or occupancy of the Mortgaged Property.

(d)     Prior to the execution thereof, all leases in effect with respect to the Mortgaged Property shall be satisfactory in form and substance to Mortgagee in Mortgagee's reasonable discretion.

(e)     Mortgagor shall not enter into any lease or similar agreement for residential space in the Mortgaged Property without obtaining Mortgagee's prior written approval of all of the terms and conditions thereof, and once approved, Mortgagor shall not materially amend or modify or cancel any such lease or similar agreement except as specifically provided for therein without obtaining Mortgagee's prior written approval.  Notwithstanding anything in the immediately preceding sentence to the contrary, Mortgagee's consent shall not be required in connection with any residential lease at the Mortgaged Property entered into by Mortgagor in the normal course of business in a manner which is consistent with sound and customary leasing and management practices for similar properties in the community in which the Mortgaged Property is located and which is at a rental and on terms consistent with the terms for similar leases in the market area of the Mortgaged Property and written on a standard form previously approved by Mortgagee.

16.     REQUIRED NOTICE:

Mortgagor shall give Mortgagee prompt written notice of any action or proceeding purporting to affect the Mortgaged Property of which it has actual knowledge including, without limitation, the following:

(a)     a material casualty to the Mortgaged Property;

(b)     receipt of notice of condemnation of the Mortgaged Property or any part thereof;

(c)     receipt of notice from any governmental authority relating to the structure, use or occupancy of the Mortgaged Property;

(d)     receipt of any default notice from any commercial tenant of all or any portion of the Mortgaged Property;

(e)     any change in the commercial occupancy of the Mortgaged Property, if applicable, it being acknowledged that as of the date of this Mortgage, Mortgagor has no intention to lease any part of the Mortgaged Property for non-residential or commercial use;

4836-3234-5548, v. 4

Case ID: 230901940

(f)     receipt of any default notice from the holder of any lien or security interest in the Mortgaged Property; or

(g)     commencement of any litigation materially affecting the Mortgaged Property.

Mortgagee shall have the right to appear in or defend any such action or proceeding to the same extent as Mortgagor.   Furthermore, Mortgagee shall have the right to bring any action or proceeding, in the name and on behalf of itself or Mortgagor, which Mortgagee, in its discretion, determines should be brought to protect its interest in the Mortgaged Property or any part thereof.

17.     EVENTS OF DEFAULT:

The occurrence of any of the following events after the expiration of any applicable notice and cure periods shall constitute an Event of Default:

(a)     Mortgagor shall fail to make or cause to be made any payment due to Mortgagee (and Mortgagee does not receive such payment) under any Loan Document when such payment is due and payable or shall fail to make or cause to be made any payment for utilities, real estate taxes, or assessments referred to in this Mortgage or insurance premiums for the insurance required under this Mortgage when such payment is due;

(b)     Except as otherwise specifically provided for in this Mortgage, Mortgagor shall fail to observe and perform any of the covenants or agreements on its part to be observed or performed under this Mortgage or under any of the other Loan Documents within thirty (30) days after written notice from Mortgagee of such non-compliance;

(c)     Any representation or warranty of Mortgagor under this Mortgage or under any of the other Loan Documents shall be untrue in any material respect when made;

(d)     Any Event of Default shall occur under the terms of any of the other Loan Documents; or

(e)     Except as otherwise specifically permitted under the Loan Agreement, Mortgagor shall have conveyed or transferred, or attempted to convey or transfer or permit or suffer a conveyance or transfer of legal or equitable title to the Mortgaged Property or in the ownership interest in the Mortgagor or any part thereof and whether such conveyance or transfer is voluntary, involuntary, by operation of law or otherwise, so long as any part of the Aggregate Debt remains unpaid without the prior written consent of Mortgagee.

18.     REMEDIES:

If an Event of Default occurs, Mortgagee may:

4836-3234-5548, v. 4

Case ID: 230901940

(a)    CONFESSION OF JUDGMENT NOTICE. THE FOLLOWING PARAGRAPHS SET FORTH A WARRANT OF AUTHORITY FOR AN ATTORNEY TO CONFESS JUDGMENT AGAINST MORTGAGOR. IN GRANTING THIS WARRANT OF ATTORNEY TO CONFESS JUDGMENT AGAINST MORTGAGOR, MORTGAGOR HEREBY KNOWINGLY, INTENTIONALLY, VOLUNTARILY, AND AFTER CONSULTING WITH SEPARATE COUNSEL OF MORTGAGOR (OR INDEPENDENTLY ELECTING NOT TO DO SO), UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS MORTGAGOR HAS OR MAY HAVE TO PRIOR NOTICE AND AN OPPORTUNITY FOR HEARING UNDER THE RESPECTIVE CONSTITUTIONS AND LAWS OF ANY COMMONWEALTH AND THE COMMONWEALTH OF PENNSYLVANIA.

(i)    Confession of Judgment for Money Damages. Mortgagor authorizes and empowers any attorney of any court of record in the Commonwealth of Pennsylvania, or elsewhere, to appear for and to enter judgment against Mortgagor the then unpaid Obligations due under this Mortgage, and all other amounts due under this Mortgage, costs of suit and an attorneys' fees of fifteen percent (15%) of the Obligations then due and owing but in no event less than Five Thousand Dollars ($5,000.00), with or without declaration, or stay of execution, and with release of all errors. Notwithstanding the attorney's commission set forth above which is included in the warrant of authority for the purpose of establishing a sum certain, the amount of attorney's fees that Mortgagee may recover from Mortgagor shall not exceed the actual attorney's fees incurred by Mortgagee.

(ii)    Confession of Judgment for Possession. For the purpose of obtaining possession of the Mortgaged Property upon the occurrence of any Event of Default, Mortgagor hereby authorizes and empowers any attorney of any court of record, in the Commonwealth of Pennsylvania or elsewhere, to appear for and confess judgment against Mortgagor and all persons claiming under, by, or through Mortgagor, in favor of Mortgagee for the recovery by Mortgagee of possession of the Mortgaged Property, for which this Mortgage (or a copy thereof verified by affidavit) shall be a sufficient warrant; whereupon a writ of possession of the Mortgaged Property may be issued forthwith, without any prior writ or proceeding whatsoever and without stay of execution, Mortgagor hereby releasing and agreeing to release Mortgagee and any such attorney from all procedural errors and defects whatsoever in entering such action or judgment or in causing such writ or process to be issued or in any proceeding thereon or concerning the same, provided that Mortgagee shall have filed in such action an affidavit made on Mortgagee's behalf setting forth the facts necessary to authorize the entry of such judgment according to the terms of this instrument, of which facts such affidavit shall be prima facie evidence. It is hereby expressly agreed that if for any reason after any such action has been commenced, the same shall be discontinued, marked satisfied of record, or be terminated, or possession of the Mortgaged Property remain in or restored to Mortgagor or anyone claiming under, by, or through Mortgagor, Mortgagee may, whenever and as often as Mortgagee shall

4836-3234-5548, v. 4

Case ID: 230901940

have the right to take possession again of the Mortgaged Property, bring one or more further actions in the manner hereinbefore set forth to recover possession of the Mortgaged Property and to confess judgment therein as hereinabove provided, and the authority and power above given to any such attorney shall extend to all such further actions in ejectment and confession of judgment therein as hereinabove provided whether before or after an action of mortgage foreclosure is brought or other proceedings in execution are instituted upon this Mortgage or any instrument then evidencing any of the obligations, and after judgment thereon or therein and after a judicial sale of the Mortgaged Property;

(b) Declare the Loan to be immediately due and payable, and thereupon the same shall become immediately due and payable, together with any and all other sums owing to Mortgagee pursuant to the Note, Loan Agreement, this Mortgage and Loan Documents;

(c) Immediately terminate any pending Loan advances (and Mortgagee shall have no obligation to make further advances) and from time to time apply all or any part of the undisbursed Loan proceeds to payment of the obligations owed by Mortgagor to Mortgagee;

(d) Enter the Mortgaged Property and complete construction of the Project substantially in accordance with the Plans (as defined in the Loan Agreement) and employ such persons in connection therewith and take whatever other action which may be reasonably necessary or desirable, in the opinion of Mortgagee, to complete the Project. All sums so expended by Mortgagee shall be advanced to Mortgagor and shall be secured by this Mortgage. It is understood that Mortgagee is under no obligation to complete the construction of the Project;

(e) Recover judgment against the Mortgagor for the indebtedness outstanding and neither the recovery of judgment nor the levy of execution on the Mortgaged Property, shall affect Mortgagee's rights hereunder or the lien hereof;

(f) Enter upon and take possession of the Mortgaged Property, or have a receiver of the rents, issues and profits thereof appointed, without proof of depreciation in the value of the Mortgaged Property, inadequacy of the Mortgaged Property, or insolvency of the Mortgagor and Mortgagee or the receiver may lease the Mortgaged Property, in the name of the Mortgagor, Mortgagee or the receiver, and may receive the rents, issues and profits and apply the same:

(i) To the payment of expenses of leasing, operating, maintaining, repairing and improving the Mortgaged Property, including renting commissions and rental collection commissions paid to an agent of Mortgagee or of the receiver; and/or

(ii) On account of the indebtedness owed to Mortgagee, in such order and in such amounts as Mortgagee or the receiver determines but while in

Case ID: 230901940

possession of the Mortgaged Property, Mortgagee or the receiver shall be liable to account only for the rents, issues and profits actually received.

(g)   Take such other action to protect and enforce the rights hereunder and the lien hereof, as Mortgagee deems reasonably advisable, including:

   (i)   The foreclosure hereof, subject, at Mortgagee's option to the rights of tenants and other persons in the Mortgaged Property and, in any proceeding to enforce any liability for the Loan, the Mortgagor shall not assert, as a defense, that Mortgagee failed to foreclose any such rights or that any such rights adversely affected the value of the Mortgaged Property;

   (ii)   The sale of the Mortgaged Property, in a foreclosure proceeding, in one or several parcels, at Mortgagee's option and without obligation to have the Mortgaged Property marshalled;

   (iii)   The exercise by Mortgagee of all rights under the Loan Documents; and

   (iv)   Set off immediately without notice or other action any money owed by Mortgagee in any capacity to the Mortgagor against any of the Mortgagor's liability to Mortgagee, whether due or not, and Mortgagee shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such Event of Default, even though the actual book entries may be made at some time subsequent thereto.

(h)   Institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement or in the other Loan Documents.

(i)   Recover judgment on the Note either before, during or after any proceedings for the enforcement of this Mortgage or the other Loan Documents;

The license granted to Mortgagor under Section 14(a) hereof shall automatically be revoked and Mortgagee may enter into or upon the Mortgaged Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Mortgagor and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Mortgagor agrees to surrender possession of the Mortgaged Property and of such books, records and accounts to Mortgagee upon demand, and thereupon Mortgagee may: (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Mortgaged Property and conduct the business threat; (ii) complete any construction on the Mortgaged Property in such manner and form as Mortgagee deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Mortgaged Property; (iv) exercise all rights and powers of Mortgagor with respect to the Mortgaged

24

Case ID: 230901940

Property, whether in the name of Mortgagor or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Mortgaged Property and every part thereof; (v) require Mortgagor to pay monthly in advance to Mortgagee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Mortgaged Property as may be occupied by Mortgagor; (vi) require Mortgagor to vacate and surrender possession of the Mortgaged Property to Mortgagee or to such receiver and, in default thereof, Mortgagor may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Mortgaged Property to the payment of the Indebtedness, in such order, priority and proportions as Mortgagee shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the taxes, other charges, insurance and other expenses in connection with the Mortgaged Property, as well as just and reasonable compensation for the services of Mortgagee, its counsel, agents and employees; and

With respect to that portion of the Mortgaged Property governed by the Uniform Commercial Code, Mortgagee shall have the right, upon five (5) calendar days' prior written notice to Mortgagor (or one (1) day notice by telephone with respect to Mortgaged Property that is perishable or threatens to decline rapidly in value), which Mortgagor hereby acknowledges to be sufficient, commercially reasonable and proper, to sell, lease or otherwise dispose of any or all of the Mortgaged Property at any time and from time to time at public or private sale, with or without advertisement thereof, and apply the proceeds of any such sale first to Mortgagee's expenses in preparing the Mortgaged Property for sale (including reasonable attorneys' fees) and second to the complete satisfaction of the Obligations. Mortgagor waives the benefit of any marshalling doctrine with respect to Mortgagee's exercise of its rights hereunder. Mortgagor grants a royalty-free license to Mortgagee for all patents, service marks, trademarks, tradenames, copyrights, computer programs and other intellectual property and proprietary rights to permit Mortgagee to exercise all rights granted to Mortgagee under this Section. Mortgagee or anyone else may be the purchaser of any or all of the Mortgaged Property so sold and thereafter hold such Mortgaged Property absolutely, free from any claim or right of whatsoever kind, including any equity of redemption of Mortgagor, any such notice, right and/or equity of redemption being hereby expressly waived and released; or in the event of a sale, by foreclosure of less than all of Mortgaged Property, this Mortgage shall continue as a lien and security interest on the remaining portion of the Mortgaged Property unimpaired and without loss of priority.

The purchase money, proceeds and avails of any disposition of the Mortgaged Property, and or any part thereof, or any other sums collected by Mortgagee pursuant to the Note, this Mortgage or the other Loan Documents, may be applied by Mortgagee to the payment of the Indebtedness in such priority and proportions as Mortgagee in its discretion shall deem proper.

Case ID: 230901940

19.   MORTGAGEE'S RIGHT TO CURE:

Mortgagee shall have the right, but not the obligation, at Mortgagee's election and without notice to Mortgagor, to cure any default by Mortgagor under any of the Loan Documents or under any mortgage or with respect to any security interest, lien or encumbrance which is senior in lien and position to this Mortgage. Any payments made or expenses reasonably incurred by Mortgagee in the exercise of such right shall not release Mortgagor from Mortgagor's obligation or constitute a waiver of Mortgagor's default hereunder. Any such payments made or expenses incurred by Mortgagee shall be repayable on demand by Mortgagee, together with interest thereon at the rate specified in the Note from the date such payment was made or such expense was incurred, and the aggregate amount thereof, including such interest, shall become part of the Aggregate Debt and shall be secured by the lien of this Mortgage.

20.   MORTGAGEE'S RIGHTS CUMULATIVE:

As more fully set forth in Section 14 of the Note, the rights and remedies of Mortgagee hereunder shall be in addition to every other right and remedy now and hereafter provided by law; the rights and remedies of Mortgagee shall be cumulative and not exclusive; Mortgagee may exercise the same at such times, in such order, to such extent, and as often as Mortgagee deems advisable, and without regard to whether the exercise of one precedes, concurs with, or succeeds the exercise of another; and no delay or omission by Mortgagee in exercising a right or remedy shall exhaust or impair the same, or constitute a waiver of, or acquiescence in, the default.

21.   DEFAULT RATE OF INTEREST:

Following the occurrence of any Event of Default and continuing either until such Event of Default is cured and that fact acknowledged by Mortgagee or until the principal sum then outstanding under the Note and all other sums payable under the Loan Documents are paid in full, the principal sum outstanding under the Note shall bear interest at the Default Rate (as defined in the Note) and shall be secured by this Mortgage and all other Collateral.

22.   COSTS AND EXPENSES:

Following the occurrence of any Event of Default under any of the Loan Documents, Mortgagor shall pay upon demand all reasonable costs and expenses, up to the maximum amount allowed by law (including all amounts paid to attorneys, accountants, real estate brokers, appraisers, and other advisors employed by Mortgagee and to any contractors for labor and materials), incurred by Mortgagee in the exercise of any of its rights, remedies or powers under any of the Loan Documents, or as a secured or unsecured creditor, as the case may be, of Mortgagor, any general partner of Mortgagor, or any Guarantor in any state or federal bankruptcy proceedings, or with respect to any Collateral with respect to such event of default, and any amount thereof not paid promptly following demand therefor, together with interest thereon at the Default Rate from the date of such demand, shall become part of the Aggregate Debt and shall be secured by the lien of this

4836-3234-5548, v. 4

Case ID: 230901940

Mortgage.  In connection with and as part of the foregoing, in the event that any of the Loan Documents is placed in the hands of any attorney for the collection of any sum payable thereunder, Mortgagor agrees to pay reasonable attorneys' fees for the collection of the amount being claimed under such Loan Documents, as well as all costs, disbursements and allowances provided by law, and the payment of such fees and such costs, disbursements, and allowances shall also be secured by the lien of this Mortgage (notwithstanding any right to confess judgment and collect a stipulated amount as set forth in any other Loan Document).  Nothing in this Section 22 shall limit the obligation of Mortgagor to pay costs and expenses of Mortgagee for which Mortgagor is otherwise liable under the Loan Documents.

23.    WAIVERS:

   (a)    The acceptance by Mortgagee of any payments hereunder, after the occurrence of an Event of Default, or the failure of Mortgagee in any one or more instances to insist upon strict performance by the Mortgagor of any terms and covenants of this Mortgage or to exercise any option or election herein conferred, shall not be deemed to be a waiver or relinquishment for the future of any such terms, covenants, elections or options.  Mortgagor agrees that Mortgagee does not, and with regard to the Note and obligations, shall not have any of the duties to Mortgagor as set forth in §5601(3)(b) of the Pennsylvania Decedents, Estates and Fiduciaries Code, 20 Pa. C.S. §5601(3)(b).

   (b)    Mortgagor waives the right of inquisition on all property levied upon to collect the indebtedness hereby secured and does voluntarily condemn the same, and authorizes the Prothonotary to enter such condemnation; and Mortgagor also waives and releases all laws, now in force or hereafter enacted, relating to exemption, appraisement or Stay of Execution. Upon request of Mortgagor, Mortgagee, at Mortgagee's option prior to release of this Mortgage, may make future advances to Mortgagor. Such future advances, with interest thereon, shall be secured by this Mortgage when evidenced by promissory note stating that said promissory notes are secured hereby. At no time shall the principal amount of the indebtedness secured by this Mortgage, not including sums advanced in accordance herewith to protect the security of this Mortgage, exceed the original amount of the Note.

24.    ADVANCES BY MORTGAGEE:

If an Event of Default occurs, or if Mortgagee enters the Mortgaged Property to complete the Project following an Event of Default pursuant to Section 18(c), then Mortgagee, at its option, may disburse such sums, and take such actions as reasonably necessary to protect its interest, including, but not limited to, defending against any action or proceeding, disbursement of reasonable attorneys' fees and entry upon the Mortgaged Property without becoming liable to the Mortgagor or any person in possession of any portion of the Mortgaged Property.  Mortgagee shall be the sole judge of the legality, validity, and priority of any charge against the Mortgaged Property, any payment due under the terms of this Mortgage, or of any action or proceeding affecting the Mortgaged Property, and of

4836-3234-5548, v. 4

Case ID: 230901940

the amount necessary to be paid in satisfaction thereof or remedial actions to be taken. Any amount disbursed by Mortgagee pursuant to this paragraph shall be added to the principal of the Note and shall be secured by this Mortgage. The Mortgagor shall pay interest on these amounts at Default Rate specified in the Note from the time of payment by Mortgagee. Upon demand, the Mortgagor shall repay these amounts, together with interest, to Mortgagee.

25.   NOTICES:

All notices required to be given to any of the parties hereunder shall be in writing and shall be deemed to have been sufficiently given for all purposes when presented personally to such party, or sent by Federal Express or other nationally recognized overnight courier to such party at its address set forth below or sent by certified or registered mail, return receipt requested, to such party at its address set forth below:

| | |
|---|---|
| Mortgagor: | USRE 257 LLC<br>45 City Avenue<br>Unit 383<br>Bala Cynwyd, PA 19004<br>Attention: David Daniel |
| with a copy to<br>Mortgagor's<br>counsel: | Blank Rome<br>One Logan Square<br>130 North 18th Street<br>Philadelphia, PA 19107<br>Attention: Peter J. Soloff, Esq. |
| Mortgagee: | Investors Bank<br>101 JFK Parkway<br>Short Hills, New Jersey 07078<br>Attention: Commercial Real Estate |
| with a copy to<br>Mortgagee's counsel: | Mandelbaum Salsburg P.C.<br>3 Becker Farm Road, Suite 105<br>Roseland, New Jersey 07068<br>Attention: Robin F. Lewis, Esq. |

Such notice shall be deemed to be given when received if delivered personally, on the next business day if sent by an overnight commercial courier or two (2) days after the date mailed if sent by certified or registered mail, return receipt requested. Any notice of any change in such address shall also be given in the manner set forth above. Whenever the giving of notice is required, the giving of such notice may be waived in writing by the party entitled to receive such notice.

4836-3234-5548, v. 4

Case ID: 230901940

26.   CONSTRUCTION OF PROJECT:

With respect to the Loan:

(a)   The principal of the Loan represents, in whole or in part, a construction loan to provide funds for the construction of the Project on the Mortgaged Property in accordance with the Plans and subject to the terms and conditions of the Loan Agreement.

(b)   Mortgagor will cause the Project to be constructed in accordance with the terms of the Loan Agreement, will proceed with the construction with due diligence and will comply with the covenants made by it in the Loan Agreement, all of which are incorporated herein by reference as though set forth herein.

(c)   The proceeds of the Loan shall be disbursed to Mortgagor, by Mortgagee in accordance with the terms of the Loan Agreement.

27.   INSPECTION:

Mortgagee and any persons authorized by Mortgagee shall have the right to enter and inspect the Mortgaged Property and the Project at all reasonable times upon reasonable notice (but not less than one (1) business day) and subject to any safety programs established by Mortgagor's contractor, except in an emergency when Mortgagee shall have the right to enter the Mortgaged Property at any time.

28.   SUCCESSORS AND ASSIGNS:

All of the terms, covenants, provisions and conditions herein contained shall be for the benefit of Mortgagee and its successors and assigns and binds the Mortgagor and its successors and assigns, and are intended and shall be held to be real covenants running with the land, and the term "the Mortgagor" shall also include any and all subsequent owners and successors in title of the Mortgaged Property.  Any act or agreement to be done or performed by Mortgagor herein shall be construed as a covenant running with the land and shall be binding upon Mortgagor and its successors and assigns.

29.   CHANGE IN LAWS:

During the term of this Mortgage, in the event of the passage after the date of this Mortgage of any law of the Commonwealth of Pennsylvania or any other Governmental Authority, changing in any way the laws now in force for the taxation of mortgages, or debts secured thereby, for state or local purposes, or the manner of the operation of any such taxes, so as to affect the interest of Mortgagee, then and in such event, the Mortgagor shall bear and pay the full amount of such taxes, provided that if for any reason payment by the Mortgagor of any such new or additional taxes would be unlawful or if the payment thereof would constitute usury or render the Loan or indebtedness secured hereby wholly or partially usurious under any of the terms or provisions of the obligation secured hereunder, or this Mortgage, or otherwise, Mortgagee may, at Mortgagee's option, pay that amount or portion of such taxes as renders the Loan or

Case ID: 230901940

indebtedness secured hereby unlawful or usurious, in which event the Mortgagor shall concurrently therewith pay the remaining lawful and non-usurious portion or balance of said taxes.

30.    SEVERABILITY:

In case any one or more of the covenants, agreements, terms or provisions contained in this Mortgage or the Note shall be invalid, illegal or unenforceable in any respect, the validity of the remaining covenants, agreements, terms or provisions contained herein and in the Note shall be in no way affected, prejudiced or disturbed thereby.

31.    INDEMNITY:

Mortgagor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless Mortgagee from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense) (collectively, the "**Losses**") imposed upon or incurred by or asserted against Mortgagee and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) ownership of this Mortgage, the Mortgaged Property or any interest therein or receipt of any Rents; (b) any amendment to, or restructuring of, the Indebtedness, and the Note, the Loan Agreement, this Mortgage, or any other Loan Documents; (c) any and all lawful action that may be taken by Mortgagee in connection with the enforcement of the provisions of this Mortgage or the Loan Agreement or the Note or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Mortgagor, any guarantor or indemnitor and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to or death of persons or loss of or damage to Mortgaged Property occurring in, on or about the Mortgaged Property or any part thereof or on the adjoining sidewalks, curbs, adjacent Mortgaged Property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Mortgaged Property or any part thereof or on the adjoining sidewalks, curbs, adjacent Mortgaged Property or adjacent parking areas, streets or ways; (f) any failure on the part of Mortgagor to perform or be in compliance with any of the terms of this Mortgage; (g) performance of any labor or services or the furnishing of any materials or other Mortgaged Property in respect of the Mortgaged Property or any part thereof; (h) any failure of the Mortgaged Property to be in compliance with any legal requirements; (i) the enforcement by Mortgagee of the provisions of this Section 31; (j) any and all claims and demands whatsoever which may be asserted against Mortgagee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; (1) the payment of any commission, charge or brokerage fee to anyone claiming through Mortgagor which may be payable in connection with the funding of the Loan; or (m) any misrepresentation made by Mortgagor in this Mortgage or any other g Loan Document.  Any amounts payable to

4836-3234-5548, v. 4

Case ID: 230901940

Mortgagee by reason of the application of this Section 31 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Mortgagee until paid to Mortgagee.   Notwithstanding anything to the contrary contained in this Mortgage, Mortgagor shall not be liable for the payment of Losses to the extent the same solely arises by reason of the willful misconduct or gross negligence of Mortgagee, its employees, agents or representatives.

32.    GOVERNING LAW:

This Mortgage is to be construed and enforced according to and governed by the Law of the Commonwealth of Pennsylvania.

33.    MARSHALLING AND SALE.

The Mortgagor waives and releases any right to have the Mortgaged Property marshalled or to require that the Mortgaged Property be sold as separate tracts or units in the event of foreclosure.

34.    DECLARATION OF NO OFFSET:

The Mortgagor represents to Mortgagee that the Mortgagor has no knowledge of any offsets, counterclaims or defenses to the principal indebtedness secured hereby, or to any part thereof, or the interest thereon, either at law or in equity.   The Mortgagor shall, within fifteen (15) days upon request, furnish a duly acknowledged written statement in form reasonably satisfactory to Mortgagee stating either that the Mortgagor knows of no offsets or defenses existing against such indebtedness, or if such offsets or defenses are alleged to exist, the nature and extent thereof, and in either case, such statement shall set forth the amount due hereunder.

35.    ACTIONS AND PROCEEDINGS:

Mortgagee shall have the right, at its sole cost and expense, to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in its discretion, Mortgagee determines should be brought to protect its interest in the Mortgaged Property or any part thereof.

36.    NO ORAL CHANGE:

This Mortgage may only be modified or amended by an agreement in writing signed by the Mortgagor and Mortgagee, and may only be released, discharged or satisfied of record by an agreement in writing signed by Mortgagee.

37.    ENTIRE AGREEMENT:

The Note, this Mortgage, the Loan Agreement and the other Loan Documents contain the entire agreement between the Mortgagor and Mortgagee relating to or connected with the Loan.   Any other agreements relating to or connected with the Loan not expressly set

31

Case ID: 230901940

forth in the Loan Documents are null and void and superseded in their entirety by the provisions of the Loan Documents.

38.   NO JOINT VENTURE OR PARTNERSHIP:

The relationship of the Mortgagor and Mortgagee created hereby is strictly of debtor-creditor and nothing contained herein or in any other document or instrument secured hereby shall be deemed or construed to create a partnership or joint venture between Mortgagor and Mortgagee.

39.   WAIVER OF TRIAL BY JURY:

**MORTGAGOR AND MORTGAGEE, BY ITS ACCEPTANCE HEREOF, HEREBY WAIVE ANY AND ALL RIGHTS THAT THEY MAY HAVE NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN MORTGAGOR AND MORTGAGEE OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS MORTGAGE.   IT IS INTENDED THAT THIS WAIVER OF JURY TRIAL SHALL APPLY TO ANY AND ALL CLAIMS, DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDING.**

40.   THIRD PARTY NOTICES:

As an open-end mortgage, this Mortgage may be subject to limitation of future advances if notice is given by a third party in accordance with Act 126 of 1990 as passed by the Pennsylvania legislature. If in fact such notice is given, Mortgagor agrees that Mortgagee shall have no obligation to advance any other funds, nor shall it be required to make any interpretation as to whether the advances are obligatory or not. By executing this document, Mortgagor agrees to release Mortgagee from any liability and hold Mortgagee harmless as a result of Mortgagee not making future advances after third-party notices.

41.   DEFINITIONS; NUMBER AND GENDER; INTERPRETATION:

In the event Mortgagor consists of more than one person or entity, the obligations and liabilities hereunder of each of such persons and entities shall be joint and several and the word the "Mortgagor" shall mean all or some or any of them.   For purposes of this Mortgage, the singular shall be deemed to include the plural and the neuter shall be deemed to include the masculine and feminine, as the context may require; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to "attorneys' fees" shall be deemed to be followed by the words "and disbursements"; and references to sections or exhibits are to those of this Note unless otherwise indicated.   The words "Loan Agreement", "Mortgage", "Note", and "Loan Document" shall include any supplements to or any amendments of or

32

Case ID: 230901940

restatements of the Loan Agreement, this Mortgage, the Note, and any of the other Loan Documents. The words "Real Property", "Mortgaged Property", "Improvements", "Appurtenances", "Equipment", "Building Equipment", "Intangibles", "Awards", "Insurance Policies", "Leases and Agreements", "Income and Rents", "Accounts Receivable", "Securities", "Deposits" , "Fixtures" and "Plans" shall include any portion of and additions to the Real Property, the Mortgaged Property, the Improvements, the Appurtenances, the Equipment, the Building Equipment, the Intangibles, the Awards, the Insurance Policies, the Leases and Agreements, the Income and Rents, the Accounts Receivable, the Securities, the Deposits, the Fixtures, and the Plans, respectively. All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

42.   INCORPORATION BY REFERENCE:

All of the terms and provisions of the Note and the Loan Agreement are hereby incorporated herein by reference. Further reference is made to Article VIII of the Loan Agreement (the "**Permanent Loan Provisions**") and the Permanent Loan Provisions in Article VIII of the Loan Agreement are hereby incorporated by reference as if fully set forth in this Mortgage.

43.   CAPTIONS:

The captions or headings of the paragraphs and Sections of this Mortgage are for convenience only and shall not control or affect the meaning or construction of any of the terms or provisions of this Mortgage.

44.   TRANSFER TAXES:

(a)   In the event of any sale or transfer of the Mortgaged Property, or any part thereof, including any sale or transfer by reason of foreclosure of this Mortgage or any prior or subordinate mortgage or by deed in lieu of any such foreclosure, Mortgagor shall timely and duly complete, execute and deliver to Mortgagee all forms and supporting documentation required by any taxing authority to estimate and fix any tax payable by reason of such sale or transfer or recording of the deed evidencing such sale or transfer (individually, a "**Transfer Tax**" and collectively, the "**Transfer Taxes**").

(b)   Mortgagor shall pay the Transfer Taxes that may hereafter become due and payable with respect to any sale or transfer of the Mortgaged Property described in this Section, and in default of such payment, Mortgagee may pay the same and the amount of such payment shall be added to the indebtedness secured hereby and, unless incurred in connection with a foreclosure of this Mortgage or deed in lieu of such foreclosure, shall be secured by this Mortgage.

(c)   Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its attorney-in-fact, coupled with an interest, to prepare and deliver any questionnaire, statement, affidavit or tax return in connection with any Transfer Tax applicable

Case ID: 230901940

to any foreclosure or deed in lieu of foreclosure described in this Section in the event that any Transfer Tax is due or payable in connection with such transfer.

(d) Mortgagor shall indemnify and hold harmless Mortgagee against: (i) any and all liability incurred by Mortgagee for the payment of any Transfer Tax with respect to any transfer of the Mortgaged Property by reason of foreclosure or acceptance of a deed-in-lieu of foreclosure, and (ii) any and all expenses incurred by Mortgagee in connection therewith including, without limitation, interest, penalties and attorneys' fees.

(e) Notwithstanding anything in the Loan Documents to the contrary, the obligation to pay the Transfer Taxes and indemnify Mortgagee under this Section is a personal obligation of Mortgagor, whether or not Mortgagor is personally obligated to pay the indebtedness secured by this Mortgage, and shall be binding upon and enforceable against the distributees, successors and assigns of Mortgagor with the same force and effect as though each of them had personally executed and delivered this Mortgage, notwithstanding any exculpation provision in favor of Mortgagor with respect to the payment of any other monetary obligations under this Mortgage.

(f) In the event that Mortgagor fails or refuses to pay a tax payable by Mortgagor with respect to a sale or transfer by reason of a foreclosure of this Mortgage in accordance with this Section, the amount of the tax, any interest or penalty applicable thereto and any other amount payable pursuant to Mortgagor's obligation to indemnify Mortgagee under this Section may, at the sole option of Mortgagee, be paid as an expense of the sale out of the proceeds of the mortgage foreclosure sale.

(g) The provisions of this Section shall survive any transfer and the delivery of the deed affecting such transfer. Nothing in this Section shall be deemed to grant to Mortgagor any greater rights to sell, assign or otherwise transfer the Mortgaged Property than are expressly provided in the Loan Agreement or herein or in the other Loan Documents nor to deprive Mortgagee of any right to refuse to consent to any transaction referred to in this Section.

Case ID: 230901940

45.   MORTGAGE RECORDING TAX:

Mortgagor shall pay when due all mortgage recording taxes, if any, payable in connection with this Mortgage and any other mortgages executed by Mortgagor in favor of, or for the benefit of, Mortgagee.   Mortgagor hereby agrees to indemnify, protect and defend Mortgagee from and against any and all claims, liabilities, losses, costs, damages and expenses incurred by Mortgagee arising in connection with Mortgagor's failure to so pay any mortgage recording taxes.

46.   SATISFACTION OF MORTGAGE:

Upon the payment in full of all amounts due under, evidenced or secured by this Mortgage and the payment of a reasonable attorney fee for the preparation of a Satisfaction of Mortgage, Mortgagee shall deliver a satisfaction instrument permitting the discharge of this Mortgage in accordance with applicable law.

47.   FUTURE ADVANCES FOR PROTECTION OF MORTGAGEE'S SECURITY

(a)   This Mortgage constitutes an "open-end mortgage" as such term is defined in Pennsylvania Act 126, Laws 1990, 42 Pa.C.S.A. Section 8143(1) and shall have lien priority in accordance with the provisions of 42 Pa.C.S.A. Sections 8143 and 8144. Notwithstanding the foregoing, to the maximum extent possible under the law, Mortgagor unconditionally and irrevocably waives its right to submit a notice to Mortgagee under 42 Pa.C.S.A. Section 8143(c); and in addition to the other remedies available under the Loan Documents, any advances made after receipt of such notice whether or not made pursuant to 42 Pa.C.S.A. Sections 8143 or 8144, shall be deemed to be obligatory advances made under and secured by this Mortgage and shall relate back to the date when this Mortgage was left for recording with the recorder of deeds for the county in which the Mortgaged Property is located.   In the event any third party shall submit a notice to Mortgagee under 42 Pa.C.S.A. Section 8143(b), in addition to the other remedies available under the Loan Documents, Mortgagor shall have the lien or encumbrance that is the subject of such notice removed in accordance with this Mortgage; and any advances made after receipt of such notice whether or not made under 42 Pa.C.S.A. Section 8143(b) shall be deemed to be obligatory advances made under and secured by this Mortgage and shall relate back to the date when this Mortgage was left for recording with the recorder of deeds for the county in which the Mortgaged Property is located. By placing or accepting any such lien or encumbrance against any or all of the Mortgaged Property, the holder thereof shall be deemed to have agreed to the maximum extent possible under the law that its lien or encumbrance shall be subject and subordinate in lien priority to this Mortgage and to any subsequent advances made by Mortgagee, to all accrued and unpaid interest and to all other sums secured by this Mortgage.

(b)   This Mortgage shall constitute security for any and all past, present, and future loans, advances, extensions of credit, or other financial accommodations made by Mortgagee to Mortgagor, or to third parties upon the surety, guaranty, endorsement, or other accommodation of Mortgagor, as well as for any and all other obligations and

4836-3234-5548, v. 4

Case ID: 230901940

liabilities of any kind of Mortgagor to Mortgagee, and for all interest thereon; provided, however, that the maximum amount of indebtedness secured by this Mortgage shall not exceed the principal sum of $14,000,000.00 plus all accrued and unpaid interest, plus all costs and expenses incurred or assumed by Mortgagee under this Mortgage [including, without limitations, costs and expenses described in paragraph (c), below].

(c)     In addition to and not in limitation of any other provisions in this Mortgage, it is understood and agreed that this Mortgage shall constitute security for the unpaid balance of advances made, with respect to the Mortgaged Property, for the payment of taxes, assessments, maintenance charges, insurance premiums, or costs incurred for the protection of the Mortgaged Property or the lien of this Mortgage, expenses incurred by Mortgagor by reason of default by Mortgagor under this Mortgage, and advances made under the Loan Agreement to enable completion of the improvements for which the construction loan was originally made.

48.   FURTHER ASSURANCES

(a)   Mortgagor forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, will cause this Mortgage and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Mortgaged Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Mortgagee in, the Mortgaged Property. Mortgagor will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Mortgage, the other Loan Documents, any Note, or mortgage supplemental hereto, any Mortgage with respect to the Mortgaged Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Mortgage, any mortgage supplemental hereto, any Mortgage with respect to the Mortgaged Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

(b)   Mortgagor will, at the cost of Mortgagor, and without expense to Mortgagee, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Mortgagee shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Mortgagee the Mortgaged Property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign to Mortgagee, or for carrying out the intention or facilitating the performance of the terms of this Mortgage or for filing, registering or recording this Mortgage, or for complying with all Legal Requirements. Mortgagor also ratifies its authorization for Mortgagee to

Case ID: 230901940

have filed any like initial financing statements, amendments thereto and continuation statements, if filed prior to the date of this Mortgage. Mortgagor grants to Mortgagee an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Mortgagee at law and in equity, including without limitation such rights and remedies available to Mortgagee pursuant to this Section 48. To the extent not prohibited by applicable law, Mortgagor hereby ratifies all acts Mortgagee has lawfully done in the past or shall lawfully do or cause to be done in the future by virtue of such power of attorney.

**[SIGNATURE PAGE FOLLOWS]**

Case ID: 230901940

IN WITNESS WHEREOF, the Mortgagor has caused these presents to be executed the day and year first above written.

**USRE 257 LLC, a Delaware limited liability company**

**By: USRE 257 MM LLC, a Delaware limited liability company, its Manager**

**By:** _____
**Name:** David Daniel
**Title:** Managing Member

**The address of the within-named Mortgagee is:**

**Investors Bank**
**101 JFK Parkway**
**Short Hills, New Jersey 07078**

_____
**James T Schaeffer, VP**
**On behalf of the Mortgagee**

Mortgage (Signature Page)

Case ID: 230901940

IN WITNESS WHEREOF, the Mortgagor has caused these presents to be executed the day and year first above written.

**USRE 257 LLC, a Delaware limited liability company**

**By:  USRE 257 MM LLC, a Delaware limited liability company, its Manager**

**By:** _____
     **Name:  David Daniel**
     **Title:   Managing Member**

**The address of the within-named Mortgagee is:**

**Investors Bank**
**101 JFK Parkway**
**Short Hills, New Jersey 07078**

_____
**On behalf Of the Mortgagee**

Mortgage

Case ID: 230901940

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF _Montgomery_                    SS

On this, the _11_ day of November 2020, before me, the undersigned officer, personally appeared David Daniel, who acknowledged himself to be the Managing Member of **USRE 257 MM LLC**, Manager of **USRE 257 LLC**, a Delaware limited liability company, and that he as such Managing Member being authorized to do so, executed the foregoing instrument for the purposes therein contained, by signing the name of the limited liability company, by himself as Managing Member.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

> Commonwealth of Pennsylvania - Notary Seal
> Eric Freundlich, Notary Public
> Montgomery County
> My commission expires February 7, 2022
> Commission number 1281551
> Member, Pennsylvania Association of Notaries

_____
Notary Public

My Commission Expires: 02/07/2022

Mortgage (Notary Acknowledgement)

## **EXHIBIT A**

### **LEGAL DESCRIPTION OF MORTGAGED PROPERTY**

Case ID: 230901940



| | Loan Policy of Title Insurance |
|---|---|
| | ISSUED BY |
| | **First American Title Insurance Company** |
| **Schedule A (Cont.)** | POLICY NUMBER<br>**PROFORMA** |

File No. **PAFA20-4578 M/K**

### LEGAL DESCRIPTION

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected, situate in the 8th Ward of the City of Philadelphia and County of Philadelphia, Commonwealth of Pennsylvania and described according to a Plan and Survey thereof, made by William H.H. Ogden, Jr., Surveyor and Regulator of the 3rd District on the 11th day of March A.D., 1942 and re-checked by Ben H. Joseph, present Surveyor and Regulator of the 3rd District on the 27th day of August A.D., 1951 and re-checked by Thomas J, Johnston, Surveyor and Regulator of the 3rd District on the 14th day of November A.D., 1972, as follows:

BEGINNING at the intersection of the Northerly side of Spruce Street (58 feet wide) and the Easterly side of 16th Street; thence (1) North along the Easterly side of 16th Street and crossing a certain 3 feet wide alley 86 feet; thence (2) East and parallel with Spruce Street and running along the Northerly side of said 3 feet wide alley 44 feet to a point its extended line of a wall between these premises and the premises adjoining to the East known as 1531 Spruce Street; thence (3) South parallel with 16th Street and crossing the head of the aforesaid 3 feet wide alley and running through said wall and its extension thereof 86 feet to the Northerly side of Spruce Street; and thence (4) West along the Northerly side of Spruce Street 44 feet to the Easterly side of 16th Street and place of beginning.

BEING known as No. 257 South 16th Street.

BEING Parcel #88-1-0315-00.

TOGETHER with the free and common use, right, liberty and privilege of the aforesaid 3 feet wide alley, which extends across the Northernmost 3 feet of the above described premises into 16th Street in common with the owners, tenants and occupiers of the premises adjoining to the East.

Case ID: 230901940

## EXHIBIT B

## PROPERTY SUBJECT TO SECURITY INTEREST

Any and all fixtures, appliances, machinery, equipment furnishings and furniture of any nature whatsoever, and other items of personal Mortgaged Property and fixtures at any time now or hereafter owned by Mortgagor/Debtor and now or at any time hereafter installed in, attached to or situated in or upon the land described in Exhibit "A" or the buildings and improvements now erected or to be erected thereon (including, without limitation, communications, computer and security systems and the software system therefor), or used or intended to be used in connection with the real estate, or in the operation or maintenance of the buildings and improvements, plant or business situate or operated thereon (the "**Mortgaged Property**") or in connection with the conduct of Mortgagor/Debtor's business whether or not the personal property is or shall be affixed to the Mortgaged Property.

Such personal property and fixtures shall include, without limiting the generality of the foregoing:

> All plants, furnaces, boilers, machinery, ranges, engines, stokers, pumps, heaters, tanks, compressors, dynamos, motors, electrical transformers, fittings, siding, pipe, pipe connections, conduits, ducts, partitions, communication systems, storm and screen windows, doors, refrigerators, ovens, kitchen equipment, chests, chairs, desks, bookcases, tables, curtains, hangings, pictures, carpeting, artwork, lighting fixtures and apparatus, furniture, furnishings, elevators and motors, built-in filing cabinets, shelves, water coolers, signs, tools, electrical equipment, and all equipment, appliances and apparatus of every kind and description now or hereafter affixed or attached to or contained within and used or procured for use in connection with said buildings or improvements for heating, cooling, lighting, plumbing, ventilating, sprinkling, irrigating, refrigerating or air conditioning, or for providing water, gas, electricity or other services or for general operation of the buildings and improvements, or the plant or business situate or operated thereon.

> All licenses, permits, franchises, trade names, logos, service marks, service contracts, management agreements, telephone numbers, advertising materials, warranties, guarantees, tenant lists, engineering, environmental, marketing and similar studies and appraisals for the Mortgaged Property and all other documents and items relating to the operation of the Mortgaged Property, and all leases and lease guarantees with respect to any part of the Mortgaged Property, and all rents, issues and profits arising out of the operation, use or occupancy of the Mortgaged Property.

> All of Mortgagor's/Debtor's interest in all utility security deposits or bonds for the Mortgaged Property and all security deposits, bonds or other security delivered to any governmental authority in

Case ID: 230901940

connection with the use, development or operation of the Mortgaged Property.

All of Mortgagor's/Debtor's books and records relating to the use, operation and occupation of the buildings and the Mortgaged Property including, without limitation, the books and records relating to the operation of Mortgagor's/Debtor's business therein, and the plans and specifications for the construction or reconstruction thereof.

If the Mortgaged Property is now or hereafter used in whole or in part as a hotel, motel or similar facility or as a restaurant or other food and/or beverage service facility, such personal property shall also include all licenses for the serving of alcoholic beverages at the Mortgaged Property and all lodging and food and/or beverage equipment including, without limitation, beds, bureaus, divans, couches, chinaware, linens, glassware, silverware, uniforms, ornaments, kitchen utensils, bars, bar fixtures, radios, televisions, electric equipment, lamps, mirrors, and other personal property and fixtures used now or hereafter in on or about the operation, use and occupation of a lodging facility and/or food and/or beverage facility, on the Mortgaged Property.

Such security interest shall extend to and include as well as any and all cash and non-cash proceeds, insurance proceeds and condemnation proceeds of such fixtures and personal property and any and all subsequently acquired fixtures and personal property by way of replacement, substitution, addition or otherwise and the proceeds thereof.

Such security interest shall not extend to property owned by third party space tenants now or hereafter occupying the Mortgaged Property.

Case ID: 230901940

**Exhibit D**

Case ID: 230901940

CERTIFIED TRUE COPY

PREPARED BY:

Robin F. Lewis, Esq.
Mandelbaum Salsburg P.C.
105 Becker Farm Road, Suite 105
Roseland, New Jersey 07068

RETURN RECORDED DOCUMENT TO:

Robin F. Lewis, Esq.
Mandelbaum Salsburg P.C.
105 Becker Farm Road, Suite 105
Roseland, New Jersey 07068

PROPERTY OPA #: 881031500

## ABSOLUTE ASSIGNMENT OF LEASES AND RENTS

### USRE 257 LLC

(Assignor)

and

### INVESTORS BANK

(Assignee)

Dated:  November 11, 2020 and effective as of November 30, 2020

Case ID: 230901940

## ABSOLUTE ASSIGNMENT OF LEASES AND RENTS

**THIS ABSOLUTE ASSIGNMENT OF LEASES AND RENTS** (the "**Assignment**") is made this 11th day of November, 2020, and effective as of November 30, 2020 by **USRE 257 LLC**, a Delaware limited liability company having a mailing address of 45 City Avenue, Unit 383, Bala Cynwyd, Pennsylvania 19004 (the "**Assignor**"), in favor of **INVESTORS BANK**, a New Jersey chartered bank (the "**Assignee**") having an office at 101 JFK Parkway, Short Hills, New Jersey 07078.

On this date, Assignor has executed and delivered to Assignee a mortgage loan note (the "**Note**") payable to Assignee in the stated principal sum of up to **FOURTEEN MILLION AND 00/100 DOLLARS ($14,000,000.00)**.  The Note evidences a loan made by Assignee to Assignor in said amount of up to $14,000,000.00 (the "**Loan**") made and executed this date pursuant to the terms and provisions of a certain loan agreement (the "**Loan Agreement**") by Assignee and Assignor. The Note is secured by, inter alia, an open-end mortgage, assignment of leases and rents, security agreement and fixture filing of even date herewith (the "**Mortgage**") executed by Assignor in favor of Assignee and encumbering certain real property (the "**Property**") more commonly known as 257 South 16th Street, City of Philadelphia, Commonwealth of Pennsylvania, OPA No. 881031500, as more fully described in **Exhibit A** attached hereto.

As a condition of making the Loan, Assignee is requiring Assignor to provide Assignee with the Mortgage on the Property and this Assignment.  The Note, Loan Agreement, Mortgage, this Assignment and any other document executed and delivered in connection with the Loan, as same may be amended, restated, and extended, are sometimes individually referred to herein as a "**Loan Document**" and, collectively, as the "**Loan Documents**."

### Assignment

**NOW, THEREFORE**, in consideration of the Loan, and intending to be legally bound hereby, Assignor hereby agrees as follows:

**FOR VALUE RECEIVED**, Assignor hereby absolutely and unconditionally assigns, transfers, grants and sets over to Assignee all of its right, title, and interest in and to all those leases, tenancies, rental agreements, occupancy agreements, and subleases (collectively, the "**Leases**" and any individually, a "**Lease**") now or hereafter existing and affecting all or any portion of the Property, and any and all extensions and renewals thereof,

**TOGETHER** with any and all of Assignor's right, title and interest in and claims under any and all lease guaranties, letters of credit and any other credit support (each, a "**Lease Guaranty**" and, collectively, the "**Lease Guaranties**"),

**TOGETHER** with the present and continuing right of Assignor to collect, receive, and retain all of the rents, income, receipts, revenues, issues, and profits now or hereafter due, arising or issuing from or out of the Leases or from or out of the Property or any part thereof, regardless of type or source of payment, including, without limitation, common area maintenance charges,

Case ID: 230901940

lease termination payments, purchase option payments, refunds of any type, prepayment of rent, settlement of litigation or settlement of past due rents (collectively, the "**Rents**").

**SUBJECT, HOWEVER,** to the revocable license hereby granted by Assignee to Assignor, but limited as hereinafter provided, to collect and receive all of the Rents.

**TO HAVE AND TO HOLD** the same unto Assignee, its successors and assigns, for such period as is indicated in paragraph 10 below.

**FOR THE PURPOSE OF SECURING** the payment of the obligations and indebtedness of Assignor to Assignee pursuant to the Loan Documents, including any and all amendments, extensions, and renewals thereof and any and all supplemental note(s) increasing any indebtedness to Assignee as well as the payment, observance, performance, and discharge of all other obligations, covenants, conditions, and warranties contained in the Loan Documents.

1.      Assignor represents and warrants that, as of the date hereof:

(a)      Assignor is the owner of fee simple title to the Property, has good title to the Leases and Rents hereby assigned, has the power and right to assign them, and no other person, entity, or corporation has any right, title, or interest therein;

(b)      There are currently no Leases which affect all or any portion of the Mortgaged Property;

(c)      [*Intentionally Deleted*];

(d)      [*Intentionally Deleted*];

(e)      Assignor has not sold, assigned, transferred, mortgaged, pledged, or otherwise encumbered any Leases or any of the Rents, whether now due or hereafter to become due, or any other right or interest therein except for any encumbrances granted to Assignee;

(f)      No Rents have been collected for any period and no payment of any of the Rents has been anticipated, waived, released, discounted, set off or otherwise discharged or compromised;

(g)      Assignor has not received any funds or deposits from any lessee or occupant of the Mortgaged Property; and

2.      Assignor covenants and agrees as follows:

(a)      (i)      To duly and timely observe, perform, and discharge all the obligations, terms, covenants, conditions, and warranties of the Loan Documents and each Lease on the part of Assignor to be kept, observed and performed, and (ii) to give prompt written notice to Assignee of any failure on the part of Assignor to do so under a Lease and of any default notice received from a tenant (together with a copy of any such default notice);

Case ID: 230901940

(b)    To enforce and secure the performance in a commercially reasonable manner of each and every material obligation, term, covenant, condition, and agreement in each Lease and in any Lease Guaranty thereof on the part of the tenant or the guarantor to be kept, observed and performed;

(c)    To appear in and defend any action or proceeding arising under or in any manner connected with any Leases and any Lease Guaranty, and upon request by Assignee, to do so in the name and on behalf of Assignee but at the expense of Assignor, and to pay all reasonable costs and expenses of Assignee including reasonable attorneys' fees, incurred with respect to any such action or proceeding; and

(d)    To deliver to Assignee: (i) at its request executed copies of any and all Leases and Lease Guaranties; and (ii) a certified rent roll for the Mortgaged Property in accordance with the requirements of the Loan Agreement, and

(e)    To notify Assignee in writing within ten (10) days of Assignor learning of a tenant's actual vacancy of its leased premises in violation of its Lease.

3.    Assignor further covenants and agrees, except with Assignee's prior written consent, in each instance:

(a)    Not to receive or collect any Rents for a period of more than one month in advance (whether in cash or by promissory note);

(b)    Not to further sell, pledge, transfer, mortgage or otherwise encumber or assign any Lease or any Rents or any other right or interest granted therein;

(c)    Not to waive, excuse, condone, discount, set off, compromise, or in any manner release or discharge any material obligation of any tenant or lease guarantor of and from any obligations, covenants, conditions or agreements by that tenant or lease guarantor to be kept, observed and performed, including without limitation the obligation of that tenant to pay Rents in the manner and at the place and time specified in its Lease, other than in the ordinary course of business; and

(d)    Except as permitted by the Loan Agreement: (i) not to enter into, materially amend or modify any Lease or Lease Guaranty; and (ii) not to cancel, terminate or consent to any surrender of any Lease or any Lease Guaranty other than in accordance with the terms thereof.

4.    The falsity in any certification, representation, or warranty of Assignor in this Assignment or the default by Assignor in the observance or performance of any obligation, term, covenant, condition, or warranty herein subject to any applicable notice and cure provisions in the Loan Agreement, at Assignee's option, shall constitute an Event of Default hereunder and under the Loan Documents.

5.    This Assignment is a present and absolute assignment by Assignor to Assignee of the Leases, Rents and Lease Guaranties and not an assignment for additional security only. Provided Assignor is not in default hereunder or under any of the other Loan Documents beyond

Case ID: 230901940

any applicable notice and cure period, Assignor shall have the right under a license granted hereby to collect, but not more than one month in advance, the Rents payable under the Leases. Assignor shall receive and hold such Rents, as well as the rights and license to receive such Rents, in trust and as a trust fund, for the benefit of Assignee, to be applied, and Assignor hereby covenants and agrees that such Rents shall be so applied, first to the payment of real estate taxes and other lienable assessments, then to the cost of insurance and maintenance and repairs or other ordinary and customary expenses directly attributable to the operation of the Property, then to the satisfaction of Assignor's obligations under the Leases, and then to the payment of interest and principal and other sums becoming due under the Note, the Mortgage, or other Loan Documents before using any part of the Rents for any other purpose.

6.     Upon the occurrence and during the continuation of an Event of Default hereunder or under any of the other Loan Documents (beyond applicable notice and cure periods),  Assignee shall have the right and power to exercise and enforce any or all of the following rights and remedies, which rights shall be cumulative:

(a)     To revoke the license granted to Assignor to collect the Rents, and then thereafter, without taking possession, in Assignee's own name, to demand, collect, receive, sue for, attach and levy the Rents, to give proper receipts, releases and acquittances therefor, and after deducting all necessary, proper and reasonable costs and expenses of operation and collection, as determined by Assignee, including without limitation, reasonable attorneys' fees and all disbursements, to apply the net proceeds thereof, together with any funds of Assignor deposited with Assignee, to any indebtedness secured by this Assignment or the Loan Documents and in such order of priority as Assignee may determine in its sole and absolute discretion; the tenants shall be, and hereby are, irrevocably authorized to rely upon and act in accordance with (and shall be fully protected in so doing) any notice or demand by the Assignee for the payment to the Assignee of any Rents which may then be or thereafter become due under the Leases, or for the performance of any of the tenants' obligations under the Leases, and shall have no duty to inquire whether any default has actually occurred or is then continuing;

(b)     To declare all sums evidenced by the Note and secured by this Assignment and by the Mortgage immediately due and payable and, at its option, exercise any or all of the rights and remedies provided in any of the Loan Documents, or at law or in equity; and/or

(c)     Without regard to the adequacy of any security, and with or without any action or proceeding through any person or by agent or court-appointed receiver and irrespective of Assignor's possession, then or thereafter to: (i) enter upon, take possession of, manage and operate the Property, or any part thereof, (ii) make, modify, enforce, cancel or accept surrender of any of the Leases, (iii) remove and/or dispossess any tenant, (iv) increase or decrease the Rents, (v) decorate, clean and repair, and (vi) otherwise do any act or incur any costs or expenses as Assignee may deem proper to protect the security of this Assignment, as fully and to the same extent as Assignor could do if in possession, and in any such event to apply the Rents so collected to such costs and expenses in such order of priority as Assignee may determine in its sole and absolute discretion, including without limitation to the payment of management, brokerage and reasonable attorneys' fees, disbursements, the costs of maintenance, repair or replacement of the Property and the indebtedness secured by this Assignment or the Mortgage.

Case ID: 230901940

Provided, however, that the acceptance by Assignee of this Assignment, with all of the rights and powers created by this Assignment, shall not, prior to entry upon and taking of possession of the Property by Assignee, be deemed to constitute Assignee a mortgagee-in-possession nor thereafter or, in any event, obligate Assignee to appear in or defend any action or proceeding relating to any of the Leases or the Rents or the Property, or to take any action under this Assignment, or to expend any money or incur any expense or perform or discharge any obligation or liability under any of the Leases, or with respect to the Rents or the Property, nor shall Assignee be liable in any way for any injury or damage to person or property sustained by any person, firm, or entity in or about or relating to the Leases, the Rents on the Property, except to the extent that such damage is due to the gross negligence or willful misconduct of the Assignee or its agents with respect to matters first occurring after Assignee or its nominee has taken title to the Property by foreclosure or delivery of a deed in lieu thereof.

And provided further that the collection and application of the Rents as aforesaid and/or the taking of possession of the Property or the taking by Assignee of any other remedial action shall not cure or waive any default or waive, modify or affect any notice of default under any of the Loan Documents or invalidate any act done pursuant to such notice, and the enforcement of one or more such rights or remedies by Assignee, once exercised, shall continue until Assignor has cured the original default. If Assignee thereafter elects to discontinue the exercise of any such right or remedy, that or any other right or remedy hereunder may be reasserted at any time and from time to time following any subsequent default.

Assignor hereby constitutes and appoints Assignee its true and lawful attorney, coupled with an interest, of Assignor; so that in the name, place, and stead of Assignor, the Assignee can subordinate, or render paramount at any time and from time to time, any Leases affecting the Property or any part thereof to the lien of the Mortgage, any other deed encumbering the Property, or any ground leases of the Property, or the Loan Documents or any of them, and request or require such subordination or granting of paramount status where such option or authority was reserved to Assignor under any such Leases, or in any case where Assignor otherwise would have the right, power, or privilege so to do. This appointment is to be irrevocable and continuing, and these rights, powers, and privileges shall be exclusive in Assignee, its successors, and assigns as long as any party of the indebtedness secured hereby shall remain unpaid; Assignor hereby warrants that it has not, at any time prior to the date hereof, exercised any right to subordinate any such Lease to the Mortgage or to any other deed of trust or ground leases, or the other Loan Documents, or any of them, and further covenants not to exercise any such right.

7.      Assignor hereby agrees to indemnify, defend, and hold Assignee harmless from and against any and all liability, loss, damage and/or expense that it may or might incur by reason of this Assignment, or by reason or in defense of any claims or demands that may be asserted against Assignee arising out of any Lease including, without limitation, any and all claims by a tenant for credit for rental paid to and received by Assignor, but not delivered to Assignee, for any period more than one month in advance of the due date thereof. If Assignee incurs any such liability, loss, damage and/or expense, the amount thereof (including reasonable attorneys' fees and disbursements), together with interest thereon at the Default Rate (as defined in the Note) shall be payable by Assignor to Assignee immediately without demand, and shall be evidenced by the Note and secured hereby and by the  Mortgage and the other Loan Documents.

Case ID: 230901940

Notwithstanding the foregoing, Assignor shall not be liable for any liability, loss or damage resulting from the gross negligence or willful misconduct or Assignee or Assignee's agents or first arising after Assignee or its nominee has taken title to the Property by foreclosure or delivery of a deed in lieu thereof.

8.      All representations, warranties, covenants, conditions and agreements contained in the Loan Agreement and the other Loan Documents as same may be modified, renewed, substituted or extended are hereby made a part of this Assignment to the same extent and with the same force as if fully set forth herein.

9.      The failure of Assignee to enforce or exercise any or all of its rights under this Assignment at any time(s) shall not be construed or deemed to be a waiver of any such rights, and nothing contained in this Assignment, nor anything done or omitted to be done by Assignee pursuant to this Assignment, shall be deemed a waiver by Assignee of any of its other rights and remedies under this Assignment or under any Lease or any of the Loan Documents or at law or in equity or otherwise.  The right of Assignee to collect the indebtedness evidenced by the Note and to enforce any security or Collateral (as defined in the other Loan Documents) therefor may be exercised by Assignee, either prior to, simultaneously with, or subsequent to any action taken under this Assignment.

10.      So long as any of the indebtedness secured hereby and by the Mortgage remains outstanding, unless Assignee otherwise consents in writing, the fee estate and the leasehold interest in the Property shall not merge, notwithstanding the union of such interests either in Assignor or in any tenant or in any third party.

11.      Upon payment in full of all of the indebtedness and all other sums payable under the Note and the Mortgage, this Assignment shall become void and of no further effect, but the affidavit, certificate, letter or statement of any officer of Assignee stating that any part of said indebtedness remains unpaid shall constitute conclusive evidence of the validity, effectiveness and continuing force of this Assignment, and any person, firm or corporation may and is hereby authorized to rely thereon.  A demand on any tenant made by Assignee for payment of any Rents claimed by Assignee shall be sufficient warrant to that tenant to make future payments of the Rents to Assignee without the necessity for further consent by Assignor.

12.      All notices, demands or documents of any kind that Assignee may be required or may desire to serve upon Assignor hereunder shall be sufficiently served by delivering or mailing the same by the manner and to the address specified in the Mortgage or to such other person or address of which Assignor may give Assignee written notice from time to time.  All notices to be sent to Assignee hereunder shall be sent by the manner and to the address specified in the Mortgage or to such other person or address of which Assignee may give Assignor written notice from time to time.

13.      Assignor, upon any request by Assignee to do so, shall execute, deliver, and file or record in the proper governmental offices any instrument and take any other action that Assignee may deem necessary or desirable to create, preserve, perfect or terminate this Assignment, or to enable Assignee to exercise or enforce any of its rights hereunder, or to otherwise carry out the intent and purpose of this Assignment.

Case ID: 230901940

14.      The terms, covenants, conditions, and warranties contained herein shall inure to the benefit of Assignee, its successors and assigns, and shall bind Assignor, its successors and assigns, and all lessees, subtenants, and their respective successors, assigns and all subsequent holders of any interest in the Property.  Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Assignment shall be used interchangeably in the singular or plural form and the use of any gender shall include all genders. The words "Note" and "Mortgage" shall include any supplements to any amendments of or restatements of the Note and the Mortgage, respectively.

15.      This Assignment shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania. This Assignment is, and shall be deemed to be, a contract entered into and pursuant to the laws of the Commonwealth of Pennsylvania and shall be in all respects governed, construed, applied and enforced in accordance with the laws of said Commonwealth including those regarding statutes of limitations; no defense given or allowed by the laws of any other state or country shall be interposed in any action or proceeding hereon unless such defense is also given or allowed by the laws of said Commonwealth; and the Assignee and Assignor agree to submit to personal jurisdiction in Philadelphia County in any action or proceeding arising out of this Assignment.  Assignor and Assignee agree that the proper venue for any action or proceeding arising out of this Assignment shall be Philadelphia County or any other County, as Assignee in its sole discretion may elect.

16.      Assignor consents to the recordation of this Assignment in the office of Recorder of Deeds or other appropriate state and county offices in Philadelphia County.

17.      To the extent that any provision of this Agreement is inconsistent with any provision of a Lease, the provisions of this Agreement shall supersede and replace inconsistent provisions of a Lease relating to subordination of the Lease and the interest and estates created thereby, to the lien or charge of the Mortgage.

18.      This Assignment may be executed in one or more counterparts by some or all of the parties hereto, each of which counterparts shall be an original and all of which together shall constitute a single agreement.  The failure of any party listed below to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

19.      It is expressly agreed by Assignor and Assignee that this Assignment shall not be construed or deemed made for the benefit of any other party or parties.

20.      This Assignment of Leases and Rents is primary in nature to the obligation evidenced and secured by the Note, Mortgage, and any other Loan Documents that are incorporated by reference.  Assignor further agrees that Assignee may enforce this Assignment without first resorting to or exhausting any other security or collateral. Nothing herein contained shall prevent Assignee from suing on the Note, foreclosing the Mortgage, or exercising any other right including the rights of confession of judgment under other Loan Documents.

21.      Until the Mortgage shall have been discharged of record, Assignor shall deliver to Assignee executed copies of any and all renewals of existing leases and all future leases upon all or any part of the Premises, and will transfer and assign such Leases upon the same terms and

Case ID: 230901940

conditions as herein contained. Assignor hereby covenants and agrees to make, execute, and deliver to Assignee upon demand and at any time, any and all assignments and other records and instruments, including, but not limited to, rent rolls and books of account sufficient for the purpose, that Assignee may deem to be advisable for carrying out the purposes and intent of this Assignment.

[Remainder of Page Intentionally Left Blank]

Case ID: 230901940

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the day and year first set forth above.

**ASSIGNOR:**

**USRE 257 LLC, a Delaware limited liability company**

**By:  USRE 257 MM LLC, a Delaware limited liability company, its Manager**

By: _____
Name:  **David Daniel**
Title:   **Managing Member**

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF _Montgomery_                    SS

On this, the __11__ day of November 2020, before me, the undersigned officer, personally appeared David Daniel, who acknowledged himself to be the Managing Member of **USRE 257 MM LLC**, a Delaware limited liability company, Manager of **USRE 257 LLC**, a Delaware limited liability company, and that he as such Managing Member being authorized to do so, executed the foregoing instrument for the purposes therein contained, by signing the name of the limited liability company, by himself as Managing Member.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public

My Commission Expires: _02/07/2022_

Commonwealth of Pennsylvania - Notary Seal
Eric Freundlich, Notary Public
Montgomery County
My commission expires February 7, 2022
Commission number 1281551
Member, Pennsylvania Association of Notaries

Assignment of Leases and Rents

Case ID: 230901940

**EXHIBIT A**
**<u>Legal Description of the Property</u>**

Case ID: 230901940



| **Loan Policy of Title Insurance** | | |
| --- | --- | --- |
| ISSUED BY | | |
| **First American Title Insurance Company** | | |

| **Schedule A (Cont.)** | POLICY NUMBER **PROFORMA** |
| --- | --- |

File No. **PAFA20-4578 M/K**

### LEGAL DESCRIPTION

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected, situate in the 8th Ward of the City of Philadelphia and County of Philadelphia, Commonwealth of Pennsylvania and described according to a Plan and Survey thereof, made by William H.H. Ogden, Jr., Surveyor and Regulator of the 3rd District on the 11th day of March A.D., 1942 and re-checked by Ben H. Joseph, present Surveyor and Regulator of the 3rd District on the 27th day of August A.D., 1951 and re-checked by Thomas J, Johnston, Surveyor and Regulator of the 3rd District on the 14th day of November A.D., 1972, as follows:

BEGINNING at the intersection of the Northerly side of Spruce Street (58 feet wide) and the Easterly side of 16th Street; thence (1) North along the Easterly side of 16th Street and crossing a certain 3 feet wide alley 86 feet; thence (2) East and parallel with Spruce Street and running along the Northerly side of said 3 feet wide alley 44 feet to a point its extended line of a wall between these premises and the premises adjoining to the East known as 1531 Spruce Street; thence (3) South parallel with 16th Street and crossing the head of the aforesaid 3 feet wide alley and running through said wall and its extension thereof 86 feet to the Northerly side of Spruce Street; and thence (4) West along the Northerly side of Spruce Street 44 feet to the Easterly side of 16th Street and place of beginning.

BEING known as No. 257 South 16th Street.

BEING Parcel #88-1-0315-00.

TOGETHER with the free and common use, right, liberty and privilege of the aforesaid 3 feet wide alley, which extends across the Northernmost 3 feet of the above described premises into 16th Street in common with the owners, tenants and occupiers of the premises adjoining to the East.

Case ID: 230901940

**Exhibit E**

Case ID: 230901940

# BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

### A PROFESSIONAL LIMITED LIABILITY COMPANY
### ATTORNEYS AND COUNSELORS

333 W. Fort Street
Suite 1200
Detroit, Michigan 48226
WWW.BSDD.COM
(313) 965-9725

Fax (313) 965-2493

C. David Bargamian

DIRECT DIAL: (313) 596-9328
E-MAIL: dbargamian@bsdd.com

June 27, 2023

### Via UPS Next Day Air

USRE 257 LLC
45 E. City Avenue, Unit 383
Bala Cynwyd, Pennsylvania 19004

Attention: David Daniel

David Daniel
45 E. City Avenue, Unit 383
Bala Cynwyd, Pennsylvania 19004

David Schreiber
Ruth 3/9
Jerusalem, Israel 9310105

Re:    Citizens Bank, N.A., successor by merger to Investors Bank ("Lender")
$14,000,000.00 Mortgage Loan (the "Loan") to between USRE 257 LLC, (the
"Borrower") guaranteed by David Daniel and David Schreiber (the
"Guarantors" and singularly, a "Guarantor")

Dear Gentlemen:

We write on behalf of our client, the Lender, with regard to the above-referenced
Loan and in furtherance of our letter to you dated May 8, 2023 (the "Default Letter").
Capitalized terms used in this letter, but not defined in this letter, shall have the meaning
ascribed to them in the Loan Agreement dated November 30, 2020 (the "Loan Agreement")
entered into between the Borrower and the Lender.

The Defaults described in the Default Letter are continuing and have not been cured
by the Borrower and Guarantors, including, but not limited to, that the Initial Maturity Date
has passed and the Loan was not repaid in full in accordance with the Loan Documents.
Reference to aforesaid Defaults shall not be construed as waiving any other defaults that may
exist under the terms and conditions of the Loan Documents.

As a result of the Defaults, the Lender has elected to invoke the Default Rate of Interest
as of the Initial Maturity Date. Furthermore, the Lender demands payment of the outstanding

627682.docx

Case ID: 230901940

**BARRIS, SOTT, DENN & DRIKER,** P.L.L.C.

USRE 257 LLC, et. al
June 27, 2023
Page 2

principal, accrued and unpaid interest, and all other late fees, costs and expenses due Lender in respect of the Loan which Ten Million Five Hundred Nine Thousand Two Hundred Thirty-One and 01/100 ($10,509,231.01) Dollars as of June 22, 2023, detailed as follows:

| | |
|---|---|
| Outstanding Principal | $9,583,461.76 |
| Accrued and Unpaid Interest | $574,275.26 |
| Accrued and Unpaid Default Interest | $310,131.47 |
| Accrued and Unpaid Late Charges | $32,780.10 |
| Out of Pocket Expenses | $8,582.42 |
| **Total Due and Owing** | **$10,509,231.01** |

Interest will continue to accrue on the outstanding balance at the rate of Three Thousand Five Hundred Twenty-Seven and 25/100 ($3,527.25) Dollars per day for each day after June 22, 2023 that the Loan is not paid. Late fees, costs and expenses, including additional attorneys' fees, will also continue to accrue.

As a result of the Defaults, the Lender is entitled to, and reserves its rights to, pursue its other rights and other remedies available to it under the terms of the Loan Documents, at law or in equity to protect its interests, as determined by the Lender in its sole discretion. Neither the Lender's enforcement of any particular right it may have under the Loan Documents, at law, or in equity, nor the timing of its enforcement of any particular right it may have under the Loan Documents at law or in equity, shall be construed or considered as a waiver by the Lender of any of the other rights or remedies it may possess under the Loan Documents, at law, or in equity, or an election of remedies. All of the rights and remedies available to the Lender under the Loan Documents, at law or in equity shall be cumulative and may be exercised separately, successively or concurrently at the sole discretion of the Lender. Accordingly, the Lender shall be free to invoke or pursue any right or remedy available to it at any time, including any time after having previously invoked a right or remedy available to it.

Nothing contained in this letter or in any other communication between the Lender and the Borrower or any Guarantor shall be deemed to constitute or shall be construed as: (a) a waiver or release of any of the Lender's rights or remedies against the Borrower or any person that is a party to the Loan Documents or pursuant to applicable law, (b) a course of dealing obligating the Lender to provide any accommodations, financial or otherwise, to the Borrower or an Guarantor at any time, (c) a commitment or an agreement to make a commitment with respect to any possible restructure of the terms provided in the Loan Documents, or (d) having terminated, extinguished or discharged all or any portion of the indebtedness due to the Lender under the Loan Documents. Nothing contained in this letter shall confer on the Borrower or any other person or entity any right to other or further notice or cure periods with respect to the existing Defaults. The Lender hereby expressly reserves

Case ID: 230901940

**BARRIS, SOTT, DENN & DRIKER,** P.L.L.C.

USRE 257 LLC, et. al
June 27, 2023
Page 3

and preserves all of the rights and remedies it possesses under the Loan Documents and applicable law.

Please contact Joseph Gargiulo of the Lender at (973) 924-5447 to advise the Lender when the Borrower and Guarantors will pay the Loan.

Govern your actions accordingly.

Sincerely,

BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

By:

C. David Bargamian

CDB/kg

cc:   Joseph Gargiulo (via e-mail)
      Gavin A. Taylor (via e-mail)
      Peter Soloff, Esq. (via e-mail)

627682.docx

**STRADLEY RONON STEVENS & YOUNG LLP**
Gretchen M. Santamour, Esq. (41720)
Julie M. Murphy, Esq. (206265)
Daniel M. Pereira, Esq. (318674)
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Tel. (856) 321.3409
Fax. (856) 321.2415                         Attorneys for Plaintiff, Citizens Bank, N.A.,

| | | |
|---|---|---|
| CITIZENS BANK, N.A., successor by merger to Investors Bank | : : : | PHILADELPHIA COUNTY COURT OF COMMON PLEAS |
| Plaintiff, | : : | Court Term  September, 2023 |
| v. | : : | No. 01940 |
| USRE 257 LLC, | : : | |
| Defendant. | : : : | |

### NOTICE PURSUANT TO PA.R.C.P. 2958.1
### OF JUDGMENT AND EXECUTION THEREON

TO:        USRE 257 LLC                          USRE 257 LLC
           2711 Centerville Road, Suite 400      c/o Corporation Service Company
           Wilmington, DE 19808                  251 Little Falls Drive
                                                 Wilmington, DE 19808


           USRE 257 LLC
           45 City Avenue, Unit 3838
           Bala Cynwyd, PA 19004

*Via Personal Service and Certified Mail, Return Receipt Requested*

A judgment in the amount of **$12,455,556.90**, together with all interest from and after September 18, 2023 at a per diem rates set forth in the within Judgment by Confession, and all additional costs of suit and collection costs, including without limitation, reasonable attorneys' fees accrued and accruing hereafter, has been entered against you and in favor of Citizens Bank, N.A. without any prior notice or hearing based on a confession of judgment contained in a written agreement or other paper allegedly signed by you. The sheriff may take your money or other property to pay the judgment at any time after thirty (30) days after the date on which this notice is served on you.

You may have legal rights to defeat the judgment or to prevent your money or property from being taken. **YOU MUST FILE A PETITION SEEKING RELIEF FROM THE**

5463885v.1

**JUDGMENT AND PRESENT IT TO A JUDGE WITHIN THIRTY (30) DAYS AFTER THE DATE ON WHICH THIS NOTICE IS SERVED ON YOU OR YOU MAY LOSE YOUR RIGHTS.**

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**

**IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.**

Philadelphia Bar Association Lawyer Referral
and Information Service
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197

Date: September 21, 2023          STRADLEY RONON STEVENS & YOUNG LLP

/s/ *Julie M. Murphy*
Gretchen M. Santamour, Esq.
Julie M. Murphy, Esq. (206265)
Daniel M. Pereira, Esq. (318674)
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Tel. (856) 321.2409
Fax (856) 321.2415
gsantamour@stradley.com
jmmurphy@stradley.com
dpereira@stradley.com

*Attorneys for Citizens Bank, N.A., successor by merger to Investors Bank*

5463885v.1